UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA


-against-                                              S1 10 CR 60 (RJD)


MOHAMMED ZAZI
-------------------------------------------------------x




**AMENDED MEMORANDUM OF LAW IN SUPPORT OF
MOHAMMED ZAZI'S PRETRIAL MOTIONS**








Deborah A. Colson, Esq.
Justine A. Harris, Esq.
COLSON & HARRIS LLP
10 E. 40th Street, Suite 3307
New York, New York 10016
(212) 257-6455

*Attorneys for Mohammed Wali Zazi*



Dated:   New York, New York
         March 18, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

ARGUMENT ................................................................................................................... 12

I.      COUNTS ONE, FOUR, SIX, SEVEN AND EIGHT SHOULD BE DISMISSED
        FOR LACK OF VENUE ..................................................................................... 12

        A.  Legal Framework ....................................................................................... 14

        B.  Count Four Should be Dismissed for Lack of Venue ................................. 16

        C.  Counts Six and Eight Should be Dismissed for Lack of Venue ................ 18

        D.  Count Seven Should be Dismissed for Lack of Venue .............................. 20

        E.  Count One Should be Dismissed for Lack of Venue ................................. 21

II.     THE INDICTMENT IS MULTIPLICITOUS AND THE GOVERNMENT
        SHOULD BE REQUIRED TO DISMISS THE DUPLICATIVE CHARGES ............... 22

        A.  Counts Two and Four Are Multiplicitous ................................................. 24

        B.  Count Five Impermissibly Charges the Same Crime as Counts Six and Eight ......... 30

III.    MR. ZAZI'S STATEMENS SHOULD BE SUPPRESSED AS INVOLUNTARY ......... 32

        A.  Mr. Zazi's Statements on September 16, 2009 Were Involuntary .............. 34

        B.  Mr. Zazi's Statements on September 18, 2009 Were Involuntary .............. 37

IV.     THE PHYSICAL EVIDENCE SEIZED FROM THE ZAZI RESIDENCE ON
        SEPTEMBER 16, 2010 SHOULD BE SUPPRESSED AND AN EVIDENTIARY
        HEARING HELD BECAUSE THE SEARCH EXCEEDED THE SCOPE OF
        THE WARRANT ................................................................................................ 38

V.      THE ADDITIONAL PHYSICAL EVIDENCE SEIZED FROM MR. ZAZI AND
        HIS HOME SHOULD BE SUPPRESSED BECAUSE AGENTS DID NOT
        HAVE A WARRANT AND THE PROPERTY WAS NOT PROVIDED ON
        CONSENT ........................................................................................................ 43

        A.      Mr. Zazi Did Not Voluntarily Consent to the Search and Seizure of his
                Cell Phone on September 16, 2009 ....................................................... 44

B.    Mr. Zazi Did Not Voluntarily Consent to the Seizure of a Cooler from his Apartment on September 17, 2009 ........................................................................45

C.    Sultan Bibi Zazi Did Not Voluntarily Consent to the Seizure of Backpacks from the Zazi Residence on February 1, 2010 ......................................................46

VI.   THE GOVERNMENT SHOULD BE COMPELLED TO PROVIDE A BILL OF PARTICULARS AND ADDITIONAL ITEMS OF DISCOVERY .................................48

A.    The Government Should Provide A Bill of Particulars .........................................49

B.    The Government Should Produce Additional Discovery ......................................50

CONCLUSION ................................................................................................................................54

## TABLE OF AUTHORITIES

**Cases**

*Andresen v. Maryland,* 427 U.S. 463 (1976) .............................................................. 42

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)................................. 25, 26

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ......... 39

*Blockburger v. United States*, 284 U.S. 299 (1932)...................................................... passim

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................... 48, 50, 51, 52

*Brown v. Mississippi,* 297 U.S. 278 (1936) .......................................................... 32

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ................................................. 38

*Dickerson v. United States*, 530 U.S. 428 (2000) ...................................................... 33

*Groh v. Ramirez,* 540 U.S. 551 (2004) ................................................................... 39

*Illinois v. Rodriguez*, 497 U.S. 177 (1990) ............................................................... 44

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177 (2d Cir. 2008)........ 33, 35

*Jackson v. Denno,* 378 U.S. 368 (1964) ................................................................... 34

*Katz v. United States,* 389 U.S. 347 (1967) ........................................................ 38, 43

*Lynumm v. Illinois,* 372 U.S. 528 (1963)................................................................. 33

*Miranda v. Arizona,* 384 U.S. 436 (1966) ........................................................... passim

*Oregon v. Elstad,* 470 U.S. 298 (1985).......................................................... 32, 33, 34

*Parsad v. Greiner,* 337 F.3d 175 (2d Cir. 2003)....................................................... 33

*Quartararo v. Mantello,* 715 F. Supp. 449 (1989)..................................................... 37

*Schneckloth v. Bustamonte,* 412 U.S. 218 (1973)............................................... 33, 43, 44

*Smith v. Maryland,* 442 U.S. 735 (1979) ................................................................ 38

*Tankleff v. Senkowski,* 135 F.3d 235 (2d Cir. 1998)............................................. 32, 36

*United States ex rel. Negron v. State of New York*, 434 F.2d 386 (2d Cir. 1970)........................ 36

*United States v. Aguilar*, 515 U.S. 593 (1995) ..................................... 25, 26, 30, 31

*United States v. Amaro,* 229 F.3d 801 (9th Cir. 2000) .................................................. 33

*United States v. Anderson,* 929 F.2d 96 (2d Cir. 1991) ........................................... 34, 37

*United States v. Artis,* No. 10-CR-15, 2010 WL 3767723 (D. Vt. Sept. 16, 2010)..................... 35

*United States v. Basciano,* 599 F.3d 184 (2d Cir. 2010) ............................................. 27

*United States v. Bellomo,* 263 F. Supp. 2d 561 (E.D.N.Y. 2003)..................................... 15

*United States v. Ben Zvi,* 168 F.3d 49 (2d Cir. 1999) ......................................... 23, 26, 27

*United States v. Bin Laden,* 146 F. Supp. 2d 373 (S.D.N.Y. 2001)........................................ 18, 19

*United States v. Bortnovsky,* 820 F.2d 572 (2d Cir. 1987) .................................................. 48, 49

*United States v. Bronson,* No. 05-CR-714, 2007 WL 2455138 (E.D.N.Y. Aug. 23, 2007)......... 15

*United States v. Busic,* 549 F.2d 252 (2d Cir. 1977) ................................................... 13

*United States v. Butler,* 351 F. Supp. 2d 121 (S.D.N.Y. 2004) .................................... 28

*United States v. Chacko,* 169 F.3d 140 (2d Cir. 1999) ................................................... 23

*United States v. Chisholm,* No. 07-CR-795, 2009 WL 29313 (E.D.N.Y. Jan. 2009)................... 43

*United States v. Cohan,* 628 F. Supp. 2d 355 (E.D.N.Y. June 24, 2009) ................................... 39

*United States v. Como,* 340 F.2d 891 (2d Cir. 1965)................................................... 43

*United States v. Davidoff,* 845 F.2d 1151 (2d Cir. 1988) ...................................... 48, 49

*United States v. Davis,* 967 F.2d 84 (2d Cir. 1992)................................................... 44

*United States v. Fakih,* No. 06-CR-5219, 2008 U.S. App. Lexis 3131 (2d Cir. Feb. 13, 2008) .................................................................................................... 17

*United States v. Gabriel,* 125 F.3d 89 (2d Cir. 1997)................................................... 25

*United States v. Garcia,* 339 F.3d 116 (2d Cir. 2003) ................................................... 47

*United States v. Genao,* 343 F.3d 578 (2d Cir. 2003)................................................... 31

*United States v. Hayes,* No. 09-CR-397, 2010 WL 2696894 (M.D. Pa. July 7, 2010) ............... 26

*United States v. Hill,* 459 F.3d 966 (9th Cir. 2006) ................................................... 39

*United States v. Holmes,* 44 F.3d 1150 (2d Cir. 1995) ................................................... 23

*United States v. Isiofia,* 370 F.3d 226 (2d Cir. 2004) .......................................... 45, 47

*United States v. Jahedi*, 681 F. Supp. 2d 430 (S.D.N.Y. 2009).................................. 23, 24, 29, 30

*United States v. Johnson*, 171 F.3d 139 (2d Cir. 1999) ............................................. 53

*United States v. Johnson*, 323 U.S. 273 (1944) ........................................................ 13

*United States v. Mahaffy,* No. 05-CR-613, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006) .......... 19

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)............................... 23

*United States v. Matias,* 836 F.2d 744 (2d Cir. 1988) ........................................... 39, 42

*United States v. Matlock*, 415 U.S. 164 (1974) ...................................................... 44

*United States v. Medlin,* 798 F.2d 407 (10th Cir. 1986)........................................... 42

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ............................... 48

*United States v. Nakashian,* 820 F.2d 549 (2d. Cir. 1987) ......................................... 23

*United States v. Novak,* 443 F.3d 150 (2d Cir. 2006) ................................................ 15

*United States v. O'Brien,* 498 F. Supp. 2d 520 (N.D.N.Y. 2007)................................. 43

*United States v. Ortiz*, 220 Fed. Appx. 13 (2d Cir. 2007) ..................................... 24, 25

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) ............................................... 25

*United States v. Price,* 599 F.2d 494 (2d Cir. 1979)......................................... 43, 44, 47

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ....................................... 24

*United States v. Ramirez,* 420 F.3d 134 (2d Cir. 2005)...................................... passim

*United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) ........................................... 25

*United States v. Reed*, 639 F.2d 896 (2d Cir. 1981) ............................................... 23

*United States v. Reed,* 773 F.2d 477 (2d Cir. 1985) ............................................... 19

*United States v. Reich*, 479 F.3d 179 (2d Cir. 2007) ......................................... 24, 25

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)........................................ 50

*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999) ....................................... 14

*United States v. Russell*, 639 F. Supp. 2d 226 (D. Conn. 2007)............................ 25, 26

*United States v. Saavedra,* 223 F.3d 85 (2d Cir. 2000) ..................................... 14, 15, 21

*United States v. Sanders*, 211 F.3d 711 (2d Cir. 2000) .................................................. 52, 53

*United States v. Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004)....................................... 53

*United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002)............................................ 30, 31

*United States v. Shi Tan Liu*, 239 F.3d 138 (2d Cir. 2000)...................................... 38, 42

*United States v. Shi,* 525 F.3d 709 (9th Cir. 2008) ............................................... 33, 35

*United States v. Singh,* No. 02-CR-1138, 2003 WL 145222 (E.D.N.Y. Jan. 8, 2003) .......... 46, 47

*United States v. Stephenson,* 895 F.2d 867 (2d Cir. 1990) ........................................ 15

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ............................................. 31

*United States v. Towne,* 997 F.2d 537 (9th Cir. 1993) ............................................. 39

*United States v. Waker,* 534 F.3d 168 (2d Cir. 2008) .............................................. 39

*Whalen v. United States*, 445 U.S. 684 (1980) ...................................................... 26

*Wong Sun v. United States*, 371 U.S. 471 (1963) .................................................... 45

**Statutes**

18 U.S.C. § 1001...................................................................................... passim

18 U.S.C. § 1001(a)(2)................................................................... 18, 19, 31, 50

18 U.S.C. § 1503...................................................................................... passim

18 U.S.C. § 1503(a) ................................................................................... 16

18 U.S.C. § 1512..................................................................................... 25, 26

18 U.S.C. § 1512(b).................................................................................. 25, 29

18 U.S.C. § 1512(b)(3) ................................................................................ 17

18 U.S.C. § 1512(c) .................................................................................... 29

18 U.S.C. § 1512(c)(1)............................................................................ passim

18 U.S.C. § 1512(c)(2).............................................................................. 24, 25

18 U.S.C. § 1512(f).................................................................................... 25

18 U.S.C. § 1512(i)................................................................................. 14, 17

18 U.S.C. § 1512(k) ............................................................................................ 21

18 U.S.C. § 1515(a)(1) ...................................................................................... 25

18 U.S.C. § 1515(a)(1)(A), (C) ......................................................................... 25

18 U.S.C. § 1519 ........................................................................................ passim

18 U.S.C. § 1541(a) ........................................................................................... 20

18 U.S.C. § 1546(a) ........................................................................................... 19

18 U.S.C. § 1623 ................................................................................................ 28

18 U.S.C. § 3237(a) ........................................................................................... 14

18 U.S.C. § 3501(a) ........................................................................................... 34

18 U.S.C. § 3501(b) ........................................................................................... 33

Sarbanes-Oxley Act of 2002, Pub L. No. 107-204, 116 Stat. 745 (2002) ...................... 29

**Constitutional Provisions**

U.S. Const. amend. IV ....................................................................................... 38

U.S. Const. amend. V ......................................................................................... 23

U.S. Const. amend. VI ....................................................................................... 14

U.S. Const. art. III, § 2, cl. 3 ............................................................................ 14

**Rules**

Fed. R. Crim. P. 16 ...................................................................................... 48, 50

Fed. R. Crim. P. 16(a)(1)(A) ............................................................................. 50

Fed. R. Crim. P. 16(a)(1)(E)(i) .......................................................................... 51

Fed. R. Crim. P. 18. .......................................................................................... 14

Fed. R. Crim. P. 7(f) .......................................................................................... 48

**Other Authorities**

148 Cong. Rec. S6542, S6545, S6550 (daily ed. July 10, 2002) ................................ 29

A.G. Sulzberger & William K. Rashbaum, *Guilty Plea Made in Plot to Bomb New York Subway*, N.Y. Times, Feb. 22, 2010 ............................................................... 5

Bibi Aff. ............................................................................................................ 11

Carrie Johnson & Spencer S. Hsu, *N.Y. Terror Plea as Validation of Court Strategy*,
  Wash. Post, Feb. 23, 2010 .......................................................................... 5

Colson Aff. .................................................................................................. passim

Colson Aff. Ex. A. ............................................................................................ 4

Colson Aff. Ex. B. ............................................................................................ 4

Colson Aff. Ex. C. ............................................................................................ 5

Colson Aff. Ex. D. ...................................................................................... passim

Colson Aff. Ex. E. ........................................................................................ 8, 51

Colson Aff. Ex. F. ............................................................................................ 8

Colson Aff. Ex. G. ............................................................................................ 8

Colson Aff. Ex. H. ........................................................................................ 9, 11

Colson Aff. Ex. I. ............................................................................................ 11

Colson Aff. Ex. J. ............................................................................................ 11

Letter from Deborah Colson to Andrew Goldsmith (Jan. 14, 2011) .......................... 50

S. Rep. No. 107-146 (2002) ................................................................................ 29

Zazi Aff. ...................................................................................................... passim

PRELIMINARY STATEMENT

Mohammed Zazi respectfully submits this memorandum of law in support of his pretrial motions for discovery, dismissal of counts, and suppression of statements and physical evidence.

Mr. Zazi is charged in an eight-count indictment alleging obstruction of justice, witness tampering, visa fraud, and false statements.  He was first arrested in connection with these offenses on September 19, 2009, at his home in Aurora, Colorado.  His son, Najibullah Zazi was arrested the same day and subsequently pled guilty to participating in an al Qaeda plot to detonate explosives in New York City.  Mr. Zazi is not accused of assisting Najibullah or even knowing in advance about his plot.  Rather, the government alleges that, after Najibullah abandoned his plans, Mr. Zazi conspired to destroy physical evidence, lied to FBI agents, and encouraged family members to lie to a federal grand jury in New York.

Thus far, Mr. Zazi's case has proceeded in three stages.  Following his arrest on September 19, 2009, Mr. Zazi was charged in a single-count indictment in the District of Colorado with making materially false statements to the FBI.  In February 2010, however, the Colorado case was dismissed, and Mr. Zazi was re-arrested and transferred in custody to the Eastern District of New York, where he was charged with conspiracy to obstruct justice for his alleged assistance in destroying physical evidence.  Less than two weeks later, Najibullah pled guilty in the Eastern District pursuant to a cooperation agreement with the government.  In November 2010, after Mr. Zazi turned down his own plea offer from the government, prosecutors filed an eight-count superseding indictment against him, adding three additional counts of obstruction of justice, two counts of false statements, witness tampering, and visa fraud.

In Point I, we move to dismiss Counts One, Four, Six, Seven and Eight of the Superseding Indictment for lack of venue.  The obstruction alleged in Count Four took place in Colorado; the false statements alleged in Counts Six and Eight were also made in Colorado; and the visa fraud alleged in Count Seven occurred in Manhattan.  Since none of these offenses was begun, continued, or completed in the Eastern District of New York, and since prosecution in this district comes at great cost to Mr. Zazi, these Counts should be dismissed.  Although venue is proper as to the conspiracy charged in Count One, this count must also be dismissed because, in a conspiracy case, venue lies in the district where all counts, including the substantive counts, may be tried.

In Point II, we demonstrate that several counts in the indictment are multiplicitous, and the government should elect which charges to try.  Counts Two and Four impermissibly charge twice the same acts of evidence destruction.  Similarly, Count Five duplicates the false statements charges in Counts Six and Eight.  Because multiplicitous indictments raise Double Jeopardy concerns, the government should dismiss the duplicative charges.

In Point III, we move to suppress statements taken during interrogations of Mr. Zazi on September 16 and September 18, 2009.  Mr. Zazi did not participate in the interrogations knowingly and voluntarily.  Though he repeatedly told the agents his English was flawed, they did not provide an interpreter, nor did they make any significant efforts to locate one.  In addition, on the first day of interrogation, they did not even bother to notify attorneys Arthur Folsom and Armstrong Graham that they intended to interrogate Mr. Zazi.

In Point IV, we move to suppress physical evidence taken from Mr. Zazi's residence on September 16, 2009.  Agents conducted the search pursuant to a warrant signed in this district by

Magistrate Judge Gold, but the warrant was facially defective, and the scope of the search exceeded its terms. Multiple items outside the permissible bounds of the warrant were seized.

In Point V, we move to suppress additional physical evidence taken from Mr. Zazi's home and person on September 16 and 17, 2009, and February 1, 2010. Mr. Zazi did not voluntarily consent to the search and seizure of his cell phone on September 16, 2009 or to the seizure of a cooler from his home the next day. Nor did Mr. Zazi's wife, Sultan Bibi Zazi voluntarily consent to the seizure of backpacks from their home on February 1, 2010.

In Point VI, we move for a bill of particulars and additional discovery of evidence. In particular, we request any evidence potentially undermining the government's theory that Mr. Zazi's alleged false statements were capable of influencing the FBI investigation. We also seek production of documents bearing on the government's charging decisions as they relate to a potential claim of vindictive prosecution.

## STATEMENT OF FACTS

Procedural History

In early September 2009, the FBI initiated an investigation against Najibullah Zazi and others for participation in a terrorist plot to detonate explosives in New York City. *See* Colson Aff. ¶ 3. Agents followed Najibullah from Denver, Colorado to New York City on September 9, 2009; searched his car and seized and searched his computer on September 10, 2009; tracked his every movement in New York City on September 10 and September 11, 2009; and recorded his calls with family members and others beginning on or before September 11, 2009. *See id.*

The government admits that Mr. Zazi knew nothing about Najibullah's involvement in terrorist activities, or the FBI's investigation of Najibullah, before his son traveled to New York on September 9, 2009. *See* Colson Aff. ¶ 4. According to prosecutors, Mr. Zazi learned that the

FBI had taken an interest in his son on September 11, 2009, when he had phone conversations with Najibullah and Ahmed Afzali Wais, an Imam in New York. *See id.* Those phone conversations were recorded, and the government seeks to introduce them at trial.

While in New York on September 9-11, 2009, Najibullah stayed in Queens with a friend named Naiz Khan. *See* Colson Aff. ¶ 5. He returned to his parents' home in Aurora, Colorado on September 12, 2009. *See id.*

The government alleges that Mr. Zazi participated in a conspiracy to destroy evidence linked to Najibullah on September 15, 2009. *See* Colson Aff. ¶ 6. Mr. Zazi is not accused of destroying the evidence himself, but of enlisting the assistance of various family members, including his wife Sultan Bibi, daughter Murawi, and nephew Amanullah.[1] *See id.* According to prosecutors, Najibullah stored masks, glasses, containers and liquid chemicals at the home of his aunt and uncle, Naqib and Rabia Jaji. *See id.* On September 15, 2009, Mr. Zazi's wife, daughter and nephew allegedly traveled to the Jaji home where they poured chemicals down the drain and cut up masks and other materials. *See id.* Other relatives are also alleged to have participated, but Mr. Zazi was not present. *See id.*

On September 19, 2009, Mr. Zazi was arrested and charged with making false statements to the FBI. *See* Colson Aff. Ex. A. His son, Najibullah, was arrested the same day and also charged with making false statements. *See* Colson Aff. ¶ 7.

On September 23, 2009, a federal grand jury in the Eastern District of New York returned a one-count indictment against Najibullah, alleging his participation in a conspiracy to use weapons of mass destruction. *See* Colson Aff. ¶ 8. Mr. Zazi was indicted in the District of Colorado on the false statements charge on October 8, 2009. *See* Colson Aff. Ex. B.

---

[1]In referring to Amanullah as Mr. Zazi's nephew, we do not concede there was no adoption.

On February 1, 2010, while on pre-trial release in Colorado, Mr. Zazi was arrested again and charged in this district with a single count of conspiracy to obstruct justice.  *See* Colson Aff. Ex. C.  His Colorado case was dismissed, and he was transported in custody to Brooklyn.

Mr. Zazi was arraigned on the new indictment in this courthouse on February 9, 2010, and released on a $50,000 secured bond on February 17, 2009.  *See* Colson Aff. ¶ 11.  Just five days later, on February 22, 2011, his son, Najibullah, pled guilty to three major terrorism offenses, pursuant to a cooperation agreement with the government.[2]  *See id.*  Najibullah's guilty plea was hailed as an enormous victory for the government and one that gave the Obama administration a new argument in its battle with Republicans over the handling of terrorism trials in civilian courts.  *See id.* ¶ 12.  Speaking on the condition of anonymity, law enforcement sources told the Washington Post that Najibullah Zazi "began to accelerate his cooperation after authorities charged his Afghan-born father with crimes and threatened to charge his mother with immigration offenses—options that are not available in the military justice system."  Carrie Johnson & Spencer S. Hsu, *N.Y. Terror Plea as Validation of Court Strategy*, Wash. Post, Feb. 23, 2010, at A01.  *See also* A.G. Sulzberger & William K. Rashbaum, *Guilty Plea Made in Plot to Bomb New York Subway*, N.Y. Times, Feb. 22, 2010 ("There have been a number of additional arrests in the case, including his father, his uncle and two of his classmates at Flushing High School.  Mr. Zazi agreed to cooperate in part out of concern that a widening inquiry would result in more charges against his family members, including his mother, said one person involved in the case.").

---

[2]Najibullah Zazi pled guilty to a three-count indictment, charging conspiracy to use weapons of mass destruction, conspiracy to commit murder in a foreign country, and providing material support to a foreign terrorist organization.

Several months later, the government made Mr. Zazi his own plea offer. *See* Colson Aff. ¶ 13. Mr. Zazi considered the offer and turned it down. *See id.* On November 29, 2010, after Mr. Zazi made clear his intention to proceed to trial, the government filed an eight-count superseding indictment against him, charging three additional counts of obstruction of justice, two counts of false statements, witness tampering and visa fraud. *See* Colson Aff. Ex. D.

The Interrogations on September 16 and September 18, 2009

Mr. Zazi and Najibullah were each interrogated by the FBI for the first time on September 16, 2009. The interrogations took place at the FBI offices in downtown Denver. *See* Colson Aff. ¶ 15. Mr. Zazi drove Najibullah to the offices, where they met up with lawyers Arthur Folsom and Armstrong Graham. *See* Zazi Aff. ¶ 5. Mr. Zazi accompanied his son to the FBI to provide him with moral support. His plan was to rest in the waiting area while Najibullah and the lawyers went inside for an interview. *See id.* He was fasting for Ramadan, and he was tired, hungry and nervous. *See id.* ¶ 6. He had no idea FBI agents also intended to interrogate him.

While Mr. Zazi was sitting in the waiting area, FBI Special Agent John Gedney approached and began speaking to him. *See* Zazi Aff. ¶ 7. Mr. Zazi immediately told Agent Gedney he did not speak English well and needed an interpreter. *See id.* Agent Gedney said there was no need for an interpreter because he was not going to question Mr. Zazi but simply keep him company while he waited for his son. *See id.* Based on a review of discovery, Agent Gedney did not notify Mr. Zazi of his right to silence. *See* Colson Aff. ¶ 16.

Mr. Zazi's native language is Pashto. He immigrated to the United States in 1990 with a seventh grade education. *See* Zazi Aff. ¶¶ 1-2. At the time, he spoke no English at all. *See id.* ¶ 2. To this day, his English is heavily accented, his grammar and sentence structure are flawed,

6

and his vocabulary and comprehension are mediocre. *See* Colson Aff. ¶ 17. Native English speakers often have trouble understanding him, and he has trouble understanding them. *See id.* He can read some English, but does not understand large portions of what he reads. He can write the English alphabet, but his spelling is poor. *See* Zazi Aff. ¶ 4. He associates mainly with other Afghans, and he communicates with his family and friends in Pashto. *See id.* ¶ 3.

Without notifying Mr. Zazi of his right to silence, Agent Gedney began asking him questions about his family members and his life in Afghanistan and Colorado. *See* Zazi Aff. ¶ 7. Mr. Zazi answered the questions because he did not know he had the right to refuse. *See id.*

After some time, FBI Special Agent Mike Copeland and Colorado Police Officer John Nagengast appeared and told Mr. Zazi they wanted to speak further. *See* Zazi Aff. ¶ 8. They took him to a small interview room in "secured FBI space," along the same hallway where Najibullah was being interrogated. *See* Colson Aff. ¶ 18; Zazi Aff. ¶ 8. Though they were only several feet away from Najibullah's interview room, the agents neglected to notify lawyers Folsom and Graham that they intended to interrogate Najibullah's father. *See* Zazi Aff. ¶ 10.

Upon sitting down, Mr. Zazi repeated that he did not speak English well and needed an interpreter. *See* Zazi Aff. ¶ 9. The agents did not make any efforts to locate an interpreter. Instead, they told Mr. Zazi they would ask him simple questions. Mr. Zazi agreed to speak with the agents, and to do so without an interpreter, because he did not understand he had the right to refuse. *See* Zazi Aff. ¶ 11.

According to the government, the interrogation began at approximately 4 pm, *see* Colson Aff. ¶ 19, eleven or twelve hours after Mr. Zazi had begun his fast at sunrise that morning. As the agents interrogated him, Mr. Zazi grew increasingly thirsty, hungry and tired. At some point, Najibullah's lawyer, Arthur Folsom got wind of the interrogation. *See id.* He left Najibullah

7

with his partner Armstrong Graham, entered Mr. Zazi's interrogation room, and declared the interview over.  *See id.*  Mr. Zazi was relieved.

While still at the FBI offices later that evening, an agent asked for consent to search Najibullah's phone.  Based on the transcript of the FBI's interview with Najibullah, it appears that either Najibullah or Mr. Folsom retrieved two phones from an FBI locker—one of which belonged to his Mr. Zazi—and handed them both to the agent.  *See* Colson Aff. Ex. E.  There is nothing in the transcript to suggest that the agents asked Mr. Zazi for permission to handle his phone or for consent to search the phone.  *See id.*  The agent who took the phones remarked that one of the phones was "old" and asked who it belonged to.  Mr. Zazi said: "This mine."  *See id.*  The agent then said: "Against the rules here, we're going to turn this on.  Just don't tell anybody that we turned this on."  *See id.*  The agent turned on the phone and asked Mr. Zazi for his number.  Mr. Zazi said the number out loud because he did not understand he had the right to refuse.  *See* Zazi Aff. ¶ 13.  After this, the agents immediately began scrolling through the phone's address book and contacts.

At some point *after* the phone searches were complete, the agents asked Najibullah and Mohammed to sign consent to search forms.  *See* Colson Aff. Ex. F.  The forms were written in English and were not translated into Pashto for Mr. Zazi.  Mr. Zazi signed the form because he did not understand he had the right to refuse.  *See* Zazi Aff. ¶ 13.

Around the same time, the agents announced they had some additional questions for Mr. Zazi.  Najibullah and Mr. Zazi conferred in Pashto, after which Najibullah explained: "it's the end of the fast, fast, he's [my father's] very thirsty and very tired."  The agents asked no further questions of Mr. Zazi that evening.  But they collected his fingerprints, took a DNA sample, and conducted a handwriting test, which took one hour and a half to complete.  At the end of the test,

the agents dictated 16 English words to Mr. Zazi, each of which he spelled incorrectly. *See* Colson Aff. Ex. G.

Mr. Zazi was interrogated by the same agents for a second time on September 18, 2009. This time, he was accompanied by attorney Armstrong Graham. *See* Colson Aff. ¶ 23. Mr. Graham notified Agent Copeland and Officer Nagengast at the outset that Mr. Zazi "possessed a limited ability to speak and understand English." *See id.* Despite that "a linguist was available," the agents again neglected to provide Mr. Zazi with an interpreter. *See id.*

Mr. Zazi spoke with the agents for a second time because he still did not know he had the right to refuse. *See* Zazi Aff. ¶ 14.

Searches of the Zazi Residence

While Mr. Zazi and Najibullah were being interrogated on the September 16, 2009, agents conducted a search of their apartment at 22959 East Smoky Hill Road, Unit K301, in Aurora. *See* Colson Aff. ¶ 29. The search was conducted pursuant to a warrant signed on September 14, 2009, by Magistrate Judge Gold. *See* Colson Aff. Ex. H. The warrant was issued on the basis of the supporting affidavit of FBI Special Agent John Tinning, which described the government's theory of the case against Najibullah and the grounds for probable cause.[3] The warrant read, in pertinent part: "Affidavits(s) having been made before me by [unnamed] Special Agent who has reason to believe that on the premises known as 22959 East Smoky Hill Road, Unit K301, Aurora, CO, in the Eastern District of New York, there is now concealed a certain person or property namely: See Attachment A...." *See* Colson Aff. Ex. H.

---

[3]On September 12, 2009, prior to applying for the warrant, an FBI bomb technician conducted what the government has characterized as a "ruse inspection" of the Zazi residence. The nature and extent of the inspection is unclear. What is clear, however, is that the technician failed to observe any evidence of explosive manufacturing or other criminal activity in the apartment. On September 13 and 14, 2009, also prior to applying for the warrant, agents searched the trash outside the Zazi residence. On those occasions too, the agents, failed to recover any evidence of terrorist or other criminal activity.

9

Attached to the warrant was a rider titled "Attachment A," which listed the "Items to be seized."  *See* Colson Aff. Ex. H.  Attachment A included the following list of items:

1. Explosive materials and residue including, but not limited to, dynamite, binary explosives [etc.]… and their respective containers and/or wrappers

2. Explosive precursor chemicals including, but not limited to, nitric acid, glycerin, [etc.].

3. Explosive initiating devices, including, but not limited to, blasting caps, exploding bridge wires, squibs and/or any homemade version of these manufactured initiating devices.

4. Fuzing systems for improvised explosive devices (IEDs), including, but not limited to, clocks, watches, electronic timers, mechanical timers, [etc.]…and their respective containers and/or wrappers.

5. Materials commonly used to construct IEDs including, but not limited to, wire, batteries, switches, solder, adhesives and tape.

6. Fragmentation material, including, but not limited to railroad spikes, nails, screws, [etc.].

7. IED construction tools, including, but not limited to, screwdrivers, wire cutters, pliers, saws, [etc.].

8. Documents, memoranda, notes, photographs, newspaper or magazine clippings, books, pamphlets and other printed and/or handwritten materials which contain information on the construction and use of IEDs and explosive materials.

9. Clothing, eyewear, and apparel accessories including, but not limited to, gloves, hats, shoes, [etc.]… which contain explosive residue and/or other forensic evidence.

10. Documents and other materials relating to the purchase, transport and concealment of IEDs and explosive materials.

11. Any and all computer hardware, meaning any and all computer equipment including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.

12. Any and all computer software, meaning any and all information instructions, programs or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components.

    13. Any and all cellular telephones, mobile telephones or other wireless communication
        devices.

The Zazis' apartment on Smoky Hill Road had three bedrooms and two bathrooms.  *See*
Colson Aff. ¶ 27.  Altogether, it was 1,263 square feet.  *See id.*  The search of the apartment
began at 2:30 pm and did not end until 11:15 pm.  *See id.*  At least eight agents participated in
the search. *See id.*  Special Agent Tinning, the author of the supporting affidavit, was not present.
*See id.*  The agents seized dozens of items, including multiple swabs from various locations
inside the Zazi residence, vials of white powder from an igloo cooler, U.S. currency and gold
coins, electronic equipment, music CDs, DVDs, and VHS tapes.  *See* Colson Aff. Ex. H.

        Agents seized additional evidence, including a cooler, from the Zazi residence on
September 17, 2009.  The agents did not have a warrant, but the government alleges the search
was conducted with Mr. Zazi's consent.  *See* Colson Aff. Ex. I.  The consent form signed by Mr.
Zazi was written in English, and he was not provided with a Pashto translation.  He signed the
form because he did not understand he had the right to refuse.  *See* Zazi Aff. ¶ 15.

        On February 1, 2010, the day of Mr. Zazi's arrest on the obstruction charge, agents
traveled to the Zazi residence for a third time, interrogated his wife and children, accused them
of criminal conduct and immigration offenses, and threatened to arrest them.  *See* Bibi Aff. ¶ 6.
Later in the day, after Mr. Zazi's two young children had returned from school, the agents
returned a fourth time, continued to interrogate Mr. Zazi's wife and children, and seized two
children's backpacks.  *See* Bibi Aff. ¶ 8.  The agents did not have a search warrant, but they
allege that Mr. Zazi's wife voluntarily consented to the seizure of the bags.  *See* Colson Aff. Ex.
J.

Mr. Zazi's wife was born and raised in Afghanistan.  *See* Bibi Aff. ¶ 2.  She came to this country approximately twelve years ago as an adult.  *See id.*  She does not speak English, she is illiterate, and she has never worked outside the home.  *See id.* ¶¶ 3-4.  As of February 1, 2010, her only prior experience with the criminal justice system involved the top-to-bottom search of her apartment on September 16, 2009, and the arrests of her husband and son three days later on September 19, 2009.

## **ARGUMENT**

### I.

### COUNTS ONE, FOUR, SIX, SEVEN AND EIGHT SHOULD BE DISMISSED FOR LACK OF VENUE

This case concerns Mr. Zazi's alleged attempt to obstruct a government investigation of his son's terrorist plot.  From the government's perspective, each count in the Superseding Indictment, save one, relates to Mr. Zazi's attempted obstruction.  Counts One, Two and Four charge Mr. Zazi with obstruction of justice for conspiring to destroy physical evidence linked to his son.  Count Three charges him with witness tampering for attempting to persuade others to provide false information to law enforcement officials.  And Counts Five, Six and Eight allege he made false statements about his relationship to Amanullah Zazi and his conversations with Ahmed Wais Afzali.  All of these alleged offenses took place in the State of Colorado.  In fact, Mr. Zazi is not charged with setting foot in New York at any point during his son's attempted terrorism offenses or the subsequent FBI investigation.  The visa fraud charged in Count Seven is the only count unrelated to the alleged obstruction.  The fraud alleged Count Seven did not take place in Colorado *or* the Eastern District of New York.  Mr. Zazi is alleged to have committed that crime in Manhattan.

The government filed its initial criminal complaint against Mr. Zazi in the District of Colorado. But it dismissed that case in February 2010 and transferred Mr. Zazi in custody to Brooklyn, reportedly in order to pressure his son, Najibullah, to cooperate. The government's transfer of Mr. Zazi's case to this district was a tactical success, but it came at great cost to Mr. Zazi and his defense, and it will undoubtedly undermine the fairness of his trial.

Mr. Zazi and his family live in Aurora, Colorado. His attorneys live and work in New York. Mr. Zazi has been unemployed since his arrest and cannot afford to travel to and from New York on his own. Although the U.S. Marshals finance his trips for designated court appearances, there have only been a handful of court appearances in this case, thus severely limiting the number of in-person meetings we have had with Mr. Zazi. Mr. Zazi speaks mediocre English and cannot communicate well in English over the phone. Each phone call requires the assistance of a Pashto interpreter and must be scheduled in advance. Since Mr. Zazi also cannot read English, and since much of the discovery in this case was provided pursuant to a protective order, it is practically impossible to review evidence with him over the phone. It is even more challenging for him to attempt to review it alone. Moreover, since the alleged evidence destruction took place in Colorado, we cannot investigate the case ourselves and have been forced to rely on an investigator in Colorado to interview witnesses, track down records, etc. We have never met this investigator, and she will not be present for the trial. Finally, while it would obviously benefit Mr. Zazi to have his family members in court, his wife and children may also be prevented from attending the trial because they cannot afford the bus fare or a hotel in New York.

Venue is not merely a "matte[r] of formal legal procedure." *United States v. Johnson,* 323 U.S. 273, 276 (1944). It is a constitutional requirement "meant to be a safeguard against the

injustice and hardship involved when the accused [i]s prosecuted in a place remote from his home and acquaintances." *United States v. Busic,* 549 F.2d 252, 258 (2d Cir. 1977).   Here, the injustice and hardship to Mr. Zazi of prosecuting him nearly two thousand miles away from the location of his alleged crimes, his family, and his home should outweigh the convenience and strategic benefit to the government of bringing its case in New York.

The specific reasons why the government lacks venue as to individual counts are discussed below.   In light of those reasons, and the unquestionable prejudice to Mr. Zazi, Counts One, Four, Six, Seven and Eight should be dismissed.

A. Legal Framework

The United States Constitution requires that trials "shall be held in the State where the said Crimes shall have been committed,"  U.S. Const. art. III, § 2, cl. 3, and that the accused shall have the right to "an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  Rule 18 of the Federal Rules of Criminal Procedure codifies the constitutional requirement, providing that "the government must prosecute an offense in the district where the offense was committed."  Fed. R. Crim. P. 18.

Some federal criminal statutes include specific venue provisions, indicating where the crime is deemed to have been committed.  *See, e.g.,* 18 U.S.C. § 1512(i)  (witness tampering).  In cases where there is no statutory provision on venue, venue is determined by "the nature of the crime alleged and the location of the act or acts constituting it."  *United States v. Rodriguez-Moreno,* 526 U.S. 275, 279 (1999).

Where a crime consists of a "single, non-continuing act," venue lies in the district where that act was performed.  *United States v. Ramirez,* 420 F.3d 134, 139 (2d Cir. 2005).  For continuing offenses, however, the government must prove that the crime was begun, continued,

14

or completed in the charging district.  *See United States v. Saavedra,* 223 F.3d 85, 97 (2d Cir. 2000); 18 U.S.C. § 3237(a) (Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.").  In short, venue lies where an "essential conduct element of the crime took place."  *Ramirez,* 420 F.3d at 139.

If a defendant is charged with conspiracy, along with various substantive offenses, venue lies in the district where all the counts may be tried.  *See Saavedra,* 223 F.3d at 89.  Thus, venue in a conspiracy case is narrowed by the substantive counts the government chooses to prosecute. *See id.*

An indictment that specifically alleges venue in the charging district is sufficient to withstand pretrial attack.  *See United States v. Bronson,* No. 05-CR-714, 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007); *United States v. Bellomo*, 263 F. Supp. 2d 561, 579 (E.D.N.Y. 2003).  Where venue is not alleged on the face of the indictment, however, the defendant must object prior to trial, or he waives the right to contest venue later.  *See United States v. Novak,* 443 F.3d 150, 161 (2d Cir. 2006).  The government bears the burden of proof that venue is proper, and, in a multi-count indictment, venue must be proper as to each count.  *See United States v. Stephenson,* 895 F.2d 867, 874 (2d Cir. 1990).

B. Count Four Should be Dismissed for Lack of Venue

Count Four charges obstruction of justice, in violation of 18 U.S.C. § 1519, for Mr. Zazi's alleged participation in the destruction of liquid chemicals, glasses, masks and containers in September 2009.  Venue in this district is not alleged on the face of the indictment, which

charges that the obstruction took place "within the District of Colorado."[4]  It is also improper on the facts.

Section 1519 proscribes the alteration, destruction, mutilation, concealment, covering up, falsification, or false entry of evidence with the intent to impede, obstruct, or influence the investigation of a matter within the jurisdiction of a U.S. department or agency.  *See* 18 U.S.C. § 1519.  The essential conduct element of § 1519 is the alteration or destruction of evidence. *See Ramirez,* 420 F.3d at 139, 145-46 (drawing a sharp distinction for venue purposes between the elements of an offense that involve the commission of actual conduct and those that do not).  In this case, the destruction began, continued, and was completed solely within the District of Colorado.  Mr. Zazi and his family members were in Colorado when they allegedly conspired to destroy evidence; his wife and children allegedly destroyed evidence at the Jaji residence in Aurora; and they allegedly disposed of the destroyed evidence there and elsewhere around town. Although Mr. Zazi is not accused of participating in the actual destruction, he was nonetheless in Colorado the day the government claims it occurred.  In fact, he was arrested in Colorado just several days later and did not leave the state again until the government transferred him in February 2010 for prosecution in New York.

Since the alleged offense began, continued and was completed in the District of Colorado, venue is improper in the Eastern District of New York unless a special statutory provision permits prosecution outside the district where the conduct occurred.  Section 1519 does not include such a provision.  In fact, it makes no mention of venue at all.  The statute reads:

---

[4]Counts Two and Five also charge obstruction of justice, albeit under distinct statutory provisions.  *See* 18 U.S.C. § 1512(c)(1); 18 U.S.C. § 1503(a).  Unlike Count Four, however, Counts Two and Five survive pretrial scrutiny as to venue because they each allege that the obstructive conduct took place, at least in part, in the Eastern District of New York.  *See* Colson Aff. Ex. D. (Counts Two and Five alleging conduct "within the Eastern District of New York, the District of Colorado, and elsewhere…").

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519.

Nor is § 1519 covered by any other venue provision in the criminal code. Chapter 73, which defines the obstruction offenses, includes only one special venue provision, and that provision is inapplicable to § 1519. Section 1512(i) permits the prosecution of some obstruction offenses in either of two districts: the district where the conduct occurred *or* "the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected." 18 U.S.C. § 1512(i) . The plain language of § 1512(i) clearly excludes § 1519. Indeed, § 1512(i) explicitly states that it applies *only* to offenses listed in § 1512 and § 1503. *See* 18 U.S.C. § 1512(i) ("A prosecution *under this section or section § 1503* may be brought…") (emphasis added).[5] If Congress meant to allow prosecutions under § 1519 outside the district where the obstructive conduct occurred, it would have added a venue provision § 1519 or listed § 1519 among the offenses covered by § 1512(i).

In short, since the essential conduct elements alleged in Count Four took place in Colorado, and there is no special venue provision covering § 1519, venue in this district is improper, and Count Four should be dismissed. In light of the severe prejudice to Mr. Zazi of

---

[5]Count Three, which charges witness tampering under § 1512(b)(3), *is* covered by § 1512(i). As a result, even though the tampering alleged in Count 3 occurred solely within the District of Colorado, unlike Count Four, Count 3 survives pretrial attack. Since the government may argue that the alleged witness tampering in Colorado *affected* a grand jury proceeding in the Eastern District of New York, the Eastern District of New York could qualify as the district in which the "official proceeding" occurred. *See also United States v. Fakih,* No. 06-CR-5219, 2008 U.S. App. Lexis 3131 (2d Cir. Feb. 13, 2008) (affirming that § 1512(i) allows for venue in the district where witness tampering occurred or in the district in which an official proceeding was intended to be affected).

prosecuting him in this district, there is no sensible reason to delay dismissal until trial.  It can and should be dismissed now.

   C.  <u>Counts Six and Eight Should Be Dismissed for Lack of Venue</u>

        Counts Six and Eight charge Mr. Zazi with making materially false statements in September 2009, in violation of 18 U.S.C. § 1001(a)(2) .  Count Six accuses him of lying about whether he knew imam Ahmed Wais Afzali and had spoken with him on September 11, 2009.  Count Eight accuses him of falsely stating that his nephew Amanullah Zazi was his adopted son.  Venue is improper as to both counts on the face of the indictment since they each charge that the false statements were uttered "within the District of Colorado."  Venue is also improper on the facts.  Since both counts allege a single, non-continuing offense—a lie—that took place at the FBI offices in Denver, venue lies in the District of Colorado and not in the Eastern District of New York.

        The facts here are analogous to those in *United States v. Bin Laden,* 146 F. Supp. 2d 373 (S.D.N.Y. 2001), where the trial judge dismissed a false statements charge filed in the Southern District of New York because the defendant was accused of uttering the statements to agents in Texas, not in New York.  The government argued that the crime of making a false statement should be considered a continuing offense.  *See id.* at 376.  But the trial court rejected this claim and found that venue determination for false statements charges must be made on a case-by-case basis.  The court held that, where there is a "geographic discontinuity between the defendant's physical *making* of the disputed statement, whether oral or written, and the actual *receipt* of that statement by the relevant federal authority," venue may lie in the district where the statement is received. *Id.  See, e.g., Ramirez,* 420 F.3d at 142 (venue proper in the Southern District of New York where false papers were filed in New Jersey, but reviewed and processed in Manhattan).

But where, as in *Bin Laden*, the alleged false statement is uttered by the defendant and received by federal authorities in the *same* district, the offense begins, continues, and is completed in that district.  *See Bin Laden*, 146 F. Supp. 2d at 377.[6]  The court further observed that, of the four offense elements required to prove the defendant guilty of making a false statement, not one involved evidence arising out of the State of New York.  *See id.*

Applying the logic articulated in *Bin Laden,* because Mr. Zazi made his alleged false statements in Denver, and those statements were received by agents in Denver, the offense began, continued, and was completed in the District of Colorado.  Indeed, of the four offense elements required to prove Mr. Zazi guilty of making false statements, not one involves evidence arising out of the Eastern District of New York.[7]  Venue was proper when the government filed its original false statements complaint against Mr. Zazi in the District of Colorado.  But venue is *not* proper in the Eastern District of New York.  Given the lack of proper venue, and the resulting prejudice to Mr. Zazi, Your Honor should dismiss Counts Six and Eight.

   D.  Count Seven Should be Dismissed for Lack of Venue

Count Seven charges Mr. Zazi with visa fraud, in violation of 18 U.S.C. § 1546(a), in connection with a Petition for Alien Relative filed in January 2007 on behalf of Amanullah Zazi.

---

   [6]*But see United States v. Mahaffy,* No. 05-CR-613, 2006 WL 2224518, at *10 (E.D.N.Y. Aug. 2, 2006) (venue proper in the Eastern District of New York, even though false statements were made in the Southern District of New York, in part because the defendant was told his statements would be used in the Eastern District, he did not argue prejudice, and a trial in the Eastern District was no less convenient than in the Southern District); *United States v. Reed,* 773 F.2d 477, 483 (2d Cir. 1985) (venue was proper in the Southern District of New York, even though perjurious statements were made outside that district, because the defendant gave his testimony "pursuant to the Southern District's local rules and shielded by a protective order secured in the district").

   [7]To satisfy its burden of proof under 18 U.S.C. § 1001(a)(2), the government must prove each of the following four elements beyond a reasonable doubt:  (1) that the defendant made a material statement; (2) that the statement was false; (3) that the statement was made knowingly and willfully; and (4) that the statement or representation was made in a matter within the jurisdiction of the U.S. government.

Mr. Zazi is accused of falsely representing on the petition that Amanullah was his biological son, when he knew and believed that Amanullah was his nephew.

Neither of the first two indictments filed against Mr. Zazi included this charge.  The government added it to the Superseding Indictment filed more than a year after Mr. Zazi's initial arrest.  Though we are not moving to sever the charge, it bears noting that the conduct alleged in Count Seven took place nearly three years prior to the other alleged offenses, and it is unrelated to those offenses, all of which concern the obstruction of an FBI investigation.

Venue is improper on the face of Count Seven, which alleges the visa fraud took place "within the Southern District of New York."  It is also improper on the facts.  Section 1541(a) proscribes the making of, or subscribing to false statements under oath and the presentation of documents containing such statements.  *See* 18 U.S.C. § 1541(a).  Here, the petition containing the false statement was allegedly completed at Mr. Zazi's lawyer's office in downtown Manhattan, and it was presented to the U.S. Citizenship and Immigration Services, which has offices in California, Nebraska, Vermont and Texas.  Thus, the false statements were made in the Southern District of New York, and presented in yet another jurisdiction.  Since the indictment alleges venue within the Southern District of New York, and the essential conduct elements of the offense took place in Manhattan and some other unknown location, venue is improper here.

Mr. Zazi's case closely parallels *Ramirez,* 420 F.3d at 140-41, in which the Second Circuit vacated the defendant's conviction for visa fraud in the Southern District of New York where the allegedly false petition was signed in New Jersey and filed in Vermont.  Since the defendant did not sign or file the petition in the Southern District of New York, the Court found that venue was improper.  *See id.*

Given the lack of venue in this district, and the tenuous connection between Count Seven and the other charges in the indictment, Count Seven should be dismissed.

E.   Count One Should be Dismissed for Lack of Venue

Count One charges a conspiracy to obstruct justice under 18 U.S.C. § 1512(k).  When viewed independently, Count One survives pretrial attack because it alleges that the criminal conduct took place, at least in part, in the Eastern District of New York.  *See* Colson Aff. Ex. D. (Count One alleging conduct "within the Eastern District of New York, the District of Colorado and elsewhere").  But, in a conspiracy case, venue lies in the district where all the counts, including the substantive counts, may be tried.  *See Saavedra,* 223 F.3d at 89.  Thus, venue in a conspiracy case is narrowed by the substantive counts the government chooses to prosecute.  *See id.*  Since there is no venue in the Eastern District of New York for Counts Four, Six, Seven and Eight, it would be improper to move forward on Count One, unless Counts Four, Six, Seven and Eight are dismissed.  The alternative would be to dismiss the indictment in its entirety and prosecute Mr. Zazi in the District of Colorado where all the counts, save Count Seven, may be tried.

II.

## THE INDICTMENT IS MULTIPLICITOUS AND THE GOVERNMENT SHOULD BE REQUIRED TO DISMISS THE DUPLICATIVE CHARGES

Throughout the Superseding Indictment, the government has impermissibly charged Mr. Zazi with the same crime twice.  First, Mr. Zazi's alleged destruction of evidence is charged in both Count Two and Count Four.  Count Two of the Indictment charges a violation of 18 U.S.C. § 1512(c)(1), namely that Mr. Zazi, "together with others, did knowingly, intentionally and corruptly alter, destroy, mutilate and conceal . . . one or more objects, to wit; glasses, masks, liquid chemicals and containers, with the intent to impair the objects' integrity and availability for use in one or more official proceedings."  Colson Aff. Ex. D ¶ 8.[8]  Count Four of the Indictment charges the same acts as a violation of another obstruction of justice statute, 18 U.S.C. § 1519.  It alleges that Mr. Zazi, "together with others, did knowingly and intentionally alter, destroy, mutilate, conceal and cover up one or more tangible objects, to wit:  glasses, masks, liquid chemicals and containers, with the intent to impede, obstruct and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit: an investigation by the FBI into federal crimes of terrorism, and in relation to and contemplation of such matter."  *Id.* ¶ 12.

Second, the indictment also charges Mr. Zazi with multiple counts relating to his allegedly false statements to the FBI.  He is charged in Count Five with impeding the "due administration of justice," by "providing false information in connection with the Federal Terrorism Proceedings," in violation of 18 U.S.C. § 1503.  Colson Aff. Ex. D ¶ 14.  The false

---

[8]The indictment alleges that the "one or more official proceedings" constitute: "an investigation by the FBI, proceedings before one or more Federal grand juries and a criminal proceeding before a judge and court of the United States, all relating to the Federal crimes of terrorism (collectively, the "Federal Terrorism Proceedings.")." *See* Colson Aff. Ex. D ¶ 6.

statements are also charged as violations of 18 U.S.C. § 1001.  The government charges Mr. Zazi

in Count Six with making two false statements to the FBI on September 16, 2009, and in Count

Eight with making one false statement to the FBI on September 18, 2009.  *Id.* ¶¶ 16, 32.

 "A multiplicitous indictment . . . is one that charges in separate counts two or more

crimes, when in fact and law, only one crime has been committed."  *United States v. Holmes*, 44

F.3d 1150, 1153-54 (2d Cir. 1995) (citing *United States v. Nakashian,* 820 F.2d 549, 551 (2d.

Cir. 1987)).  *See also United States v. Ben Zvi*, 168 F.3d 49, 57 (2d Cir. 1999); *United States v.

Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  Multiplicitous indictments violate the Due Process

Clause of the United States Constitution, which provides that no person "shall . . . be subject for

the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  They are

also disfavored because multiple charges for the same crime "may improperly prejudice a jury by

suggesting that a defendant has committed not one but several crimes."  *United States v. Reed*,

639 F.2d 896, 904 (2d Cir. 1981).

 To determine whether charges are multiplicitous, courts apply the *Blockburger* "same

elements" test.  *See Blockburger v. United States*, 284 U.S. 299 (1932).  The charges are not

multiplicitous "[i]f there is an element in each offense that is not contained in the other."  *United

States v. Jahedi*, 681 F. Supp. 2d 430 (S.D.N.Y. 2009) (quoting *Chacko,* 169 F.3d at 146).  The

ultimate "touchstone is whether Congress intended to authorize separate punishments for the

offensive conduct under separate statutes."  *Chacko*, 169 F.3d at 146.  Thus, even if the

*Blockburger* test is satisfied, the presumption that multiple punishments are authorized should be

"tested against the legislative history of the applicable provisions to be sure there is no indication

of a contrary congressional intent."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 981 (2d

Cir. 1990).  *See also Jahedi*, 681 F.  Supp. 2d at 434 ("the ultimate touchstone of multiplicity is

legislative intent; thus, even where the *Blockburger* test is not met, separate punishments under

separate statutes for the same offensive conduct is permissible if Congress intended to permit

such punishment.").  If the charges are multiplicitous, the government must elect to proceed on

one charge only.

    A.  <u>Counts Two and Four Are Multiplicitous</u>

       Counts Two and Four allege the same crime: namely, the destruction of evidence

(glasses, masks, liquid chemicals and containers) in September 2009.  While the same conduct

may legitimately violate two different statutes, here the statutes underlying Counts Two and Four

fail the *Blockburger* test because the proof required to establish a violation of § 1512(c)(1),

charged in Count Two, subsumes the proof required to establish a violation of § 1519, charged in

Count Four.  Beyond that, the legislative history makes clear that Congress did not intend to

authorize multiple punishments for conduct that violated both 18 U.S.C. §§ 1512(c)(1) and 1519.

    1.  <u>The Statutory Elements of §§ 1512(c)(1) and 1519</u>

       Section 1512(c)(1), charged in Count Two, is the narrower of the two provisions.  It

requires proof beyond a reasonable doubt (1) that a defendant "corruptly" altered, destroyed,

mutilated, or concealed an object, (2) with intent to impair the object's availability for use in an

official proceeding.  18 U.S.C. § 1512(c)(1).  *See also Jahedi*, 681 F. Supp. 2d at 434-35.  In

*United States v. Ortiz*, 220 Fed. Appx. 13, 16-17 (2d Cir. 2007) (unpublished), the Second

Circuit assumed without deciding that this section requires proof of a nexus in "time, causation

or logic between the conduct and its effect on the proceeding."  *Id.  See also United States v.*

*Reich*, 479 F.3d 179, 185-86 (2d Cir. 2007) (applying nexus requirement to 18 U.S.C. §

1512(c)(2)).  The "nexus limitation is best understood as an 'articulation of the proof of wrongful

intent that will satisfy the *mens rea* requirement of 'corruptly' obstructing or endeavoring to

obstruct.'"  *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006) (citing *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) [hereinafter *Arthur Andersen*]).  Although under § 1512(f), an official proceeding need not be pending or about to be instituted at the time of the offense, the Supreme Court has made clear that, because of the intent requirement, a proceeding must at least have been *foreseen* when the crime is committed.  *Arthur Andersen*, 544 U.S at 707.  Put another way, a defendant must know that his or her actions "are likely to affect the . . . proceeding."  *United States v. Aguilar*, 515 U.S. 593, 599 (1995).[9]

Under § 1512(c)(1), the proceeding the defendant intended to obstruct must be an "official proceeding."  That term is defined in 18 U.S.C. § 1515(a)(1) to include not only a proceeding before a judge, including a grand jury, but "a proceeding before a Federal Government agency which is authorized by law."  18 U.S.C. § 1515(a)(1)(A), (C).[10]

Section 1519 penalizes the precisely the same conduct as § 1512(c)(1) – i.e., altering, destroying, mutilating or concealing an object – but dispenses with the requirements that the defendant act "corruptly" and with the intent to obstruct an "official proceeding."  Section 1519 prohibits acts of obstruction committed "knowingly," and "with the intent to impede, obstruct, or

---

[9]The Supreme Court first applied the nexus requirement to § 1503 in *Aguilar*, 515 U.S. at 599.  In *Arthur Andersen*, 544 U.S. at 696, the Supreme Court extended the nexus requirement to § 1512(b).  In *Reich*, 479 F.3d at 185-86, the Second Circuit held that the nexus requirement established in *Aguilar* applied to § 1512(c)(2).  Thus, after *Reich* and *Ortiz*, there can be "little doubt" that the nexus requirement applies to § 1512(c)(1).  *United States v. Russell*, 639 F. Supp. 2d 226, 234 (D. Conn. 2007).

[10]While the Second Circuit has yet to define "official proceeding" with specificity, the weight of the case law holds that a "proceeding before a Federal Government agency" does not include an investigation, unless such investigation is accompanied by formal adjudicative procedures.  *See United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) (declining to rule as to whether an investigation constitutes a "proceeding before a Federal Government agency," but holding that Bureau of Prison Use of Force inquiry is such a proceeding because it requires "findings" by BOP officials).  *See also United States v. Gabriel*, 125 F.3d 89, 105 n.13 (2d Cir. 1997), *abrogated on other grounds by Arthur Andersen*, 544 U.S. 696 (if defendant's "sole intent was to interfere with [an] FBI investigation," then the jury "would have been compelled to find [the defendant] innocent" of witness tampering because a "government investigation" was not an "official proceeding" under § 1515(a)(1)) (dicta); *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) ("Thus, in all the instances in which the term 'official proceeding' is actually used in § 1512, its sense is that of a hearing rather than simply any investigatory step taken by an agency.").

influence the investigation or proper administration of any matter within the jurisdiction of any

department or agency of the United States. . . . or in relation to or contemplation of any such

matter or case."  18 U.S.C. § 1519.

Unlike § 1512, § 1519 punishes obstruction directed at investigations, not "official

proceedings."  Under § 1519, it is prohibited to "influence the investigation or proper

administration of any matter within the jurisdiction of any department or agency of the United

States or any case filed under title 11."  18 U.S.C. § 1519.

The "in relation to or in contemplation" language suggests that a substantially lesser link

is needed between the acts of obstruction and the official investigation than what courts have

required under §§ 1512 and 1503.  Nevertheless, several district courts have read into § 1519 a

nexus requirement similar to what the Supreme Court in *Aguilar* and *Arthur Andersen* read into

§§ 1503 and 1512.  *See Russell*, 639 F. Supp. 2d at 234 ("there appears to be little doubt that the

nexus requirement applies to prosecutions under both [§ 1512(c)(1) and § 1519]"); *United States

v. Hayes*, No. 09-CR-397, 2010 WL 2696894, at *5 (M.D. Pa. July 7, 2010) ("While each [of the

obstruction statutes] encompasses different actions and different proceedings, the effect of each

statute is the same.  The action must be intended to affect the federal proceeding covered in the

statute.  This is the nexus that is required by *Aguilar* and *Arthur Andersen* and also by § 1519.").

2.   The Charges Under § 1519 and § 1512(c)(1) Fail the *Blockburger* Test

Here, while the elements of § 1519 are different than those of § 1512(c)(1), the counts are

nevertheless multiplicitous because the proof required to establish a violation of § 1512(c)(1)

will necessarily also prove a violation of § 1519.  The Second Circuit has made clear that

"*Blockburger* is not satisfied where the elements of one charged offense are subsumed within

another charged offense."  *Ben Zvi*, 168 F.3d at 57 (citing *Whalen v. United States*, 445 U.S. 684,

26

694 (1980) (defendant could not be convicted of both rape and felony murder where underlying felony was the rape, even though rape did not require proof of murder)).  In *Ben Zvi*, the indictment charged both domestic and international money laundering, based on the exact same financial transaction.  The Second Circuit found the charges multiplicitous because the "financial transaction" element of domestic money laundering was merely a type of the "international transfers" element required to prove international money laundering, and the government's proof of the international money laundering count necessarily proved the domestic money laundering charge, i.e. the two alleged crimes were really one.  *Id.  But see United States v. Basciano*, 599 F.3d 184 (2d Cir. 2010) (emphasizing that "critical double jeopardy analysis is legal, i.e., whether the offense—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another") (internal quotation marks omitted).

That is precisely the case here:  Both Counts Two and Four charge exactly the same crime, namely the *same* acts of obstruction targeted at the *same* FBI investigation.  Both allege that, between September 2009 and October 2009, Mohammed Zazi, together with others, did "alter, destroy, mutilate and conceal, and attempt to alter, destroy, mutilate and conceal, one or more objects, to wit:  glasses, masks, liquid chemicals and containers."  *See* Colson Aff. Ex. D ¶¶ 8, 12.  While Count Two charges that Mr. Zazi destroyed evidence for use in one or more "official proceedings," the indictment defines "official proceedings" to include "an investigation by the FBI."  Count Four charges Mr. Zazi with obstructing the *very same* FBI investigation, alleging that Mr. Zazi acted with "the intent to impede, obstruct and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the

United States, to wit: an investigation by the FBI into federal crimes of terrorism, and in relation to and contemplation of such matter." *See id.* ¶ 12. [11]

While the FBI investigation is but one of the proceedings that the government collectively refers to as the "Federal Terrorism Proceedings" that Mr. Zazi supposedly intended to obstruct, proof that Mr. Zazi obstructed one of the other "Federal Terrorism" proceedings – i.e., "proceedings before one or more Grand Juries" or "a criminal proceeding before a judge" – will also automatically establish that he obstructed the FBI investigation detailed in Count Four. According to the indictment, the grand jury investigations began on September 9, 2009, in the Eastern District of New York, and on September 16, 2009, in the District of Colorado, and there is no plausible scenario in which a jury could find that Mr. Zazi obstructed the grand jury proceeding or the criminal proceeding, but did not obstruct the simultaneous FBI investigation. The two counts therefore fail the *Blockburger* test.

In *United States v. Butler*, 351 F. Supp. 2d 121, 132 (S.D.N.Y. 2004), Judge Lynch approached the multiplicity question with the same analytical framework, namely, by determining whether the elements of one count were subsumed within the other. The court found counts alleging perjury under 18 U.S.C. § 1623 and a false statement under 18 U.S.C. § 1001 for the same statements in the grand jury to be multiplicitous, despite that § 1001 theoretically captured unsworn false statements, while § 1623 only applied to false statements made under oath. *Id.* In dismissing the § 1001 count, Judge Lynch reasoned that the oath distinction between the two statutes was immaterial since proof of a violation of § 1623 would necessarily prove a violation of § 1001, and no separate or broader crime was being charged by

---

[11]We do not concede that proof that Mr. Zazi intended to obstruct nothing more than a FBI investigation would be sufficient to establish a violation of 18 U.S.C. § 1512(c)(1).

the government under § 1001.  *Id.* at 127-28 ("While a false statement that violates § 1001 will

not always be a violation of § 1623, because the latter only applies to sworn testimony, a

violation of § 1623 will always necessarily violate § 1001, because such false testimony will

always constitute a 'materially false  . . .  statement'").

      Judge Sheindlin followed the same logic in *Jahedi*, 681 F. Supp. 2d at 436, finding that

document destruction counts charged as violations of both §§ 1503 and 1512(c)(1) were

potentially multiplicitous because the "pending grand jury proceeding underlying the section

1503 charge [was] the official proceeding for the section 1512(c)(1) charge," and "proving one

count will necessarily prove the other." [12]  *Id.* at 436.

      However the *Blockburger* test is applied, the legislative history to both §§ 1519 and

1512(c)(1) makes clear that Congress did not intend to authorize multiple punishments for the

destruction of evidence.  Both §§ 1519 and 1512(c)  were passed in 2002 as part of the Sarbanes-

Oxley Act of 2002, Pub L. No. 107-204, 116 Stat. 745 (2002).  Enacted in direct response to the

difficulties prosecutors faced in the *Enron* litigation, the bill was designed to capture a variety of

conduct that the prior statutory regime could not.  *See* S. Rep. No. 107-146, at 7, 14-15 (2002).

While Congress intended § 1519 to prohibit acts of obstruction directed at investigations and

avoid the burdens of the "nexus" requirement, § 1512(c) was enacted to complement § 1512(b),

which punished only those who *persuaded* others to destroy evidence, by ensuring that those

who actually destroyed evidence would not be immune from prosecution.  *Id.  See also* 148

Cong. Rec. S6542, S6545, S6550 (daily ed. July 10, 2002).  Neither was intended to impose

---

[12]Judge Sheindlin declined to decide pre-trial whether the indictment was multiplicitous and instead
deferred until trial to determine whether the evidence for one charge was subsumed within the other.  *Jahedi*, 681 F.
Supp. 2d at 437.

cumulative punishments for the same crime, and thus to do so here would thwart the legislative design.

Especially in light of Congress's intent when enacting these obstruction statutes, there is no basis to distinguish the destruction of evidence charges against Mr. Zazi. Proving one charge will necessarily prove the other, rendering them multiplicitous and requiring the government to dismiss either Count Two or Count Four.

B. <u>Count Five Impermissibly Charges the Same Crime as Counts Six and Eight</u>

Not only did the government charge Mr. Zazi multiple times for the alleged destruction of evidence, it charged him more than once for his alleged false statements to the FBI on September 16 and September 18, 2009. In Count Five, the indictment alleges that he provided false information in violation of 18 U.S.C. § 1503. In Counts Six and Eight, the indictment alleges that Mr. Zazi made material false statements to the FBI in violation of 18 U.S.C. § 1001. As with the destruction of evidence charges, these counts fail the *Blockburger* test, as the proof needed to establish a violation of § 1503 necessarily establishes a violation of § 1001.

1. <u>The Statutory Elements of 18 U.S.C. §§ 1503 and 1001</u>

The "omnibus" or "residual" clause of 18 U.S.C. § 1503 criminalizes "corruptly or by threats or force, or by any threatening letter or communication, influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice." *Jahedi*, 681 F. Supp.2d at 434. The elements of § 1503 are that (1) a judicial proceeding was pending, (2) the defendant knew about the judicial proceeding, and (3) the defendant acted corruptly with the intent to impede or obstruct that proceeding. *See, e.g.*, *United States v. Schwarz*, 283 F.3d 76, 105 (2d Cir. 2002) (citing *Aguilar*, 515 U.S. at 599) ("'[A]dministration of justice' has been authoritatively construed to require a pending federal judicial proceeding,

such as a federal grand jury proceeding.").  To establish a violation of § 1503, the government

must satisfy the "nexus" requirement discussed *supra*, at pp. 24-25, n.10.  *See Aguilar*, 515 U.S.

at 600 ("We do not believe that uttering false statements to an investigating agent . . . who might

or might not testify before a grand jury is sufficient to make out a violation of the catch-all

provision of § 1503.").

     Section 1001 of Title 18 criminalizes "knowingly and willfully" making a "materially

false, fictitious, or fraudulent statement or representation," "in a matter within the jurisdiction of

the executive, legislative, or judicial branch of the Government of the United States."  18 U.S.C.

§ 1001(a)(2).  "A false statement is material if it tends to or is capable of influencing the

decision-making body to which it was addressed."  *United States v. Stewart*, 433 F.3d 273, 318

(2d Cir. 2006).

     2.  The Charges Under 18 U.S.C. §§ 1503 and 1001 Fail the *Blockburger* Test

     The § 1001 and § 1503 charges are multiplicitous in the same way the destruction of

evidence charges are:  The proof required to establish Count Five will necessarily prove the

charges in Counts Six and Eight.  In fact, 18 U.S.C. § 1001(a)(2) operates as a lesser included

offense of 18 U.S.C. § 1503.  Assuming that the particulars of Count Five are in fact the three

false statements alleged in Counts Six and Eight, Count Five charges the exact same crime --

namely, lying to the FBI on September 16 and 18, 2009.

     The only significant difference between the legal elements of the two charges is the

different scienter requirements.  Under § 1503, the government must establish the requisite

"nexus"-*i.e.,* some "relationship in time, causation, or logic" to a judicial proceeding, and

demonstrate that Mr. Zazi's allegedly false statements to the FBI had the "natural and probable

effect" of interfering with a grand jury or other court proceeding.  *Aguilar,* 515 U.S. at 599.

Thus, with respect to Count Five, the government will have to prove that Mr. Zazi had a "specific intent to interfere with an actual judicial proceeding-not just to interfere with a federal investigation. *United States v. Genao,* 343 F.3d 578, 585 (2d Cir. 2003) (citing *Aguilar,* 515 U.S. at 599). *See also Schwarz,* 283 F.3d at 109 (false statements did not constitute violation of § 1503 because defendant did not know that his statements would be conveyed to a federal grand jury and had not himself been called to testify before the grand jury). Such proof, however, will necessarily establish the less stringent requirement under § 1001 that Mr. Zazi's false statements were made "knowingly and willfully," and thus establish the proof needed for Counts Six and Eight.[13]

### III.

### MR. ZAZI'S STATEMENTS SHOULD BE SUPPRESSED AS INVOLUNTARY

The statements Mr. Zazi made on September 16 and 18, 2009, at the FBI offices in Denver should be suppressed as involuntary. Mr. Zazi spoke to the agents because he did not understand he had a right to refuse. Although he repeatedly told the agents his English was flawed, the agents did not provide an interpreter. Nor did they even engage in any significant effort to locate one. Moreover, on September 16, 2009, the agents failed even to notify attorney Arthur Folsom that they intended to interrogate Mr. Zazi.

Due process forbids the use at trial of a confession that has been obtained by coercion. *See Brown v. Mississippi,* 297 U.S. 278, 286 (1936). Coerced confessions also implicate the Fifth Amendment because a confession necessarily entails the defendant's relinquishment of the privilege against self-incrimination. *See Miranda v. Arizona,* 384 U.S. 436, 460-63 (1966). "If a

---

[13]While § 1001 requires that any false statement be "material" – such that it tends to or is capable of influencing the decision-making body to which it was addressed – this is indistinct from the requirement in § 1503 that any false statements have the "natural and probable effect" of interfering with that judicial proceeding.

defendant's confession was obtained by 'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will,' the statements are inadmissible under the Fifth Amendment." *Tankleff v. Senkowski,* 135 F.3d 235, 242 (2d Cir. 1998) (quoting *Oregon v. Elstad,* 470 U.S. 298, 304 (1985) (internal quotation marks and other citations omitted)).

No single factor controls whether a suspect's confession was coerced. Rather, a court must examine the "totality of circumstances" surrounding the questioning, including "1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *In re Terrorist Bombings of U.S. Embassies in E. Africa,* 552 F.3d 177, 213 (2d Cir. 2008) (citing *Parsad v. Greiner,* 337 F.3d 175, 183 (2d Cir. 2003)). *See also Dickerson v. United States,* 530 U.S. 428, 434 (2000) (describing the inquiry into "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession … [as taking] into consideration the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.") (internal citation and quotation marks omitted). A suspect's relevant personal characteristics include his background and intelligence, level of education, and any prior experience with the criminal justice system. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *Lynumm v. Illinois,* 372 U.S. 528, 534 (1963). The Court is also required to take into consideration whether "the defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him" and whether or not counsel was present during the interrogation. 18 U.S.C. § 3501(b). In the case of a foreign national, courts should further "consider whether extra steps were taken to ensure that the defendant understood his rights." *United States v. Shi,* 525 F.3d 709, 730 (9th Cir. 2008) (citing *United States v. Amaro,* 229 F.3d 801, 804-05 (9th Cir. 2000)).

33

Where an initial confession is involuntary, it may taint a subsequent confession, so that the latter statements must also be suppressed as "fruit" of the original due process violation. *See Elstad,* 470 U.S. at 314 (the use of coercive and improper tactics in obtaining an initial confession may warrant a presumption of compulsion as to a second one, even if the latter was obtained after properly administered *Miranda* warnings); *United States v. Anderson,* 929 F.2d 96, 102 (2d Cir. 1991) (suppressing defendant's second confessions because "nothing in the record suggests that the taint clinging to the first confession was dissipated"). "[T]he time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Elstad,* 470 U.S. at 310. Courts must also consider the "twin rationales" of "trustworthiness and deterrence" and evaluate whether suppressing the second statement would serve to deter unlawful police conduct or assure the receipt of trustworthy evidence. *Id.* at 308.

A defendant challenging a confession has the right to "a fair hearing and a reliable determination on the issue of voluntariness." *Jackson v. Denno,* 378 U.S. 368, 377 (1964); *see also* 18 U.S.C. § 3501(a) (when a confession is offered, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness"). The prosecution bears the burden of demonstrating voluntariness by a preponderance of the evidence. *Anderson,* 929 F.2d at 99.

A. Mr. Zazi's Statements on September 16, 2009 Were Involuntary

The totality of circumstances weighs against a finding of voluntariness during the first interrogation on September 16, 2009. As an initial matter, Mr. Zazi had no intention of speaking with FBI agents when he went to their offices that day. His sole purpose was to accompany his son Najibullah and provide him with moral support. Mr. Zazi was fasting for Ramadan. He was tired, hungry, and nervous for his son and looked forward to taking a rest.

34

Second, when Agent Gedney approached him in the waiting room, he did not know he had a right to remain silent.  Mr. Zazi was not born and raised in this country; he came here as an adult.  He did not grow up watching police shows on television or learning about *Miranda* warnings or the U.S. Constitution in school.  He had only a seventh grade education in Afghanistan and left school altogether in the eighth grade.  *Cf. In re Terrorist Bombings,* 552 F.3d at 213 (considering voluntariness and noting that defendant was an intelligent individual who received two years of university-level education and was familiar with political and world events).  He had no prior arrests in this country and no prior experience with the American criminal justice system.  *Cf. United States v. Artis,* No. 10-CR-15, 2010 WL 3767723 (D. Vt. Sept. 16, 2010) (finding that the defendant's statements were voluntary in part because he had multiple prior arrests and, thus, considerable experience with the criminal justice system).

Though Agents Copeland and Nagengast claim that Mr. Zazi understood his right to silence before they interrogated him further in "secure FBI space," those claims are belied by their failure to provide an interpreter or to notify lawyers Folsom and Graham of their interrogation plans.  The facts here provide a stark contrast to *Shi*, 525 F.3d at 730, where a Chinese-speaking defendant was deemed to have made voluntary admissions in part because "extra steps" were taken to ensure he understood his rights.  The defendant was read his rights by an interpreter and was presented a *Miranda* waiver form in Chinese.  *Id.*

Mr. Zazi admittedly speaks some English.  But he is accustomed to frequent misunderstandings with native English speakers, and he requested an interpreter to prevent such misunderstandings here.  As this Court is well aware, in addition to acting as translators, court-certified interpreters often assist in bridging cultural barriers and explaining foreign legal concepts.  Had the agents truly wished to ensure Mr. Zazi understood his right to silence, they

35

would have provided him with an interpreter or, at the very least, allowed him time to consult with Mr. Folsom.  Indeed, given the magnitude of their investigation, the agents' failure to obtain an interpreter or to notify Mr. Folsom only begs the question whether they were more interested in gaining intelligence from Mr. Zazi or trapping him in a lie.

The Second Circuit has held that non-English speakers have a constitutional right to an interpreter at a criminal trial.  *United States ex rel. Negron v. State of New York,* 434 F.2d 386, 389 (2d Cir. 1970).  In so doing, the Court found it "imperative that every criminal defendant…possess sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.  Otherwise, the adjudication loses its character as a reasoned interaction … and becomes an invective against an insensible object." *Id.* (citations and internal quotation marks omitted).  Here, too, it was imperative for Mr. Zazi to possess a "reasonable degree of rational understanding" when the agents allegedly advised him of his right to silence and interrogated him.  Instead, the absence of both an interpreter and a lawyer undermined the character of the interrogation, transforming it from a "reasoned interaction" to a tactical maneuver on the part of the agents.

In short, the agents took advantage of Mr. Zazi's lack of education and familiarity with U.S. law, his lack of fluency in English, his fear for his son, and his hunger, thirst and exhaustion on Ramadan to pressure him to speak.  Their "techniques and methods [were] offensive to due process," *Tankleff,* 135 F.3d at 242, and Mr. Zazi's statements on September 16, 2009, should be suppressed.  In the alternative, the Court should hold an evidentiary hearing.

B.  Mr. Zazi's Statements on September 18, 2009 Were Involuntary

The coercion that induced Mr. Zazi's first confession carried over into the second set of questioning on September 18, 2010.  Mr. Zazi was interrogated just two days later in the same office by the same agents.  This time, neither agent advised Mr. Zazi of his right to silence or his right to leave.

Mr. Zazi's lawyer told the agents that Mr. Zazi's ability to speak and understand English was limited.  In response, the agents represented that a "linguist was available," but incredibly, they made no effort to locate the linguist, even if just by telephone.  The government has repeatedly claimed that their investigation of Najibullah Zazi was one of the most important terrorism investigations since 9/11.  Had the agents truly wished to extract as much useful intelligence as possible from Mr. Zazi, surely they would have provided an interpreter.  Moreover, since they confronted Mr. Zazi with his suspected false statements from the first round of interrogation on September 16, 2009, the failure to provide an interpreter again suggests the agents were more interested in catching Mr. Zazi in a lie than gathering information.

Just as non-English speakers have a right to an interpreter at trial, so should they have a right to an interpreter before undergoing interrogation by the police.  The agents' failure to provide an interpreter is especially egregious here where they filed a false statements charge against Mr. Zazi the very next day.  Suppressing Mr. Zazi's second set of statements would serve to deter further unlawful police conduct of this nature.  *See Anderson,* 929 F.2d at 102.  *See also Quartararo v. Mantello,* 715 F. Supp. 449, 463 (1989) (suppressing first and second confessions and finding that "first and second confessions were essentially a single confession by an emotionally distraught teenager that was interrupted only by the belated effort of [the detective] to comply with *Miranda*").  In the alternative, an evidentiary hearing should be held.

IV.

THE PHYSICAL EVIDENCE SEIZED FROM THE ZAZI RESIDENCE ON
SEPTEMBER 16, 2010 SHOULD BE SUPPRESSED AND AN EVIDENTIARY HEARING
HELD BECAUSE THE SEARCH EXCEEDED THE SCOPE OF THE WARRANT

The physical evidence seized during the search of Mr. Zazi's home on September 16,

2009, in Aurora, Colorado should be suppressed because the search exceeded the scope of the

warrant, and multiple items outside the permissible bounds of the warrant were seized.

The Fourth Amendment provides that "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched, and the person or things to be seized."  U.S.

Const. amend. IV.  An individual has the right to challenge a search and seizure as unreasonable

where, as here, he has a subjective expectation of privacy in the area searched, and his subjective

expectation is one that society is willing to accept as reasonable.  *Smith v. Maryland,* 442 U.S.

735, 740 (1979) (citing *Katz v. United States,* 389 U.S. 347, 361 (1967)).

The basic impetus for the Fourth Amendment's Warrant Clause was the elimination of

general searches.  *United States v. Shi Tan Liu,* 239 F.3d 138, 140 (2d Cir. 2000).  *See also*

*Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971) (Fourth Amendment's objective is to

prevent the "general, exploratory rummaging in a person's belongings").  General searches have

been described as "especially pernicious," and they "have long been deemed to violate

fundamental rights."  *Shi Tan Liu*, 239 F.3d at 140 (citation and internal quotation marks

omitted).

The Fourth Amendment operates by limiting government applications for search warrants

in two respects:  Applications must include both particularity and breadth.  "Particularity is the

38

requirement that the warrant must clearly state what is sought.  Breadth deals with the

requirement that the scope of the warrant be limited by the probable cause on which the warrant

is based." *United States v. Hill,* 459 F.3d 966, 973 (9th Cir. 2006) (quoting *United States v.*

*Towne,* 997 F.2d 537, 544 (9th Cir. 1993)).  Importantly, a search must also "be confined to the

terms and limitations of the warrant authorizing it." *United States v. Matias,* 836 F.2d 744, 747

(2d Cir. 1988) (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403

U.S. 388, 394, n.7 (1971)).

The warrant authorizing the September 16, 2009 search of the Zazi residence failed to

describe the nature of the criminal conduct alleged or to cite the relevant criminal statutes.  That

some information regarding the alleged offenses was contained in the supporting affidavit of

Special Agent John Tinning is insufficient because the warrant neglected to expressly

incorporate the affidavit, and it is unclear whether the affidavit was even attached to the copy of

the warrant provided to the executing agents.  *See Groh v. Ramirez,* 540 U.S. 551, 557-58 (2004)

(warrant may cross-reference a supporting affidavit only "if the warrant uses appropriate words

of incorporation, and if the supporting document accompanies the warrant"); *United States v.*

*Waker,* 534 F.3d 168, 172-73, n.2 (2d Cir. 2008) (warrant complied with *Groh* because the

affidavit was attached and the warrant specifically stated that the affidavit was "incorporated

herein by reference"); *United States v. Cohan,* 628 F. Supp. 2d 355, 363 (E.D.N.Y. June 24,

2009) ("[t]he Government cannot rely on language in a warrant simply referencing the

underlying affidavit…rather, it must attach the affidavit to the warrant and incorporate it by

reference using 'deliberate and unequivocal language'") (quoting *Waker*, 534 F.3d at 172).

Here, rather than include "deliberate and unequivocal language of incorporation," *Waker,* 534

F.3d at 172, the warrant read:

Affidavits(s) having been made before me by [unnamed] Special Agent who has reason to believe that on the premises known as 22959 East Smoky Hill Road, Unit K301, Aurora, CO, in the Eastern District of New York, there is now concealed a certain person or property namely: See Attachment A….

Attachment A to the warrant permitted agents to search for:

1.  Explosive materials and residue including, but not limited to, dynamite, binary explosives [etc.]… and their respective containers and/or wrappers

2.  Explosive precursor chemicals including, but not limited to, nitric acid, glycerin, [etc.].

3.  Explosive initiating devices, including, but not limited to, blasting caps, exploding bridge wires, squibs and/or any homemade version of these manufactured initiating devices.

4.  Fuzing systems for improvised explosive devices (IEDs), including, but not limited to, clocks, watches, electronic timers, mechanical timers, [etc.]…and their respective containers and/or wrappers.

5.  Materials commonly used to construct IEDs including, but not limited to, wire, batteries, switches, solder, adhesives and tape.

6.  Fragmentation material, including, but not limited to railroad spikes, nails, screws, [etc.].

7.  IED construction tools, including, but not limited to, screwdrivers, wire cutters, pliers, saws, [etc.].

8.  Documents, memoranda, notes, photographs, newspaper or magazine clippings, books, pamphlets and other printed and/or handwritten materials which contain information on the construction and use of IEDs and explosive materials.

9.  Clothing, eyewear, and apparel accessories including, but not limited to, gloves, hats, shoes, [etc.]… which contain explosive residue and/or other forensic evidence.

10. Documents and other materials relating to the purchase, transport and concealment of IEDs and explosive materials.

11. Any and all computer hardware, meaning any and all computer equipment including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.

12. Any and all computer software, meaning any and all information instructions, programs or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components.

13. Any and all cellular telephones, mobile telephones or other wireless communication devices

Since the items to be seized were listed with particulary in Attachment A, the warrant's facial defects do not alone invalidate it.  Nonetheless, the executing agents may not have read the supporting affidavit and apparently lacked sufficient information about the nature of the government's investigation.  As a result, rather than limit their search to the items listed in Attachment A, they searched for and seized items far beyond the warrant's permissible scope, including:

1. A Panasonic camcorder

2. A Fugi digital camera containing tape, plus 3 tapes with case and power cord

3. Multiple music CDs

4. Multiple DVDs containing movies and TV. show episodes

5. Multiple VHS tapes

6. A choice money transfer and photocopy of Amanullah Zazi's social security card

7. More than $7,000 in U.S. currency found in a safe and a closet

8. 6 gold colored Canadian coins

9. Pushcart documents

10. A safety deposit box receipt

11. Additional undescribed miscellaneous documents

12. An unidentified letter from Pakistan

13. A 1996 address book

14. A 2001 address book and planner

15. A white address book

When items outside the scope of a valid warrant are seized, one remedy is suppression of those items and their return to the suspect. *See Andresen v. Maryland,* 427 U.S. 463, 482, n.11 (1976); *Matias,* 836 F.2d at 747.  Where, however, there is a "flagrant disregard" for the limitations of a search warrant, an otherwise valid search becomes an impermissible general search, and all items seized must be suppressed. *See United States v. Medlin,* 798 F.2d 407, 411 (10th Cir. 1986).  In the Second Circuit, government agents "flagrantly disregard the terms of a warrant so that wholesale suppression is required only when (1) they effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *Shi Tan Liu,* 239 F.3d at 140 (citations and internal quotation marks omitted).

Mr. Zazi and his son Najibullah were under interrogation at the FBI offices during the search of their apartment.  Although other family members were home, they were asked to leave the apartment at some point after the search began.  Thus, the specific circumstances surrounding the search are unknown.  However, there is ample evidence to suggest the agents conducted an impermissible general search.  At least eight agents participated, the search lasted approximately nine hours, and agents seized over a dozen items outside the scope of the warrant.  Accordingly, an evidentiary hearing is required to determine whether the agents' improper conduct was so flagrant as to require wholesale exclusion of all of the items they took. *See Medlin,* 798 F.2d at 411 (remanding case to the district court for an evidentiary hearing where a large number of items seized were not listed in the warrant).

V.

THE ADDITIONAL PHYSICAL EVIDENCE SEIZED FROM MR. ZAZI AND
HIS HOME SHOULD BE SUPPRESSED BECAUSE AGENTS DID NOT HAVE
A WARRANT AND THE PROPERTY WAS NOT PROVIDED ON CONSENT

The physical evidence seized from Mr. Zazi's person on September 16, 2009 and from
his home on September 17, 2009 and February 1, 2010, should be suppressed because agents did
not have a search warrant, and none of the property seized was provided on consent.  Mr. Zazi
did not voluntarily consent to the search of his cell phone on September 16, 2009 or to the
seizure of a cooler from his home the next day.  Nor did Mr. Zazi's wife, Sultan Bibi Zazi
voluntarily consent to the seizure of backpacks from their home on February 1, 2010.

Warrantless searches are *per se* unreasonable under the Fourth Amendment subject to a
"few specifically established and well-delineated exceptions," *Katz,* 389 U.S. at 357, including
searches upon consent.  *See Schneckloth,* 412 U.S. at 218.  When the constitutionality of a
consent search is challenged, the government has the burden of proving by a preponderance of
the evidence "that consent was freely and voluntarily given."  *United States v. Price,* 599 F.2d
494, 503 (2d Cir. 1979).  "Mere acquiescence to lawful authority or submission to express or
implied coercion cannot validate a search." *Id.  See also United States v. O'Brien,* 498 F. Supp.
2d 520, 537 (N.D.N.Y. 2007) ("[N]on-resistance is not synonymous with cooperation and is not
a factor demonstrating consent").  "Consent to search is not to be lightly inferred and must be
unequivocal, specific, and intelligently given."  *United States v. Chisholm,* No. 07-CR-795, 2009
WL 29313, at *4 (E.D.N.Y. Jan. 2009) (quoting *United States v. Como,* 340 F.2d 891, 893 (2d
Cir. 1965) (internal quotation marks omitted).

Whether voluntary consent to search was provided is a fact-based inquiry that turns on
the totality of circumstances, including both the characteristics of the individual who authorized

43

the search and the details of his or her interaction with law enforcement.  *See Schneckloth,* 412 U.S. at 227; *Price,* 599 F.2d at 503.  Relevant factors in determining consent include the individual's background and intelligence, education level, physical and mental condition, and whether the person was advised of his or her right not to consent. *See Schneckloth,* 412 U.S. at 226; *Price,* 599 F.2d at 503.

A third party who maintains common authority, such as joint access, over the place to be searched may consent to the search.  *See United States v. Matlock,* 415 U.S. 164, 171 (1974).  Third party consent requires access to the location and either common authority over the area, a substantial interest in the area, or permission to gain access.  *United States v. Davis,* 967 F.2d 84, 87 (2d Cir. 1992).  Even if a third party does not, in fact, have authority to consent, the consent may still be valid if the agents reasonably rely on the "apparent authority" of the consenting party.  *Illinois v. Rodriguez,* 497 U.S. 177, 186 (1990).

A.  <u>Mohammed Zazi Did Not Voluntarily Consent to the Search and Seizure of his Cell Phone on September 16, 2009</u>

Mr. Zazi did not voluntarily consent to the search of his cell phone on September 16, 2009.  He did not even hand the agent his phone; either Mr. Folsom or Najibullah did.  Mr. Folsom obviously did not have common authority over Mr. Zazi's phone.  Although Najibullah certainly had access to his father's phone, he did not have a substantial interest in it or permission to gain access.  Nor was it reasonable for the officers to think he did.  Cell phones are not typically shared among adult family members.  *Cf. Davis*, 967 F.2d at 87 (validating third-party consent to search jointly used footlocker).  In this case, Mr. Zazi and his son were obviously not sharing a phone because Najibullah had one of his own.

Upon receiving Mr. Zazi's phone, the agent said:  "Against the rules here, we're going to turn this on.  Just don't tell anybody that we turned this on."  Then the agent asked Mr. Zazi for

his number.  Mr. Zazi was not provided with a consent to search form until much later.  Nor was he notified at that moment of his right to take back the phone or refuse to provide his number. Mr. Zazi was not born and raised in this country, and he does not have even a high school education.  As of September 16, 2009, he had no prior arrests and no prior experience with the criminal justice system.  Given his background, the interrogation he had already endured that day, and the agent's obvious intention to flout the rules, it was perfectly reasonable for him to conclude he had no right to refuse a search of his phone, and it would have been entirely ineffective even if he did.

Since the agents seized and searched Mr. Zazi's phone illegally, the phone and its Sim card must be suppressed.  The Court should also suppress the results of the forensic examination and any other information extracted from the phone or gathered as a "fruit" of the phone search. *See Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963).  Alternatively, Mr. Zazi is entitled to an evidentiary hearing on the lawfulness of the search.

B.  Mr. Zazi Did Not Consent to the Seizure of a Cooler from his Apartment on September 17, 2009

Mr. Zazi did not voluntarily consent to the seizure of a cooler from his apartment on September 17, 2009.  He turned over the cooler the day after eight agents had descended upon his apartment, conducted a nine-hour search, and taken dozens of swabs and multiple items of personal property.  In light of Mr. Zazi's inexperience with the criminal justice system, it was logical for him to assume he had no choice but to provide agents with the cooler, or they would simply take it anyway.  *See United States v. Isiofia,* 370 F.3d 226 (2d Cir. 2004) (upholding district court's finding of coercion in part because the defendant was an immigrant and non-native English speaker and was unaware of his right to refuse consent).

45

The written consent form signed by Mr. Zazi does not salvage the search.  As Judge

Gleeson found in *United States v. Singh,* No. 02-CR-1138, 2003 WL 145222, at *3 (E.D.N.Y.

Jan. 8, 2003), Mr. Zazi "was simply directed to sign a piece of paper that [h]e neither read nor

had read to h[im].  The mere fact that the paper stated a consent on h[is] part to search the

residence does not satisfy the government's burden." *Id.*

The cooler and its contents should be suppressed or, at a minimum, an evidentiary

hearing held.

C.   Sultan Bibi Zazi Did Not Voluntarily Consent to the Seizure of Backpacks from the Zazi
Residence on February 1, 2010

Sultan Bibi Zazi did not voluntarily consent to the seizure of backpacks from her

residence on February 1, 2010.  She turned over the backpacks at the end of an exceedingly long

day, which included the arrest of her husband and the lengthy interrogations and threatened

arrests of her and her children for criminal conduct and alleged immigration offenses.  Ms. Zazi

does not speak English, and she is illiterate.  She has never worked outside the home.  As of

February 1, 2010, her only prior experience with the criminal justice system involved the top-to-

bottom search of her apartment on September 16, 2009 and the arrests of her husband and son

three days later on September 19, 2009.  Given her background and experience, it is no surprise

she believed the agents had the same authority to search on February 1, 2010 as they had on

September 16, 2009.  Following the threats and accusations leveled at her and her children that

day, it was further reasonable for her to assume that failure to provide the backpacks would

anger the agents and could result in her arrest.  In short, the agents took advantage of Ms. Zazi's

inexperience, and her fragile mental and psychological state, to procure her *involuntary* consent

to search the backpacks.

46

The facts here can be compared to *Isiofia,* 370 F.3d at 231, in which the Second Circuit upheld the district court's finding of coercion in part because 1) the arrest of the defendant at his home "must have been very startling, to say nothing of harrowing," 2) the defendant was "an immigrant and not a native English-speaker, a fact readily apparent to the agents," 3) and the defendant was not aware he had the right to refuse consent.  *Cf. United States v. Garcia,* 339 F.3d 116, 120 (2d Cir. 2003) (upholding finding of consent by defendant's wife, who was "a poised and well-spoken witness who speaks both English and Spanish and is employed outside the home by a social services organization") (internal quotation marks omitted); *Price,* 599 F.2d at 503 (upholding finding of consent by college educated defendant who had previous experience with the law and provided consent within one to two minutes of encountering the agents).

Just as above, Ms. Zazi's written consent form does not salvage the search.  She "was simply directed to sign a piece of paper that she neither read nor had read to her."  *Singh,* 2003 WL 145222, at *3.  Accordingly, the backpacks seized from the Zazi residence on February 1, 2010, should be suppressed.  In the alternative, this Court should order an evidentiary hearing.

VI.

THE GOVERNMENT SHOULD BE COMPELLED TO
PROVIDE A BILL OF PARTICULARS AND
ADDITIONAL ITEMS OF DISCOVERY

By letters dated July 21, 2010 and January 14, 2011, the defense made formal written

demands for discovery, including a request for a Bill of Particulars. While the government has

produced substantial discovery, it should, given the breadth of the statutory charges, provide a

bill of particulars and, pursuant to Fed. R. Crim. P. 16 and *Brady v. Maryland*, 373 U.S. 83

(1963), produce additional items of requested discovery.

A. The Government Should Provide A Bill of Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure authorizes the Court to "direct the

government to file a bill of particulars." Fed. R. Crim. P. 7(f). As the Second Circuit has

explained, a Bill of Particulars achieves two discrete objectives:

> [a] bill is appropriate to permit a defendant "to identify with
> sufficient particularity the nature of the charge pending against
> him, thereby enabling defendant to prepare for trial, to prevent
> surprise, and to interpose a plea of double jeopardy should he be
> prosecuted a second time for the same offense."

*United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (quoting *United States v.*

*Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)). *See also United States v. Nachamie*, 91 F. Supp.

2d 565, 570 (S.D.N.Y. 2000) (quoting *Bortnovsky*, 820 F.2d at 574) (ordering a Bill of

Particulars).

Here, a bill of particulars is needed to "prevent surprise, and to interpose a plea of double

jeopardy." *Id.* Despite the information provided, given the breadth of the statutory charges,

nothing prevents the government from adding additional allegations, or changing the particulars

it intends to prove at trial. In such a circumstance, Mr. Zazi would have no ability to mount a

defense.  *See Davidoff*, 845 F.2d at 1154, (citing and quoting *Bortnovsky*, 820 F.2d at 574).

Accordingly, particulars with respect to the following counts are requested:

Counts Two and Four:  Based on the government's proffers, the alleged destruction of evidence took place on or about September 15, 2009.  However, the indictment charges that the crime took place "[i]n or about and between September 2009 and October 2009."  Especially given the broad timespan alleged, the Court should direct the government to detail whether there are any other acts of evidence destruction in addition to those allegedly committed on September 15, 2009.

Count Three:  Mr. Zazi is charged with witness tampering, in that he attempted to hinder the communication of information "relating to the commission and possible commission of one or more Federal offenses."  Colson Aff. Ex. D ¶ 10.  With respect to Count Three, the government has alleged that Mr. Zazi told his family members to lie to the grand jury and say that Amanullah was legally adopted.  Presumably, then, the "federal offenses" to which the witness tampering relates are the visa fraud and false statements offenses alleged in Count Seven and Eight.  A bill of particulars is necessary to ensure that the government will not allege at trial any other, entirely unrelated, acts of witness tampering with respect to other "federal offenses."

Count Five:  Mr. Zazi is charged with providing false information in connection with a terrorism investigation.  The Court should direct the government to specify whether there is any "false information" that Mr. Zazi supposedly provided that is different than the three statements detailed in Count Six and Eight relating to whether Mr. Zazi knew Ahmed Wais and had spoken to him, as well as the nature of  the relationship between Mr. Zazi and Amanullah.

B.  <u>The Government Should Produce Additional Discovery</u>

The following items of discovery should also be produced pursuant to Fed. R. Crim. P. 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

<u>Handwritten notes reflecting Mr. Zazi's statements to law enforcement</u>.  The government has provided several law enforcement reports detailing statements Mr. Zazi allegedly made to on September 16, September 18, and December 2, 2009.  By letter dated January 14, 2011, the defense requested production of any handwritten notes from these interviews.  *See* Letter from Deborah Colson to Andrew Goldsmith (Jan. 14, 2011), at 1-2.  To date, the government has declined to produce such notes.  Because such documents constitute Mr. Zazi's statements, they are discoverable pursuant to Rule 16, and should be produced.  *See* Fed. R. Crim. P. 16(a)(1)(A); *see also United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (handwritten notes containing different statements than those in official reports are discoverable under *Brady*).

<u>Any documents concerning or reflecting the topics as to which Mr. Zazi allegedly made false statements</u>.  In Counts Five, Six and Eight, the government alleges that, on September 16 and 18, 2009, Mr. Zazi made false statements to the FBI concerning (1) whether he knew Ahmed Wais; (2) whether he had spoken to an individual in New York about Najibullah being in trouble, and (3) whether his nephew, whom he had raised, was his legally adopted son.  In Counts Six and Eight, these allegedly false statements are charged as violations of § 1001(a)(2), which requires that the false statements be "material."  Because materiality is an element of the offense, the government should be required to produce any documents concerning its understanding of the subject matters about which Mr. Zazi allegedly made false statements, as well as any documents that bear on the larger question of whether these statements were "capable of influencing" the FBI's investigation.

Indeed, the government itself recognizes the relevance of what its FBI agents knew or were told by others as of September 16 and September 18.  In its most recent document production, the government provided the defense with a transcript of the FBI's September 16, 2009 interview of Najibullah Zazi.  AUSA Andrew Goldsmith said that the transcript was being provided because the government will seek to introduce portions of it at trial to demonstrate what the FBI agents knew at the time and what was "going on" with the investigation.  Under this theory, the government should therefore produce *all* documents that demonstrate – at least with respect to the topics of Mr. Zazi's alleged false statements – what the FBI agents knew at the time and what was "going on" with the investigation.

In particular, during the interview, Najibullah said that Amanullah was his biological brother.  *See* Colson Aff. Ex. E.  While the government will undoubtedly claim that Najibullah lied about Amanullah, the alleged lie does not seemed to have influenced the agents in any way because they had already determined that Amanullah and Najibullah were cousins, not brothers.  The agents immediately confronted Najibullah and said they knew he was lying because Amanullah had told them he was Najibullah's cousin and they had already uncovered the true family relationship between them.  Accordingly, the agents must have had that same information when they interrogated Mr. Zazi the same day, raising serious questions about the materiality of his alleged lie.

At bare minimum, then, the government should be required to produce all documents relating to its interviews with Amanullah.  Documents reflecting that the agents had information contrary to the alleged false statements are "material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E)(i), and may in fact constitute *Brady* material.

Finally, there is a substantial question as to why any purportedly false statements Mr. Zazi made about Ahmed Wais and/or the legal status of his relationship with Amanullah mattered at all, or was in any way "capable of influencing" the FBI in connection with its investigation of Najibullah Zazi's alleged plot with others to bomb the New York City subway system. The government should therefore also produce as *Brady* material any evidence that undermines the government's theory that Mr. Zazi's alleged false statements were capable of influencing the FBI investigation into Najibullah Zazi.

Documents relating to a potential claim of vindictive prosecution. Mr. Zazi has been prosecuted in two different jurisdictions, re-arrested and detained again while on pretrial release for his first case, and, after he refused to plead guilty, now faces seven additional and duplicative charges. There is ample evidence that the government prosecuted Mr. Zazi in order to pressure his son to cooperate. When that goal was achieved, speedily and effectively, the government offered Mr. Zazi a plea agreement. When Mr. Zazi chose to exercise his rights to trial, the government responded with the superseding charges, adding seven additional charges, many of which lack venue in this district. Given the unusual circumstances of Mr. Zazi's prosecution, together with what has been reported in the press and attributed to law enforcement sources about the motivation for this prosecution, the defense should be entitled to discovery that relates to a potential claim of vindictive prosecution.

Certainly, the "decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate." *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000) (omitting internal citations and quotation marks). "However, the decision to prosecute violates due process when the prosecution is brought in retaliation for the defendant's exercise of legal rights." *United*

*States v. Sattar*, 314 F. Supp. 2d 279, 311 (S.D.N.Y. 2004).  Upon such a claim, "an indictment

will be dismissed if there is a finding of actual vindictiveness, or if there is a presumption of

vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's

action."  *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999) (per curiam) (internal

citations and quotations marks omitted).  To obtain discovery on a claim of vindictive

prosecution, a defendant must provide "some evidence tending to show the existence of the

essential elements of the defense."  *Sanders*, 211 F.3d at 717.

Here the "totality of the objective circumstances" suggests that this prosecution has been

pursued largely for reasons unrelated to the alleged crimes of Mr. Zazi.  Initially, the government

used Mr. Zazi in its high stakes efforts to ensure the cooperation of his son, Najibullah Zazi.

However legitimate that goal may have been, when Mr. Zazi refused to accept the government's

plea offer and go away quietly, the government added seven additional charges.  The duplicative

and superfluous nature of those charges, as well as threats to seek the draconian "terrorism

sentencing enhancement" if Mr. Zazi is convicted, raises serious questions about the motivations

for this prosecution.  Accordingly, the government should disclose to the defense documents

bearing on its charging decisions as it relates to a potential claim of vindictive prosecution.

## <u>CONCLUSION</u>

For the above reasons:(1) Counts One, Four, Six, Seven and Eight should be dismissed for lack of venue; (2) the government should dismiss the duplicative counts; and (3) the Court should suppress Mr. Zazi's statements to agents on September 16 and September 18, 2009, as well as the property seized from his residence and person on September 16 and 17, 2009, and February 1, 2010.


Dated:    New York, New York                     Respectfully Submitted,
          March 24, 2011
                                                 COLSON & HARRIS LLP


                                                 By:      /s/
                                                     _____
                                                       Deborah A. Colson, Esq.
                                                       Justine A. Harris, Esq.
                                                       COLSON & HARRIS LLP
                                                       10 E. 40th Street, Suite 3307
                                                       New York, New York 10016
                                                       (212) 257-6455

                                                       *Attorneys for Mohammed Wali Zazi*