COLSON & HARRIS LLP

10 East 40th Street
Suite 3307
New York, NY 10016

T   212-257-6455
F   212-257-6453


June 10, 2011


By ECF

Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11202

   Re: *United States v. Mohammed Wali Zazi,* 10 CR 60 (S-1) (JG)

Dear Judge Gleeson:

   We write in opposition to the government's motions *in limine*.  In addition, we respectfully submit our own motion *in limine* to preclude the government from introducing detailed evidence of Najibullah Zazi's terrorist plot or of the related criminal investigation and to exclude any and all co-conspirators' statements made after the period of the conspiracy.  We further request notice of any and all additional statements the governments seeks to introduce under Fed. R. Evid. 801(d)(2)(E); move to strike the phrase "investigation by the FBI" from the definition of "Federal Terrorism Proceedings" in the indictment; and move for production of the relevant grand jury minutes.

   First, Mohammed Zazi's alleged visa fraud is not inextricably intertwined with the charged offenses and is inadmissible under Fed. R. Evid. 404(b) and 403.  Second, the statements of Mohammed Zazi's son, Najibullah Zazi, are irrelevant and immaterial to the crimes charged.  The government's true purpose in seeking to admit these statements is to inflame and frighten the members of the jury and to prejudice them against Najibullah and his family.  The statements are inadmissible under Fed. R. Evid. 403 and under *Crawford v. Washington,* 541 U.S. 36 (2004).  Third, detailed evidence of Najibullah's terrorist plot and related criminal investigation should be excluded as irrelevant and prejudicial.[1]  Fourth, any and all co-conspirators' statements made after the termination of the conspiracy should be excluded under Rule 801(d)(2)(E), and the government should be required to provide notice of all additional statements it seeks to admit under this rule.  Fifth, the phrase "investigation by the FBI" should be stricken from the indictment as irrelevant and prejudicial.  In addition, because the government's improper use of the phrase raises a concern that the grand jury was erroneously instructed, the government should be required to produce the relevant grand jury minutes.

---

[1] In addition to the above motions *in limine*, the government has also moved to preclude Mr. Zazi from arguing that he was prosecuted in order to pressure his son Najibullah to cooperate.  The defense does not anticipate raising such an argument at this juncture.

Honorable John Gleeson
Page 2


1.   **Evidence of the Alleged Visa Fraud is Inadmissible**

        The government seeks to admit multiple immigration documents, dating back to 1997, in which Mr. Zazi is alleged to have falsely claimed Amanullah Zazi as his biological son.  These documents include: (a) a Refugee/Asylee Relative Petition, dated August 1997, in which Amanullah is listed as Mr. Zazi's biological son; (b) three affidavits filed in support of the petition by Sherman and Mohammad Akbar, in which the Akbars claim that Amanullah is Mr. Zazi's son; (c) an Application for Naturalization, filed in June 2006, in which Amanullah is listed as one of Mr. Zazi's six children; and (d) a Form I-130 Petition for Alien Relative, filed in January 2007, stating that Amanullah Zazi is Mohammed Zazi's "child" and is not related by adoption.  For the reasons set forth below, this evidence should be precluded.[2]

        a.   *The immigration documents are not inextricably intertwined with the charged offenses*

        The government's obstruction charges are based in part upon allegations that Mr. Zazi falsely told FBI agents that Amanullah was his adopted son and subsequently encouraged family members to lie about Amanullah to the grand jury.  According to the government, Mr. Zazi's uncharged visa fraud is "inextricably intertwined" with this offense because it provides background on the co-conspirators' relationships and "helps explain the defendant's motive in lying."  (Gov't ltr. 8).

        To avoid a Rule 404(b) analysis, evidence of uncharged criminal activity must do more than provide background or context for the charged offenses.  *See United States v. Kassir,* 04-CR-356, 2009 WL 976821, at *2 (S.D.N.Y., April 9, 2009).  It must meet the criteria set forth in *United States v. Gonzalez,* 110 F.3d 936, 942 (2d Cir. 1997), namely that it 1) "ar[ises] out of the same transaction or series of transactions as the charged offense," 2) "is inextricably intertwined with the evidence regarding the charged offense," or 3) "is necessary to complete the story of the crime on trial."  *Id.* (internal quotations and citation omitted).  "[W]here it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *Kassir,* 2009 WL 976821, at *2 (quoting *United States v. Nektalov,* 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004)).

        Mr. Zazi's alleged visa fraud is not inextricably intertwined with the instant case.  It does not establish the existence of the charged conspiracy or explain the development of a relationship between the co-conspirators because none of Mr. Zazi's co-conspirators are accused of participating in the fraud.  *Cf. United States v. Stanley,* No. 09-CR-141, 2010 WL 1633459, at *1 (E.D.N.Y. April 21, 2010) (allowing evidence of uncharged criminal conduct committed with the same individual alleged to be a co-conspirator in the pending case).  In addition, whether or not Mr. Zazi previously claimed Amanullah as his biological child has no bearing on whether he lied about Amanullah's adoption because, according to the government, both statements are false.  The government contends that

---

[2] In addition to the above documents, prosecutors should also be precluded from introducing Mr. Zazi's alleged statements in November 2009 to ICE Special Agent Travis McFarren, taking responsibility for the false statements in Amanullah's immigration application.  Mr. Zazi's statements to the agents are inadmissible for the same reasons as the documents.

Honorable John Gleeson
Page 3

Amanullah is neither Mr. Zazi's biological child nor his adopted child, but rather his nephew.  Each alleged lie is, thus, its own discrete offense, wholly distinct from the other.  Proof of one lie is not required to establish the other; indeed, one negates the other.  At least one of the immigration documents explicitly states that Mr. Zazi and Amanullah are blood relatives, *not* related by adoption.  After having told immigration authorities that Amanullah was not adopted, Mr. Zazi would have no motive to state the opposite to the FBI.

In short, Mr. Zazi's alleged visa fraud is not inextricably intertwined with the instant offense, and the Court should engage in a Rule 404(b) analysis.[3]

### b.   *The immigration documents are inadmissible under Rule 404(b)*

Evidence of uncharged criminal conduct is inadmissible under Rule 404(b) to prove the character of the accused or his propensity to engage in criminal conduct.  It may be offered only for some other, legitimate purpose such as to establish motive, intent, knowledge, opportunity or plan.  *See* Fed. R. Evid. 404(b).  "The Government bears the burden of demonstrating the admissibility of evidence under Rule 404(b)."  *United States v. Nachamie*, 101 F. Supp. 2d 134, 137 (S.D.N.Y. 2000).  Here, the government contends that Mr. Zazi's alleged visa fraud establishes his motive to lie to the FBI and to encourage his family members to lie to the grand jury.  It further argues that "[e]vidence of his lies in the immigration proceedings also demonstrate his intent to continue the lie in the course of the instant investigation."  (Gov't ltr. 9).  The government's arguments are inherently flawed.

Mr. Zazi's alleged lies to the FBI fall under Count 5, charging obstruction of justice under 18 U.S.C. §1503(a).  To establish a violation of §1503(a), the government must show that Mr. Zazi intended to "corruptly…influence…the due administration of justice."  The elements of §1503 are that (1) a judicial proceeding was pending, (2) the defendant knew of the judicial proceeding, and (3) the defendant acted corruptly with the intent to impede or obstruct that proceeding.  *See United Sates v. Schwarz*, 283 F.3d 76, 105-06 (2d Cir. 2002) (citing *United States v. Aguilar*, 515 U.S. 593, 599 (1995) ("'Administration of justice' has been authoritatively construed to require a pending federal judicial proceeding, such as a federal grand jury proceeding.").  The government must show a nexus in "time, causation or logic" between the conduct and the proceeding, *United States v. Ortiz*, 220 Fed. Appx. 13, 16-17 (2d Cir. 2007) (unpublished), meaning the defendant must know that his actions "are likely to affect the…proceeding."  *Aguilar*, 515 U.S. at 599.

The judicial proceeding at issue here was a federal grand jury investigation into "the plot by Najibullah, Ahmedzay, Medunjanin and others to detonate improvised explosive devices in suicide attacks in New York City."  (Gov't ltr. 6).  Thus, to prove Mr. Zazi guilty of Count 5, the prosecution must show that he lied about Amanullah, or encouraged family members to lie, with the understanding that his lies were likely to affect the grand jury proceedings against Najibullah, Ahmedzay and

---

[3] Even if this Court decides that evidence of the uncharged visa fraud is admissible under *Gonzalez*, the Court must still balance its probative value against the danger of unfair prejudice.  *See* Fed.R.Evid. 403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury…").  For an analysis of the prejudice, *see* subsection c, *supra* 4-5.

Honorable John Gleeson
Page 4

Medunjanin.  If, as the government alleges, Mr. Zazi lied about Amanullah solely to conceal or continue a previous lie to immigration, then he lacked the intent to obstruct the terrorism proceedings against Najibullah.  Put another way, if the evidence of Mr. Zazi's uncharged visa fraud is offered to establish his intent to conceal that fraud, then it has no probative value in the instant case.

According to the government, in early September 2009, the FBI and grand jury were also investigating whether Amanullah was involved in, or had information about, Najibullah's travel to Afghanistan or his plan to attack.  (Gov't ltr. 6-7).  However, prosecutors have never provided any evidence, nor have they ever indicated an intention to argue, that Mr. Zazi *knew* Amanullah was a subject of the grand jury investigation.  Absent that knowledge, Mr. Zazi's alleged lies about Amanullah are immaterial.  *Cf. Schwarz*, 283 F.3d at 109 ("The fatal defect in the government's case is that there was no showing that Bruder, who had been subpoenaed only for his memo book, knew that the allegedly false statements he made to the federal investigators on November 8, 1997 would be conveyed to the federal grand jury").

Since the government has failed to establish a legitimate purpose for introduction of the immigration documents, they should be excluded under Rule 404(b).

> c.   *The probative value of the documents are substantially outweighed by the danger of unfair prejudice*

Whatever the relevance of the uncharged visa fraud, it is substantially outweighed by the danger of unfair prejudice.  First, Mr. Zazi's alleged lies on the immigration documents establish his character as a liar and propensity to lie to federal authorities, which is the very injustice Rule 404 attempts to prevent.  *See Nachamie,* 101 F. Supp. 2d at 142 ("The potential for prejudice, moreover, is greatly enhanced where, as here, the prior offense is similar to the one for which the defendant is on trial") (quoting *United States v. Puco*, 453 F.2d 539, 542 (2d Cir. 1971)).

Second, the government's evidence of Mr. Zazi's alleged visa fraud is stronger than its evidence of the obstruction.  The government has documentary evidence of the visa fraud, but will rely on witness testimony to establish Mr. Zazi's lies about the adoption.  This imbalance in the quality of evidence creates a serious risk of conviction—even absent sufficient proof of the crimes charged—on the theory that one lie to federal authorities is indistinguishable from another.  *See Old Chief v. United States,* 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged").  Assuming this risk is particularly inappropriate here where the counts charging visa fraud were dismissed prior to trial on Constitutional venue grounds.

Third, some jurors may view the alleged visa fraud as more egregious than Mr. Zazi's purported lies about the adoption.  *See United States v. Khan,* 591 F. Supp. 2d 202, 206 (E.D.N.Y. 2008) (prohibiting evidence of uncharged murder in a drug case, also alleging leadership in a continuing criminal enterprise, because "courts in this circuit have repeatedly expressed disapproval of the admission of uncharged criminal conduct that is 'more serious than the charged crime'").  Whether or not Amanullah was legally adopted, he was a long-term resident of the Zazi household.  The visa

Honorable John Gleeson
Page 5

fraud, however, includes multiple alleged lies, under oath for the purpose of assisting a relative to repeatedly enter the United States illegally. Many Americans hold strong anti-immigrant views and may consider any effort to further the illegal immigration of a relative as its own unique evil. *See, e.g.,* CBS News Poll, Dec. 2010 (How serious a problem do you think the issue of illegal immigration is for the country right now--very serious, somewhat serious, not too serious, or not at all serious? 58% Very serious, 26% Somewhat serious, 11% Not too serious, 4% Not at all serious, 2% Don't know/No answer); *Many U.S. Voters Say No Citizenship For Immigrant Kids, Quinnipiac University National Poll Finds; Muslims Have Right To Mosque, But It's Inappropriate*, Quinnipiac University Polling Institute, Sep. 13, 2010 ("Voters also say 68 - 24 percent that immigration policy should emphasize stricter enforcement rather than integrating illegal immigrants into U.S. society "). Mr. Zazi himself is a naturalized American citizen. Thus, but for the admission of the immigration documents, the topic of illegal immigration would not be part of this trial.

Fourth, admission of the immigration documents will prompt a diversionary trial within a trial with minimal relevance to the instant case. Before the jury may consider facts relating to another criminal offense as proof of an element of the instant offense, the jury must conclude by a preponderance of the evidence "that the act occurred and that the defendant was the actor." *Huddleston v. United States,* 485 U.S. 681, 689 (1988). Here, that determination depends on: (a) what Mr. Zazi's immigration attorney understood about his relationship with Amanullah; (b) what advice she provided; (c) who obtained the witness affidavits from Sherman and Mohammed Akbar; (d) whose decision it was to include the affidavits in one of the applications; (e) whether the applications were translated into Pashto; and (f) any and all other circumstances under which the applications were signed and submitted. The parties' examination of these questions will divert the trial, waste time, and confuse the jury. *See United States v. Whitten,* 610 F.3d 168, 204 (2d Cir. 2010) (in penalty phase of murder case, district court correctly excluded evidence as to specific prison sentence of the other defendants because it would have required a trial within a trial regarding the other defendants); *United States v. Pepin,* 514 F.3d 193, 206 (2d Cir. 2008) (upholding the exclusion of evidence of child abuse in murder trial because of the possibility that it "would necessitate a 'diversionary trial within a trial'").

Finally, it would constitute unnecessary piling on to permit the government to offer multiple documents in support of a single fact, i.e. that Mr. Zazi lied to immigration authorities about Amanullah. Such "needless presentation of cumulative evidence" is prejudicial to Mr. Zazi and impermissible under Rule 403. *See* Fed. R. Evid. 403. Therefore, even if the Court decides to admit some evidence of the visa fraud, the number of documents should be limited. One document will undoubtedly suffice.

## 2.  Najibullah Zazi's Statements to Law Enforcement Agents are Inadmissible

The government seeks to admit portions of Najibullah Zazi's statements to law enforcement officers on September 16, 17 and 18, 2009. The statements the government seeks to admit include:

- A false explanation why Najibullah traveled to Pakistan in September 2008 and what he did while he was there;
- A false explanation why he traveled to New York City in September 2009 and his belief that he was being followed by law enforcement while there;

Honorable John Gleeson
Page 6

- Several statements about his relationship to Amanullah, including that they were brothers and were born to the same parents;
- Admissions that he spoke with "Afzali" while in New York City in September 2009, that Afzali obtained Najibullah's phone number from Mr. Zazi, that Afzali might be working as a government translator, and that Afzali told Najibullah that someone was looking for him;
- A belief that the United States should have no military presence in Afghanistan;
- False statements about the bomb-making notes found on his laptop;
- Admissions that he received military training at a jihadist training camp in Pakistan in September 2008, that he learned to make explosives there, and that the notes on his laptop were taken during his explosives training;
- Admissions that he had practiced assembling explosives in a rented hotel room in Aurora, Colorado in 2009, had purchased the components at local beauty supply stores, and had successfully constructed an explosive;
- Admissions that he intended to call the media, report that a terrorist attack was going to take place at a particular location, and then blow himself up to draw attention to his cause;
- False statements that his friends Adis and Zarein had not receiving military training in Pakistan and that no one else was involved in his plot;
- Admissions that he destroyed the hard drive on his laptop after returning from New York City and seeing news reports, and that family members watched him do it; and
- False statements that he did not intend to detonate explosives in New York and that he had searched the internet for New York-area locations where components could be purchased because the only zip code he knew was in New York.

For the reasons set forth below, these statements are irrelevant and immaterial to the crimes charged, and they should be excluded under Rule 403 and *Crawford v. Washington,* 541 U.S. 36 (2004).

### a. *The statements' effect on the agents who heard them is irrelevant*

The government asserts that Najibullah's statements are not hearsay because they are not being offered for their truth, "but for their effects on those who heard them and, in part as a result, conducted an investigation that the defendant obstructed."  (Gov't ltr. at 11).

As an initial matter, the government fails to identify the specific "effects" the statements had on the agents, other than to cause them to continue their investigation.  But the government also acknowledges that, by this point, the investigation was already long underway.  The FBI already knew about Najibullah's trip to Pakistan with his co-conspirators in September 2008, and likely about the military training he had received there.  Agents had been monitoring his and others' calls for an unspecified time.  And they had put Najibullah, himself, under physical surveillance on or before September 9, 2009.  They had followed him to New York, observed him with his co-conspirators, searched his laptop and uncovered the bomb-making notes, and searched the homes of his co-conspirators and others in Queens, New York.  Needless to say, they would have continued their investigation whether or not Najibullah had spoken to them on September 16, 17 and 18, and

regardless of what he had said.  In short, given the length and breadth of the investigation preceding the Najibullah interrogations, and the sheer quantity of information the agents already had, the effect his statements had on their decision to continue their investigation was negligible.

Second, even assuming the statements had a cognizable effect on the agents' decision to continue their investigation, their state of mind is legally and morally irrelevant.  *See United States v. Al-Moayad,* 545 F.3d 139, 161 n.18 (2d Cir. 2008) (excluding evidence in material support case of a Tel-Aviv bus bombing because it was not "legally and morally relevant to the conduct constituting the offenses") (quoting *United States v. Velazquez,* 246 F.3d 204, 211 (2d Cir. 2001)).  To establish Mr. Zazi's guilt as to any of the three remaining obstruction counts, the government must prove that *he* corruptly intended to obstruct, influence or impede federal judicial proceedings, either by destroying evidence or lying to the FBI.  *His* state of mind is at issue, not that of the agents.  The only legitimate purpose served by admission of the statements would be to corroborate the existence and continuation of a federal terrorism investigation.  These are facts to which the defense is prepared to stipulate and which, of course, could be proven in myriad ways.  *Cf. Nachamie,* 101 F. Supp. 2d at 142 (excluding evidence of prior conviction under Rule 404(b) because "the probative value of the prior conviction is undercut by the availability of other, less prejudicial evidence that makes the same points").

The single case the government cites in support of its motion is distinguishable on its facts.  In *United States v. Siegel,* 717 F.2d 9 (2d Cir. 1983), the Second Circuit upheld the admission of a memo, authored by a company's director of security, detailing diversion of corporate proceeds from the company.  The memo was introduced in support of count seventeen, which charged the defendants with preventing the special counsel retained by two of the company's officers "from communicating the information obtained in the memo to federal investigators."  *Id.* at 18.  The Court held that "the memo was relevant … as evidence tending to show the defendants knew that an investigation was in progress because of the memo and that they took steps to prevent special counsel from going to federal authorities."  *Id.* at 18-19.  Thus, the defendants were the recipients of information in *Siegel,* and their alleged crime was the concealment of that information from federal investigators.  Here, however, the information was received by law enforcement agents, and the effect such information had on the agents is immaterial.

Moreover, should the Court permit the government to introduce evidence of the agents' state of mind, then the defense will be obliged to counter.  We will renew our request for discovery of materials establishing the nature of the agents' investigation preceding the Najibullah interrogations, and their body of knowledge regarding the topics he discussed. (*See* Def's Mem. Supp. Pretrial Motions 51).  If agents already knew the truth about the information he provided, then the "effect" his statements had on them likely differed in both significance and character than if the agents knew little or nothing at all.  In addition, at trial we will seek to elicit testimony about the nature of the investigation, and to establish the agents' actual purpose in questioning Najibullah and his family members about matters regarding which they already knew the truth.  This focus on the agents will only divert the trial, confuse the jury, and waste time.  *See* Fed. R. Evid. 403 (relevant evidence may be excluded if there is a danger of "undue delay, waste of time, or needless presentation of cumulative evidence").

> b.   *The statements are inadmissible under Rule 403*

The government's true purpose in seeking to admit Najibullah's statements is to inflame and frighten the jury and prejudice them against Najibullah and his family.  In light of Najibullah's guilty plea, it will be impossible for the jury to ignore the truth of his admissions regarding his military training in Pakistan, his training in bomb making, his attempts to assemble explosives in a Colorado hotel room, his successful construction of an explosive, the bomb making instructions on his laptop, and his desire to blow himself up to draw attention to his cause.  Such evidence is highly charged and emotional and, given Mr. Zazi's relationship to Najibullah, could easily mislead the jury into believing that Mr. Zazi knew about or even played a role in the terrorist plot.  *See Al-Moayad,* 545 F.3d at 159-63 (excluding evidence of a Tel-Aviv bus bombing and a witness' experience at an Al-Qaeda training camp as highly inflammatory and prejudicial).  *See also United States v. Elfgeeh,* 515 F.3d 100, 127 (2d Cir. 2008) ("There can be little doubt that in the wake of the events of September 11, 2001, evidence linking a defendant to terrorism in a trial in which he is not charged with terrorism is likely to cause undue prejudice.").  The evidence unquestionably involves conduct more violent, destructive and inflammatory than the charged offenses and will have the inevitable effect of heightening the tone and gravity of the instant case.  *See Al-Moayad,* 545 F.3d at 161.  In light of our offer to stipulate to the existence and continuation of a terrorism investigation, "the already questionable probative value of [the evidence is] diluted even further in comparison with its considerable prejudicial effect."  *Id.* at 161.

The government claims a limiting instruction will alleviate any possible prejudice.  (Gov't ltr. at 11.)  But "[t]he Second Circuit did not—and could not—hold that, as a matter of law, limiting instructions will always cure the risk of undue prejudice."  *Nachamie,* 101 F. Supp. 2d at 146.  Here, given the extremely inflammatory nature of Najibullah's statements and the irreversible impact they will have on the seriousness and tone of the case, no limiting instruction will sufficiently mitigate their prejudicial effect.  *See United States v. Jones,* 16 F.3d 487, 493 (2d Cir. 1994) ("The presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense").  In fact, such an instruction will only call additional attention to the evidence.

> c.   *Admission of Najibullah's statements to the FBI will violate* Crawford v.
> Washington, *541 U.S. 36 (2004)*

*Crawford v. Washington,* 541 U.S. 36 (2004), bars the introduction of a witness' out-of-court, testimonial statements unless the witness is unavailable, and the defendant has had a prior opportunity for cross-examination.  *Id.* at 59.  Testimonial statements include statements made, as here, during "police interrogations."  *Id.* at 68.

The government has made no showing of Najibullah's unavailability to testify at trial; in fact, he is a government cooperator.  Neither does the government claim that Mr. Zazi had the opportunity to cross-examine Najibullah.  Instead, prosecutors attempt to sidestep a *Crawford* analysis altogether by asserting that Najibullah's statements are not being offered for their truth, but for their effect on the agents.  *See id.* at 59 n.9 (citing 471 U.S. 409, 411 (1985)) ("The [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter

Honorable John Gleeson
Page 9

asserted"). This claim is entirely disingenuous. The statements the government seeks to elicit fall into two categories: statements regarding Najibullah's plans and preparations for a terrorist attack, and those constituting direct proof of his father's offenses. Both categories of statements are inadmissible under *Crawford.*

As discussed in subsection (a) above, *supra* 8, the government's actual purpose in eliciting Najibullah's plans and preparation for a terrorist attack will be to educate the jury about those very matters and, in turn, to prejudice them against Najibullah and his family. In other words, these statements *are* being offered for their truth, whether or not the government acknowledges it. At the very least, given Najibullah's guilty plea, the truth of the statements will be impossible to ignore. Thus, the statements in this category are inadmissible under *Crawford* and should be precluded.

The remaining statements are also barred under *Crawford* as direct evidence of the crimes charged:

(1) The government accuses Mr. Zazi of falsely claiming he did not know a man named Afzali and did not have a telephone conversation with Afzali while Najibullah was in New York. Najibullah's admission that he received Afzali's phone number from his father serves as direct proof of Mr. Zazi's alleged lie. In addition, since this statement is likely to corroborate other evidence in the case, it will be impossible to ignore;

(2) The government alleges that Mr. Zazi falsely told FBI agents, and encouraged family members to repeat, that Amanullah was his adopted child. Najibullah's claim that Amanullah was his blood brother serves as direct proof of Mr. Zazi's alleged lie. It will also corroborate the testimony of other family members who are expected to claim ignorance of Amanullah's adoption until Mr. Zazi urged them to testify as such before the grand jury;

(3) The government alleges that Mr. Zazi participated in a conspiracy to destroy physical evidence of Najibullah's terrorist plot. Najibullah's admission that he destroyed his own hard drive, and that family members watched him do it, establishes Mr. Zazi's knowledge of his son's potential wrongdoing and serves as a motive for Mr. Zazi and other family members to destroy additional evidence themselves; and

(4) The government accuses Mr. Zazi of conspiring with others to conceal the truth about Najibullah's activities during his 2008 trip to Pakistan. Najibullah's false explanation for his trip to Pakistan, and his subsequent admission that he received military and explosives training there, creates the misimpression that Najibullah was Mr. Zazi's co-conspirator in the alleged concealment, and provides a motive for Mr. Zazi and other family members to lie.

In short, all of the above statements serve as direct proof of the crimes charged and should be excluded under *Crawford.*

3126.DOCX

Honorable John Gleeson
Page 10

**3.  Any Additional Evidence of Najibullah Zazi's Terrorist Plot and Related Criminal Investigation is Also Inadmissible**

According to the government, the pending charges against Mr. Zazi arise out of his role "in obstructing the investigation of the plot by Najibullah, Ahmedzay, Medunjanin and others to detonate improvised explosive devices in suicide attacks in New York City."  Gov't. ltr. at 6.  Aside from Najibullah's own statements, the government has yet to specify what additional evidence it seeks to elicit regarding Najibullah's plot or the related investigation.  This Court should require the government to immediately identify the source and quantity of its evidence on these topics.  Given the inflammatory and extremely prejudicial nature of such evidence, *see supra* 8, the Court's decision on admissibility should be made prior to trial, and Mr. Zazi should receive fair warning of the evidence that will be received.

In addition, the admission of detailed evidence on these subjects should be precluded.  The defense has agreed to stipulate to the nature and existence of a terrorist plot and related grand jury investigations.  *See Al-Moayad,* 545 F.3d at 161 (in light of this offer to stipulate, "the already questionable probative value of [the evidence is] diluted even further in comparison with its considerable prejudicial effect").  The purpose of allowing the government "to prove its case by evidence of its own choice" is to permit prosecutors to develop a "natural sequence of narrative evidence."  *Old Chief v. United States,* 519 U.S. 172, 186, 189 (1997).  Mr. Zazi is not accused of taking part in the terrorism plot, nor is evidence of the plot required to prove any element of the charged offenses.  Thus, a stipulation here will not disrupt the narrative flow of the government's case against Mr. Zazi.  *See Al-Moayad,* 545 F.3d at 161 (precluding evidence of a bus bombing in a material support case because the defendants were not charged with the bombing and omission of the evidence would not disrupt the narrative flow).  It will however, minimize the prosecution's ability to appeal to the jury's emotions and prejudices.

Whether or not there is a stipulation, evidence about the terrorism plot and related investigation should be highly contained.  The existence and nature of the grand jury's investigation may be considered relevant background information.  *See United States v. Langella,* 776 F.2d 1078, 1081 (2d Cir. 1985) (in obstruction case, indictment's background paragraphs served the purpose of informing the jury "of the scope and nature of the grand jury's investigation"); *United States v. DeSalvo,* 797 F. Supp. 159, 170 (E.D.N.Y. 1992) (in obstruction case, the nature of the grand jury's investigation "is relevant to a determination whether the defendant attempted to frustrate its completion").  However, a detailed presentation of the plotters' preparation and plans, and/or a step-by-step explanation of law enforcement agents' efforts to apprehend the suspects, will serve no purpose other than to inflame and frighten the jury.  Even worse, it is entirely possible the introduction of such evidence will mislead the jury into believing Mr. Zazi was involved in, or had advanced knowledge of, the plot.  For these reasons, any mention of the terrorist plot or the FBI's investigation should be extremely limited.

Honorable John Gleeson
Page 11

**4.   Any Co-Conspirators' Statements Made Following the Period of the Conspiracy Should be Excluded under Rule 801(d)(2)(E), and the Government Should Be Required to Provide Notice of Any and All Additional Statements it Seeks to Elicit Under the Rule**

Federal Rule of Evidence 801(d)(2)(E) provides that "[a] statement is not hearsay if [t]he statement is offered against a party and is … [made] by a coconspirator of a party during the course of and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Prior to the admission of evidence under Rule 801(d)(2)(E), the trial court must determine by a preponderance of the evidence the existence of a conspiracy and the declarant's involvement in it, and that any statements were made during the course of and in furtherance of the conspiracy. *See In re Terrorist Bombings of U.S. Embassies in East Africa,* 552 F.3d 93, 137 (2d Cir. 2008); *United States v. Zhao Wu Chen,* 322 Fed. Appx. 43 (2d Cir. 2009) ("Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule") (citation and internal quotation marks omitted). "A fact-finder may properly find the existence of a criminal conspiracy where the evidence is sufficient to establish, by a preponderance of the evidence, that 'the … alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent.'" *In re Terrorist Bombings,* 552 F.3d at 137-38 (citation and internal quotation marks omitted).

We know of at least two indicted co-conspirators, Naqib Jaji and Amanullah Zazi, and of at least six unindicted co-conspirators, Zaheer Akbar, Rabia Jaji, Murawi Zazi, Tariq Zazi, and Sultan Bibi Zazi.[4] We anticipate the government will seek to introduce multiple intercepted phone calls between these individuals, portions of their statements to law enforcement agents, and portions of their testimony before the grand jury.

Any and all statements made by or among the above individuals following the termination of the alleged conspiracy should be excluded. The government has already provided notice of its intention to introduce at least three intercepted phone calls that took place in November and December 2009, weeks after completion of the alleged criminal conduct. The evidence destruction alleged in Counts One and Two occurred on September 15, 2009; Mr. Zazi's alleged lies to law enforcement were made on September 16 and 18, 2009; and his family members testified before the grand jury on September 30 and October 1, 2009. Since any statements elicited after October 1, 2009, were not made "during the course of and in furtherance of the conspiracy," they are irrelevant and inadmissible under Rule 801(d)(2)(E). *See* Fed. R. Evid. 801(d)(2)(E). All such statements, therefore, should be precluded. In addition, given the voluminous discovery in this case, the number of co-conspirators whose statements may be introduced, and the preliminary showing required under Rule 801(d)(2)(E) before their statements are admitted, the government should be required to provide immediate notice of all additional statements it intends to elicit under the rule.

---

[4] We respectfully request that the government provide the names of any and all other unindicted co-conspirators not mentioned above.

Honorable John Gleeson
Page 12

**5.** **The Phrase "Investigation by the FBI" Should Be Stricken From the Definition of "Federal Terrorism Proceedings" in the Indictment, and the Government Should be Required to Produce the Relevant Grand Jury Minutes**

Under Rule 7(d) of the Federal Rules of Criminal Procedure, the Court, "upon the defendant's motion, may strike surplusage from the indictment." Fed. R. Crim. P. 7(d). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99-100 (2d Cir. 2001) (quoting *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990)). Such motions are also granted where the objectionable language "insinuate[s] unalleged facts unnecessary to the elements of the crimes charged." *United States v. Hubbard*, 474 F. Supp. 64, 82 (D.D.C. 1979). *See also United States v. Kassir*, 2009 WL 995139, at *3-4 (S.D.N.Y. 2009) (authorizing the removal of words from an indictment which would allow the prosecution to go beyond the specific charge made by the grand jury) (citing *United States v. Pope*, 189 F. Supp. 12, 25-26 (S.D.N.Y. 1960)). Indeed, a "charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002). Thus, when an indictment contains both facts within the scope of the relevant criminal statute and facts beyond the statute's scope that fail to state an offense, the facts that fall beyond the scope of the statute must be stricken.

In Count One of the indictment, the term "official proceedings" is defined to include "an investigation by the FBI, proceedings before one or more Federal grand juries and a criminal proceeding before a judge and court of the United States, all relating to Federal crimes of terrorism (collectively, the 'Federal Terrorism Proceedings')." The use of the phrase "Federal Terrorism Proceedings" is repeated in Counts Two and Five. The government's attempt to include the FBI's investigation within the ambit of "Federal Terrorism Proceedings" at issue here is both prejudicial and misleading. An "investigation by the FBI" does not satisfy the definition of "official proceeding" and cannot form the basis for charges under any of the relevant statutory provisions. The phrase should be stricken from the definition of "Federal Terrorism Proceedings" as surplusage under Rule 7(d).

The statute charged in Count Five, 18 U.S.C. § 1503, criminalizes obstructing the "due administration of justice." *See* 18 U.S.C. § 1503. "[A]dministration of justice…has been authoritatively construed to require a pending federal judicial proceeding, such as a federal grand jury proceeding." *Schwarz*, 283 F.3d at 105 (citing *Aguilar*, 515 U.S. at 599). Because an FBI investigation does not constitute a "federal judicial proceeding," obstructing an FBI investigation does not violate § 1503.

Nor does "an investigation by the FBI" constitute an "official proceeding" under 18 U.S.C. § 1512(c)(1) or (c)(2), the statutes charged in Counts One and Two. While "official proceeding" is defined in 18 U.S.C. § 1515(a)(1) to include "a proceeding before a Federal Government agency which is authorized by law," *see* 18 U.S.C. § 1515(a)(1)(A), (C), this does not include an investigation, unless such investigation is accompanied by formal adjudicative procedures. *See United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) (declining to rule as to whether an investigation constitutes a "proceeding before a Federal Government agency," but holding that Bureau of Prison Use of Force inquiry is such a proceeding because it requires "findings" by BOP officials). *See also United States v. Gabriel*, 125

Honorable John Gleeson
Page 13

F.3d 89, 105 n.13 (2d Cir. 1997), *abrogated on other grounds by Arthur Anderson v. United States*, 544 U.S. 696 (2005) (if defendant's sole intent was to interfere with an FBI investigation, then the jury "would have been compelled to find [the defendant] innocent" of witness tampering because a "government investigation" was not an "official proceeding") (dicta); *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) ("Thus, in all the instances in which the term 'official proceeding' is actually used in § 1512, its sense is that of a hearing rather than simply any investigatory step taken by an agency."). *Cf. United States v. Gray*, -- F.3d --, 2011 WL 1585076 (2d Cir. 2011) (§ 1519, unlike § 1512 does not require proof of an "official proceeding," and thus intending to obstruct an investigation makes out a crime).

Thus, obstructing an "investigation by the FBI" does not constitute a crime under any of the relevant statutory provisions, and the phrase should be stricken from the definition of "Federal Terrorism Proceedings." Failure to do so will prejudice Mr. Zazi as it will confuse and mislead the jury and risk conviction on improper grounds.

Including "investigation by the FBI" within the definitions of "official proceeding" and "due administration of justice," raises the additional concern that the government gave an erroneous legal instruction to the grand jury. "As a legal advisor to the grand jury, the prosecutor must give the grand jury sufficient information concerning the relevant law 'to enable it intelligently to decide whether a crime has been committed.'" *United States v. Twersky*, 1994 WL 319367, at *4 (S. D.N.Y., June 29, 1994) (quoting *People v. Calbud, Inc.*, 49 N.Y.2d 389 (1980)). An incorrect legal instruction to the grand jury requires dismissal if the error casts "grave doubt that the decision to indict was free from the substantial influence" of the erroneous instruction. *See United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (quoting *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256 (1988)).

Accordingly, in order to determine whether errors were made, the Court should order production of the grand jury minutes pursuant to Fed. R. Crim. P. 6(e)(3)(E)(ii), which authorizes disclosure of the minutes upon request when a defendant shows that a "ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). *See also Dennis v. United States*, 384 U.S. 855, 870 (1966) (disclosure appropriate when defense counsel demonstrates "particularized need"). *See also Twersky*, 1994 WL 319367, at *5. Upon review of the minutes, we will seek the opportunity to present additional argument on the issue, if necessary.

Very truly yours,

/s/

Deborah Colson
Justine Harris
(212) 257-6455

cc:    AUSA Berit Berger
        AUSA Andy Goldsmith