UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        -against-

MOHAMMED ZAZI

        Defendant

10 CR 60 (JG)
11 CR-718 (JG)

## SENTENCING MEMORANDUM
## FOR MOHAMMED ZAZI

Deborah Colson
Justine Harris
COLSON & HARRIS LLP
10 E. 40th Street, Suite 3307
New York, New York 10016
(212) 257-6455

*Attorneys for Mohammed Zazi*

Dated:   New York, New York
        January 23, 2012

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Introduction | 2 |
| II. | Mr. Zazi's Personal History and Characteristics | 3 |
| III. | The Circumstances of the Offense | 8 |
| IV. | The Terrorism Enhancement is Inapplicable | 10 |
| V. | Criminal History Category VI Substantially Over-represents Mr. Zazi's Criminal History | 22 |
| VI. | The Court Should Impose a Sentence of Probation | 24 |

# I.

## INTRODUCTION

Mr. Zazi was convicted on July 22, 2011, following a jury trial, of conspiring to obstruct justice in violation of 18 U.S.C. § 1512(k) and obstruction of justice in violation of 18 U.S.C. § 1512(c)(1).  The trial concerned his participation in a family plot to destroy chemicals, goggles, and masks and to lie to FBI agents during their investigation of his son, Najibullah, for possible terrorist activity.  Following the trial, on October 21, 2011, Mr. Zazi pled guilty before Your Honor to the additional crime of visa fraud in violation of 18 U.S.C. § 1546(a).  He admitted to lying on a Form I-130 Petition for Alien Relative, submitted on behalf of his nephew, Amanullah Zazi, by stating that Amanullah was his "child" and that they were not related by adoption.

The Probation Department estimates a Guidelines range of imprisonment of 360 months to life based on a Total Offense Level of 42 and a Criminal History Category of VI.  We object to the application of Guideline 3A1.4, the terrorism enhancement, because Mr. Zazi's offenses neither directly involved, nor were they intended to promote, a crime of terrorism.  Moreover, Criminal History Category VI "substantially over-represents" the seriousness of Mr. Zazi's criminal record and the likelihood that he will engage in future criminal conduct.  U.S.S.G. § 4A1.3.

We further believe a Guidelines sentence is significantly "greater than necessary to comply with the purposes" of sentencing articulated in 18 U.S.C. § 3553(a).  Mr. Zazi is not a terrorist.  He does not share the same characteristics or the same conduct as a terrorist, and in turn, does not share the same need for incapacitation or difficulty of rehabilitation.  But for his involvement in this case, Mr. Zazi has engaged in model citizenry, working for nearly two decades as a New York City taxi driver, attending religious services, and dedicating himself to

his wife, children and extended family.  Mr. Zazi has a significant number of strong, positive relationships with family and friends.  Many of those people have sent letters to the Court attesting to his honor, integrity, generosity of spirit, and opposition to extremism.  In short, Mr. Zazi's personal history and characteristics and the circumstances of his offense present a strong case for the full extent of the Court's leniency.

In support of the application, attached please find: (1) a letter from Mr. Zazi's prior employer, William Goldwasser (Ex. A); (2) a letter from Imam Karim Abuzaid of the Colorado Muslim Society (Ex. B); letters from Mr. Zazi's wife, Sultan Bibi Zazi and his children, Murawi, Mohammed Tariq, ███████████████ (Ex. C); (3) letters from Mr. Zazi's siblings and siblings in-law, Afzal Zazi, Bozz Zazi, Yar Zazi, Meeran Zazi, Nyaz Zazi, Deena Zazi, Gulpari Zazi, Lal Mohammed Zazi, and Najibah Zazi (Ex. D); (4) letters from Mr. Zazi's nieces, nephews and cousins, ██████████████████████████████████ ████████████████████████ (Ex. E); and letters from friends and tribal members, Mohammed Assil, Ahmad Zazi, Idriss, Bibi Khanum, Ghanum Gul, Haroon, Aashor, Hedayat Shah, Mohammad Naim, Ismael, Najia, Mohammed Hashem, and Niaz Khan (Ex. F).

## II.

## MR. ZAZI'S PERSONAL HISTORY AND CHARACTERISTICS

Mr. Zazi is an affable and engaging middle-aged man who was born and raised in Kabul, Afghanistan, and immigrated to this country in 1990 at the age of thirty-five.  He is a naturalized American citizen with a spouse of twenty-six years and five biological children ranging in age from nine to twenty-eight.  His conviction has prompted an outpouring of support from his family members and friends who describe him as hardworking, loyal, and intelligent; a proud American; and a fiercely devoted father, uncle, brother, and spouse.

Strikingly, the word most commonly used in connection with Mr. Zazi is generosity.  In their letters to the Court, his family members offer countless examples of his charity, not only with them, but with their neighbors and tribe members and even with complete strangers.  There was the money he lent to his cousin, Aziz, so he could emigrate to the west:

> That day our cousin Aziz came to our home for a visit and we told him we were going to migrate to the west.  He wished that he could come with us, but he had no money.  My brother Mohammed Wali looked at our cousin and we saw how disappointed he was.  My brother Mohammed Wali decided right on the spot.  He told my cousin take my money and you go with my brothers; I will come to the west later if it is meant to be.  That's how I, my brother and my cousin made it to Canada with my brother Mohammed Wali's generous gift.  Ex. D (letter of Afzal Zazi).

There were the many trips he organized for nieces and nephews to parks, amusement parks, Montreal and Niagra Falls.  Mr. Zazi's niece, ███████, writes that Mr. Zazi "used to visit us every summer for as long as I can remember….Besides taking us to beaches and parks and buying us ice cream, he would also take us to amusement parks.  My uncle would take all of us, and to let you know, we are a lot….My uncle took us to Canada's Wonderland, and yes he paid for ALL of our tickets, including my 2 uncles who went with us.  We had a great time there!" Ex. E (████████████████).

There were the frequent donations to non-profit organizations: "I remember being a little girl when he would take me to stores and give me money to buy toys and such," writes his niece, ████████ Ex. E (████████████████ .  "And when it was time to pay at the cash register, he would always drop any amount of spare change he had in his pocket into the donation box slot.  Same thing when we would go to restaurants and fast food places.  I even asked him once why he would place his money in the donation box, because that'd be wasting his money I said, and he said 'there are people who need it a lot more than us.'" *Id.*

4

But perhaps the most poignant example of Mr. Zazi's generosity is provided by his

brother, Meeran:

> I remember one time back home I was traveling with my brother Mohammed Wali Zazi
> and we were at a Bus station and we were waiting for our Bus to arrive.  My brother
> Mohammed Wali and I saw a homeless man shivering and curled up from the cold.  We
> both walk towards the homeless man and we saw his clothing was all torn and dirty.  My
> brother Mohammed Wali opened his luggage and took out his own brand new clothes
> that were made by a tailor and he gave it to the homeless man.  The homeless man put the
> clothes on and he was very excited.  My brother told the homeless man 'you look good in
> it,' the man looked at us and he started running away as fast as he could.  We both looked
> at each other and we smiled, the reason the homeless man run, he thought my brother
> may change his mind and ask for the clothes to give it back, but that was not my brother
> intention, my brother intention was for the homeless man to keep the clothes so he can
> keep himself warm that chilly evening.  Ex. D (letter of Meeran Zazi).

Though remarkable, Mr. Zazi's generosity is unsurprising: he was taught selflessness

from a young age.  As the eldest of eleven brothers and sisters, Mr. Zazi was expected to provide

for the family when his parents no longer could.  PSR at ¶ 70.  He dropped out of school and

began driving a truck as a teenager when his father became ill.  After several years, when he lost

the truck in an accident, he moved to Saudi Arabia in search of work.  He traveled between cities

for six years, doing odd jobs and construction work and sending money home on a regular basis.

*Id.* at ¶ 77.   He "sacrificed his childhood happiness, his education and his future for the

happiness of his elderly parents and his young siblings" explains his wife.  Ex. C (letter of Sultan

Bibi Zazi).  While Mr. Zazi was in Saudi Arabia, his family migrated from Afghanistan to a

refugee camp in Pakistan.  When he returned to Pakistan, "he brought a lot of money [for his

family] with him."  *Id.*

Mr. Zazi married his wife Sultan Bibi at the age of thirty-five.  In the years immediately

following their marriage, he traveled to India and then again to Saudi Arabia for work.  PSR at ¶

77.  He immigrated to the United States on his own in 1990 after his first two children Murawi

(age 28) and Najibullah (age 27) were born.  *Id.* at ¶ 75.  He found work in a fast food restaurant,

starting as kitchen help and then progressing to supervisor. *Id.* at ¶ 95. Eventually, he became a taxi driver. His family remained in refugee camps until he earned enough money to rent housing for them in Peshawar and send his children to private school. *Id.* at ¶ 77. Sultan Bibi writes: "Wali spent six years in the United States and lived here as a single person and for six years he was separated from me, his children and from his parents. These years were very difficult for Mohammed Wali Zazai because he was deprived from the joy of seeing his young kids which is the joyous time of life for parents to watch their young kids grow." Ex. C (letter of Sultan Bibi Zazi).

In 1996, Mr. Zazi applied for his wife and children to come to the United States. PSR at ¶ 77. The family settled in Flushing, Queens, where Mr. Zazi spent the next fifteen years employed as an independent contractor for Pace Project, a taxi company. *Id.* at ¶ 94. William Goldwasser, the Assistant Personnel Manager, describes Mr. Zazi as "honest, reliable and a good worker." Ex. A. Over the years, he and Sultan Bibi had three additional children, Mohammed Tariq (age 22), ████████████████████ PSR at ¶ 75. Mr. Zazi worked six days a week from 11 am to 1 am to support the family, while Sultan Bibi cared for the children and managed the household. Ex. C (letter of Sultan Bibi). He earned barely enough to make ends meet and much to his chagrin could never purchase his own medallion, but he rarely complained. "On his day off he used to go shopping and purchase our family requirements. When I observed Wali's busy life style, I suggested to him to collect Public Assistance like other people….He used to say that there is no need for us to collect Public Assistance, it is for those who are disabled and cannot work or have other problems that cannot cover their monthly expenses." *Id.*

On October 23, 2007, Mr. Zazi became a naturalized American citizen. PSR at ¶ 79. The day of the naturalization ceremony was one of the happiest days of his life. Mr. Zazi was never

politically minded, but he fervently believed in the American dream, in education, and hard work.  He was committed to raising his children as Americans and offering them the educational and professional opportunities he never had.  His brother, Afzal, writes that Mr. Zazi "continuously reminded his kids how fortunate they were to be in the greatest country in the world and that the door of opportunity is opened to them to be the best that they can be."  Ex. D (letter of Afzal Zazi).

In addition to raising his own children, Mr. Zazi took on the added responsibility of raising his nephew, Amanullah Zazi.  Amanullah's father, Lal Mohammed, lived in poverty in Pakistan and could not afford to support his son.  Mr. Zazi's "adoption" of Amanullah was yet another example of his kindness, and one accompanied by its own frustrations and headaches.  As a teenager, Amanullah started hanging out with the wrong crowd.  He lost interest in school and began cutting classes and using drugs.  Ex. D (letter of Bozz Zazi).  He stole from the family and spent the stolen money on marijuana.  He left the house, sometimes for several days at a time, and slept in parks.  Mr. Zazi remained devoted to Amanullah, but his attempts to discipline him failed.  Eventually, Mr. Zazi sent Amanullah back to Pakistan to live with his biological parents.  *Id.*  Unfortunately, Amanullah's drug and disciplinary problems continued in Pakistan. After several years, when his family in Pakistan lost patience with Amanullah, Mr. Zazi agreed to take him back.  *Id.*  Amanullah returned to the United States as a young adult in April 2009 and moved in for the second time with Mr. Zazi and his family.  PSR at ¶ 9.

In August 2009, Mr. Zazi and his family moved to Aurora, Colorado, a small suburb of Denver.  PSR at ¶ 12.  Several other family members, including Mr. Zazi's sister and brother-in-law, Rabia and Naqib Jaji, were already in Colorado, and they convinced Mr. Zazi that the quality of life was better there and that it was easier to make a living.  Mr. Zazi's plan was to

7

open an airport limousine company with Naqib.  He incorporated the company in September

2009, and was awaiting approval of an operation permit when the FBI began its investigation of

Najibullah.  The investigation culminated in the arrest of both father and son on September 19,

2009.

Mr. Zazi has been unemployed since his arrest.  PSR at ¶ 93.  He spent nearly two years

applying for jobs as a taxi and limousine driver, in grocery stores, and at fast food restaurants.

But his son's crimes have generated an enormous amount of negative publicity against the Zazi

family, and no one will hire him.  In recent months, Mr. Zazi's son, Tariq, has begun work at a

grocery store.  *Id.*  The family gets by on Tariq's earnings, along with food stamps and some

minimal assistance from Mr. Zazi's brother, Afzal.  *Id.*  As someone who takes pride in hard

work and in his role as head of household, Mr. Zazi's long-term unemployment has been

demoralizing to him and the most difficult form of punishment imaginable.  Nonetheless, Mr.

Zazi has used his free time productively to improve his physical condition, attend mosque, *see*

Exhibit B, and spend time with his younger children, Khadija and Usmon.

## III.

### THE CIRCUMSTANCES OF THE OFFENSE

The circumstances of the offense are well-known to the Court.  The government

presented evidence at trial that, on September 14, 2009, Mr. Zazi conspired to destroy, and aided

and abetted the destruction of, chemicals, paper masks, and plastic goggles in violation of 18

U.S.C. §§ 1512(c)(1) and (c)(2).  The evidence destruction, itself, was undisputed.  Mr. Zazi's

role, however, was hotly contested.  The materials had been stored in Naqib Jaji's house, not Mr.

Zazi's.  Zaheer Akbar conceived of the idea to destroy the materials and conveyed this idea to

Naqib, not to Mr. Zazi.  (Tr. 672-73).  Mr. Zazi did not destroy the evidence himself, nor was he

even present at Rabia and Naqib Jaji's house when the destruction took place.  Instead, prosecutors relied on the testimony of Amanullah and Naqib to establish that Mr. Zazi directed family members to destroy the chemicals.  Both Amanullah and Naqib had been prosecuted for their roles in the conspiracy, and they testified at trial pursuant to cooperation agreements with the government.

The government also argued at trial that Mr. Zazi lied to FBI agents during interrogations on September 16 and 18, 2009.  Mr. Zazi participated in both interviews voluntarily despite his poor English-language ability and the absence of a Pashto interpreter.  He was unrepresented by counsel during the first interview.  FBI agents inquired about a full range of topics, including Mr. Zazi's personal history and Najibullah's trip to New York.  They also presented Mr. Zazi with eleven photographs and nearly two dozen names.  Most of Mr. Zazi's responses to the agents' questions were truthful.  Nevertheless, the government alleged two sets of false statements under 18 U.S.C. § 1512(c)(2).  Mr. Zazi was accused of lying about his relationship with Queens-based imam, Ahmed Wais Afzali, and refusing to acknowledge his phone calls with the imam the week before.  He was also accused of falsely claiming Amanullah as his adopted son.

Last the government offered evidence that Mr. Zazi encouraged family members to lie to the grand jury about his relationship to Amanullah.  Mr. Zazi, himself, was not required to testify before the grand jury, and he remained in Colorado while his family members who were subpoenaed traveled to New York.  Again the government relied largely on the testimony of Amanullah and Naqib to establish that Mr. Zazi had directed family member to describe Amanullah to the grand jury as his adopted son.

To establish guilt under §§ 1512(c)(1) and (c)(2), the government had the burden of proving Mr. Zazi's corrupt intent.  Corrupt intent has been defined as "conscious[ness] of

wrongdoing." *Arthur Andersen v. United States,* 125 S.Ct. 2129, 2136 (2005). It requires "a nexus between a defendant's corrupt act and its effect on the official proceeding," *United States v. Jahedi,* 681 F. Supp. 2d 430, 435 (S.D.N.Y. 2009), meaning prosecutors had to demonstrate that Mr. Zazi knew his actions were likely to affect an official proceeding, in this case the federal grand jury investigation of Najibullah. *See Arthur Andersen,* 125 S.Ct. at 2137. ("[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding … he lacks the requisite intent to obstruct") (citation omitted); *United States v. Reich*, 479 F.3d 179, 185-86 (2d Cir. 2007) (applying the nexus requirement to § 1512(c)(1)). The government was not, however, required to establish—nor did it establish—that Mr. Zazi intended to encourage or bring about an act of terrorism. Nor did prosecutors carry the burden of proving actual obstruction; materiality was not an element of either offense.

Following the trial, Mr. Zazi pled guilty to a one-count indictment charging visa fraud. During the plea allocution, he acknowledged filing an Form I-130 Petition for Alien Relative on behalf of Amanullah, in which he swore under oath that Amanullah was his "child" and was not related by adoption. PSR at ¶ 32.

## IV.

## THE TERRORISM ENHANCEMENT IS INAPPLICABLE

The terrorism enhancement is the most severe of all the sentencing enhancements. It increases both the offense level and criminal history category for defendants convicted of a felony "that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). To illustrate how draconian this guideline is one has only to look at Mr. Zazi's case. Absent the enhancement, he is facing a Guidelines range of 97 – 121 months. Application of § 3A1.4 more than triples his advisory Guidelines, resulting in a range of 360 months to life.

Mr. Zazi was not convicted of a terrorism offense. Nor does the record reflect that he attempted, participated in, or conspired to commit any act of terrorism. Indeed, the government has repeatedly acknowledged that this is not a terrorism case. Nevertheless, the Probation Department applies the enhancement on the ground that Mr. Zazi was convicted of "felonies that involved or were intended to promote a federal crime of terrorism, to wit, the subway plot." PSR at ¶ 46. The PSR further states that Najibullah's bombing plot "was intended to influence or affect the conduct of the United States by intimidation or coercion or retaliation against government conduct and is a violation of 18 USC § 2332a." *See id.*

We oppose the enhancement because Mr. Zazi's offenses neither directly involved nor were they intended to promote a federal crime of terrorism. In addition, Mr. Zazi's conduct did not actually or significantly obstruct the government's investigation. Application of Guideline 3A1.4 would result in impermissible double counting, and it would produce an advisory Guidelines range that is "greater than necessary" to comply with the goals of sentencing articulated in 18 U.S.C. § 3553a.

A.   *Mr. Zazi's crimes neither directly involved nor were they intended to promote a federal crime of terrorism*

Guideline 3A1.4 applies where a defendant is convicted of a felony that either (1) "involved" or (2) "was intended to promote" a federal crime of terrorism. U.S.S.G. § 3A1.4. Neither prong of the Guideline is applicable here.

In *U.S. v. Awan,* 607 F.3d 306 (2d Cir. 2010), the Second Circuit held that "a defendant's offense 'involves' a federal crime of terrorism where his offense includes such a crime, *i.e.,* the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime." *Id.* at 313-14. *See also* U.S.S.G. § 3A1.4 comment (n. 1) (defining "federal crime of terrorism" by reference to 18

U.S.C. § 2332b(g)(5)(A)).  Since obstruction of justice is not among the offenses listed in 18

U.S.C. § 2332b(g)(5)(B), Mr. Zazi's offenses did not "involve" a federal crime of terrorism.

Nor were they "intended to promote" a federal crime of terrorism.  "The 'intended to

promote' prong applies where the defendant's offense is intended to encourage, further or bring

about a federal crime of terrorism, even though the defendant's own crime of conviction or

relevant conduct may not include a crime of terrorism."  *Awan,* 607 F.3d at 314.  The Second

Circuit stated in *Awan* that the defendant need not be "personally motivated by a desire to

influence or affect the conduct of government."  *Id.* at 316.  It went on to explain, however, that

the defendant must still "inten[d] to promote a crime calculated to have such an effect, *i.e.,* that

his offenses were intended to promote a federal crime of terrorism as defined in § 2332b(g)(5)

whatever [the defendant's] reason for committing them."  *Id.*  In other words, although personal

motivation is not dispositive, the intent to encourage, further or bring about a crime of terrorism

remains essential.  And motive is, of course, relevant in determining intent.[1]

The jury in this case was not required to make a finding that Mr. Zazi intended to

encourage, further or bring about a federal crime of terrorism.  Nor does the PSR contain any

factual assertions related to the element of intent; it simply assumes that the terrorism

enhancement applies.  PSR at ¶¶ 28, 46.  This is insufficient.  The Fourth Circuit's decision in

*United States v. Chandia,* 395 Fed.Appx. 53 (4th Cir. 2010), is instructive.  Chandia was

convicted of three counts of providing material support to terrorists and a terrorist organization

based on evidence that he visited the office of a terrorist organization known as Lashkar-e-Taiba

(LET); picked up an LET official at Reagan National Airport; and helped the official to deliver

paintballs and other goods to a shipping company in Virginia, where Chandia then paid to have

the materials mailed to Pakistan.  *See Chandia,* 395 Fed.Appx. at 55.  The PSR "stated that the

---

[1] Motive is also relevant in evaluating the nature and circumstances of the offense under 18 U.S.C. § 3553.

terrorism enhancement applied but gave no explanation for the conclusion" and did not contain any factual assertions related to the element of intent. *Id.* at 58. The Fourth Circuit noted that the absence of information in the PSR triggered the district court's fact-finding duty and then held that the district court had failed to find sufficient facts and instead had mistakenly equated knowledge with intent. *See id.* at 60 ("The court concluded that Chandia 'clearly knew' that LET had terrorist purposes and that he was 'clearly involved in assisting' LET. But Chandia's knowledge of LET's purposes was part of his conviction and that does not automatically yield an inference of the specific intent required for the enhancement to apply"). The Court vacated Chandia's sentence and remanded for resentencing, directing the district court to indicate the specific facts it was relying on in determining Chandia's intent. *See id.*

As in *Chandia*, absent sufficient allegations of intent in the PSR, this Court's fact-finding duty is triggered. And the facts that gave rise to Mr. Zazi's conviction do not establish his intent to encourage, further or bring about a crime of terrorism. There was no evidence at trial that Mr. Zazi assisted Najibullah in carrying out his plot. Nor was Mr. Zazi even privy to his son's plans. In July 2009, when Naqib discovered the chemicals and other materials Najibullah had stored in his garage, Mr. Zazi was still living in New York. (Tr. 715, L. 11-19). Naqib confronted Najibullah, but he did not call the police, and he mentioned nothing to Mr. Zazi. (Tr. 734, L. 2-6).

Even after the FBI began investigating Najibullah, Mr. Zazi acquired only the most basic understanding of the nature of that investigation and of the specific allegations against his son. This is because Najibullah intentionally shielded his father from the truth. Mr. Zazi's telephone conversations with Najibullah on September 11, 2009, speak volumes. These conversations, which were both introduced by the government at trial, took place while Najibullah was still in

13

New York, shortly after Mr. Zazi learned about the FBI's interest in his son from Afzal Wais

Afzali:

> Mr. Zazi:  We don't know what's going on—he [Wais] is saying those people came by with pictures of your son, understand?  Of four people:  Amanullah's, yours, Zahrein's, of his-what do you call it—they presented a picture of someone else, he said they brought pictures of these four people asking what kind of people are they, what do they do, does he have any contact with them, what has happened—so with Wais—
>
> Najibullah:  Okay.
>
> Mr. Zazi:  Yeah, and before you thing—whether you're going to Wais, or going over there, get a lawyer—what's going on anyway?  What did you all do?
>
> Najibullah:  We haven't done anything.
>
> Mr. Zazi:  So you haven't done anything, go to the lawyer—go to Wais, understand he'll tell you.  (Govt. Ex. 71-T).
>
> ***
>
> Mr. Zazi:  You're in New York?
>
> Najibullah:  Yeah…
>
> Mr. Zazi:  Should I come there?
>
> Najibullah:  No, Haji Sahib…
>
> Mr. Zazi:  Okay…
>
> Najibullah:  Yeah…we're just going about our work…what do they call it-with our life. There is nothing going on…
>
> Mr. Zazi:  There is something going on, son—
>
> Najibullah:  No, there isn't, Haji Sahib!  There is nothing going on.
>
> Mr. Zazi:  Yeah?
>
> Najibullah:  Yeah.  (Govt. Ex. 72-T).

In short, even as Najibullah's plans began to unravel on September 11, 2009, he kept his father in

the dark.

Mr. Zazi's participation in the conspiracy to destroy evidence and his lies to the FBI all took place the following week, *after* Najibullah had already abandoned his plan and returned to Colorado.  PSR at ¶ 14.  During the course of that week, Najibullah's suspected offenses were widely reported in the press, and Najibullah himself began a series of private admissions to prosecutors that ultimately led to his cooperation.  But Mr. Zazi refused to acknowledge that his son had done anything wrong.  To this day, he still struggles to accept his son's involvement in the bombing plot.  It is impossible for Mr. Zazi to have intended to encourage, further, or bring about an act of terrorism that had already been aborted.  It is also impossible for him to have intended to promote a crime of terrorism that he refused to believe Najibullah ever planned to commit.

Motive and intent may be differentiated in some cases.  *See, e.g., United States v. Weslin,* 156 F.3d 292, 298 (2d Cir. 1998) (reluctantly distinguishing the defendants' self-proclaimed motive in blocking a Planned Parenthood clinic—to "save the lives of unborn children"—from the intent required to obstruct the provision of reproductive health services).  Here, however, Mr. Zazi's motive and intent were identical: he sought to shield Najibullah and Ahmed Wais Afzali from criminal accusations he believed were unwarranted.

Nor were Mr. Zazi's lies about Amanullah intended to promote a crime of terrorism.  As the Court has already recognized, Mr. Zazi described Amanullah as his adopted son in order to conceal his prior misstatements to immigration authorities.  His intent was to avoid criminal charges himself and to ensure Amanullah's continued residency in this country.  The government failed to establish at trial that Mr. Zazi even knew Amanullah was a suspect of the government's investigation.  Absent such knowledge, there is no evidence that Mr. Zazi's lies were intended to promote a crime of terrorism.

Since Mr. Zazi's offenses did not involve, nor were they intended to promote, a crime of terrorism, Guideline 3A1.4 does not apply.

B. *Mr. Zazi did not actually obstruct a terrorism investigation*

Application Note 2 to Guideline 3A1.4 provides in relevant part that, "[f]or purposes of this guideline, an offense that involved … obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism." U.S.S.G. §3A1.4, comment (n.2). Application Note 2 is not cited in the PSR, but it is relevant in determining whether the enhancement applies.

Despite the expansive language of Application Note 2, the government has only relied on it in a handful of obstruction cases, *see, e.g., U.S. v. Benkahla,* 501 F. Supp. 2d 748 (E.D. Va Aug. 3, 2007), *aff'd U.S. v. Benkahla,* 530 F.3d 300 (4th Cir. 2008); *U.S. v. Biheiri,* 356 F.Supp.2d 589 (E.D.Va. Feb. 9, 2005); *U.S. v. Arnaout,* 282 F.Supp.2d 838 (N.D.Ill July 17, 2003), *rev'd on other grounds,* 431 F.3d 994 (7th Cir. 2005), and we know of only two courts that have invoked Application Note 2 to trigger the terrorism enhancement. *See U.S. v. Ashqar,* 582 F.3d 819 (7th Cir. 2009); *Benkahla,* 530 F.3d 313.

The Guidelines do not provide any examples of obstructive conduct within the meaning of Application Note 2. But unlike the other obstruction-of-justice provisions in the Guidelines and the U.S. Code, the plain language of Application Note 2 makes no mention of the crimes of conspiracy or attempt to obstruct. *Compare* U.S.S.G. § 3C1.1 (providing a two-level enhancement for any defendant who "willfully obstructed or impeded, or attempted to obstruct or impeded, the administration of justice…"); 18 U.S.C. § 1503. It refers only to "obstructing an investigation." Thus, Courts have held that, in order to apply the terrorism enhancement pursuant to Application Note 2, "actual obstruction is required." *Biheiri,* 356 F. Supp. 2d at 598. *See also Benkahla*, 501 F. Supp. 2d at 756 (actual obstruction is required). Accordingly, the

16

Court's reliance on Application Note 2 would require a factual determination that Mr. Zazi *actually* obstructed the FBI's investigation, not just that he *attempted* or *conspired* to obstruct it.

Moreover, reference to the examples provided in Guideline 3C1.1 (Obstruction enhancement) suggests that the obstruction must have been significant. Where false statements to law enforcement are concerned, § 3C1.1 permits an enhancement only where those statements are "material" and they "significantly obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1, comment (n.4(G)). Similarly, the destruction of evidence warrants an enhancement only when the evidence "is material to an official investigation or proceeding." *Id.*, comment (n.4(D)).

*U.S. v. Benkahla*, 530 F.3d 300 (4th Cir. 2008), illustrates this point. There, the defendant attended a jihadist training camp abroad, was acquainted with a network of people involved in violent jihad and terrorism, and lied about both. The Fourth Circuit affirmed the trial court's finding of actual obstruction because "Benkahla's falsehoods not only delayed some parts of the investigation, but wholly frustrated others." *Benkahla,* 530 F.3d at 313. When Benkahla was questioned, "the Government did not know the details about Lashkar-e-Taiba training camps, training techniques, curriculum, and locations. Additionally, because of Defendant's false or intentionally misleading answers, the Government still does not know the identity or whereabouts of the persons about whom the Defendant was questioned, their involvement with Laskar-e-Taiba, and their role in aiding persons to obtain jihad training." *Benkahla*, 501 F. Supp. 2d at 757.

Here, the jury was not required to make a finding of actual obstruction, and the PSR is devoid of any factual assertions in support of one. In contrast to *Benkahla,* when Mr. Zazi was questioned about his relationship with Ahmed Wais Afzali, agents already knew the correct

17

answers to their questions because they had listened to Mr. Zazi's calls with the imam. (Tr. 604, L. 16-21). *Cf. Biheri,* 356 F. Supp. 2d at 598 (declining to apply the enhancement because the agents who interviewed the defendant already knew about the defendant's financial relationship with Marzook and, thus, any reliance on his false statement was unreasonable). Moreover, whether or not agents knew the truth about Mr. Zazi's relationship with Amanullah, Amanullah's status as nephew or adopted son was immaterial in assessing his involvement in terrorist activity.

Even if the Court makes a finding of actual obstruction, the obstruction was not significant. By mid-September 2009, when Mr. Zazi became involved in the case, the government's investigation was long underway. The FBI already knew about Najibullah's trip to Pakistan with his co-conspirators in September 2008 and about the military training he had received there. They had intercepted email messages in early September 2009, linking Najibullah to potential terrorist activity. (Tr. 264, L. 5-10). On September 7, 2009, they had put Najibullah under physical surveillance. (Tr. 271, L. 18-21). On September 9, 2009, they had followed him to New York, (Tr. 275, L. 12-14), where they subsequently observed him with his co-conspirators, searched his laptop and uncovered the bomb-making notes, and searched the homes of his co-conspirators and others in Queens, New York. Najibullah began making admissions even before his arrest on September 19, 2009, and in February 2010, he pled guilty pursuant to a cooperation agreement. Shortly thereafter, his co-defendant Zahrein Ahmedzay also pled guilty pursuant to a cooperation agreement. Their assistance has led to the investigation and arrest of other suspects. The government also intends to rely on both men to testify in an upcoming trial again Adis Medunjanin. The press has repeatedly hailed the prosecution of Najibullah Zazi as an enormous success for the government, and the government itself has touted the case in defense of the civilian criminal justice system. *See, e.g.,* A.G.

Sulzberger and William K. Rashbaum, "Guilty Plea Made in Plot to Bomb New York Subway,"
N.Y. Times, February 22, 2010.

In short, Mr. Zazi's conduct did not significantly impede the government's investigation,
and Application Note 2 does not apply.

C.  *Use of the terrorism enhancement where the base offense level derives from § 2M6.1
    constitutes impermissible double counting*

Pursuant to Guideline 2J1.2 (Obstruction of Justice), the base offense level for an
obstruction offense is 14. Where, however, the offense involves obstructing the investigation or
prosecution of a criminal offense, Guideline 2J1.2 cross references Guideline 2X3.1 (Accessory
After the Fact). Guideline 2X3.1 adopts the base offense level for the "underlying offense"—
meaning "the offense as to which the defendant is convicted of being an accessory," U.S.S.G. §
2X3.1, comment (note 1)—and subtracts six levels. According to the Probation Department, the
underlying offense is Najibullah's subway plot. Since Najibullah conspired to use weapons of
mass destruction to "injure the United States or to aid a foreign terrorist organization," his base
offense level is 42. *See* U.S.S.G. § 2M6.1. Subtracting six levels, Mr. Zazi's base offense level
is 36. However, since Guideline 2X3.1 caps the base offense level at 30, Mr. Zazi's level is
reduced another six levels to 30.

In short, the cross reference to Najibullah's crimes increases Mr. Zazi's level more than
two-fold from 14 to 30. This is despite that Mr. Zazi was never charged with acting as
Najibullah's accessory after the fact. Indeed, as stated above, he was not even privy to his son's
plans prior to the initiation of the FBI investigation and, even after the investigation commenced,
he developed only the most rudimentary understanding of its nature and scope and refused to
believe the government's accusations against his son.

The Probation Department then applies the terrorism enhancement, which brings Mr. Zazi to base offense level 42, the same level applicable to Najibullah, whose offenses were indisputably more serious.  Though technically applicable, Guideline 2M6.1 already overstates Mr. Zazi's involvement in the offense.  The addition of the terrorism enhancement constitutes impermissible double counting.

"Impermissible double counting occurs when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines."  *U.S. v. Volpe,* 224 F.3d 72, 76 (2d Cir. 2000) (quoting *U.S. v. Napoli,* 179 F.3d 1, 12 n.9 (2d Cir. 1999)) (internal quotation marks omitted).  Multiple adjustments are properly imposed only when they "aim at different harms."  *Id.*  In *U.S. v. Hudson,* 972 F.2d 504 (2d Cir. 1992), the defendant drove his car toward two U.S. Marshals while trying to escape from them.  The district court found that Hudson's car was a dangerous weapon and applied the base offense level for aggravated assault.  *See Hudson,* 972 F.2d at 505; U.S.S.G. § 2A2.2(a).  It also imposed a four-point adjustment for use of a dangerous weapon. *See Hudson,* 972 F.2d at 505-6; U.S.S.G. § 2A2.2(b)(2).  The Second Circuit vacated Hudson's sentence on the ground that both increases "necessarily reflected the same facet of Hudson's conduct."  *U.S. v. Rappaport*, 999 F.2d 57, 61 (2d Cir. 1993).  The Court explained:  "This two-fold upward adjustment for the use of a weapon constitutes impermissible double counting." *Hudson,* 972 F.2d at 507.  *See also United States v. Tutty,* 612 F.3d 128, 132 (2d Cir. 2010) (two-point computer enhancement in child pornography cases "has the flavor of impermissible 'double counting' because it effectively 'increases a defendant's sentence to reflect the kind of harm already accounted for' by the base offense level"); *U.S. v. Concepcion,* 983 F.2d 369, 390 (2d Cir. 1993) (rejecting weapons enhancement in narcotics and weapons case because "an

increment for possessing weapons is tantamount to adding an increase on the basis that the
defendant possessed weapons in the course of possessing weapons"); *U.S. v. C.R.,* 792 F. Supp.
2d 343, 512 (E.D.N.Y. May 16, 2011) (rejecting the two-point computer enhancement because
"[v]irtually all child pornography crimes involve the use of a computer").

As in *Hudson*, the applicable base offense level and the proposed enhancement both
reflect the "same facet" of Mr. Zazi's conduct, i.e. that he conspired to obstruct a *terrorism*
investigation as opposed to a run-of-the-mill criminal investigation.  The link to terrorism is
already reflected in the use of Guideline 2M6.1, which increases the base offense level from 28
to 42 where the underlying offense involved an intent to "injure the United States or to aid a
foreign terrorist organization."  The addition of the terrorism enhancement double counts the
same harm.

Guideline 2J1.2 (Obstruction of Justice) anticipates and prohibits this sort of double
counting in obstruction cases where it is applied.  Guideline 2J1.2(b)(1)(C) requires a twelve-
level increase for convictions under 18 USC § 1001 or § 1505 where "the matter relates to
international terrorism or domestic terrorism."  But Application Note 2(B) precludes the twelve-
level increase in all cases where the terrorism enhancement applies.  U.S.S.G. § 2J1.2, comment
(note 2(B)) ("If § 3A1.4 (Terrorism) applies, do not apply subsection (b)(1)(c)").  The same logic
should be exercised in connection with Guideline 2M6.1, and it provides the Court with yet
another ground for rejecting the application of Guideline 3A1.4.  *But see United States v.
Cromitie,* No. 09 Cr. 558, 2011 WL 2693293, at *5 (S.D.N.Y. June 29, 2010) (no double
counting where the terrorism enhancement is applied to an offense calculated under § 2M6.1
"because terrorist acts are not always intended to injure the United States or to aid a foreign

terrorist organization, and plots to injure the United States or aid a foreign terrorist organization do not always involve acts of terror.").

## V.

## CRIMINAL HISTORY CATEGORY VI SUBSTANTIALLY OVERREPRESENTS MR. ZAZI'S CRIMINAL HISTORY

Mr. Zazi was convicted of two obstruction offenses, and he has pled guilty to the additional crime of visa fraud.  He has no prior convictions or arrests on his record and has never served time in prison before.  PSR at ¶ 67.  Nevertheless, should the Court decide to apply the terrorism enhancement, he will be placed in Criminal History Category VI, the highest criminal history category.

Guideline 4A1.3 permits horizontal downward departures under the Guidelines where "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  U.S.S.G. § 4A1.3(b)(1).  Nothing in the text of Guideline 4A1.3 restricts its application in cases where the terrorism enhancement is applied.  And the Second Circuit recognizes a court's discretion to grant a horizontal departure following application of Guideline 3A1.4.  *See U.S. v. Meskini,* 319 F.3d 88, 92 (2d Cir. 2003) ("[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of defendant's past criminal conduct or the likelihood that defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing.").  *See also U.S. v. Preacely*, 628 F.3d 72, 81 (2d Cir. 2010).

A horizontal departure to Criminal History Category I is warranted here.  Criminal History Category VI is typically reserved for terrorists and career offenders.  *See* U.S.S.G. § 4A1.3 (terrorism enhancement); § 4B1.1 (career offender guideline).  Even armed career criminals and repeat and dangerous sex offenders are not automatically placed in Criminal

History Category VI.  *See* U.S.S.G. § 4B1.4 (armed career criminals are category IV at minimum); § 4B1.5 (repeat and dangerous sex offenders are category V at minimum).  Since Mr. Zazi is not terrorist, and he has no prior criminal record, Criminal History Category VI necessarily over-represents his criminal history.

It also substantially over-represents his chance of recidivism.  Mr. Zazi has worked his entire adult life to provide for and protect his family and to give his children the educational and professional opportunities he never had.  Since he was released on bail more than two years ago, he has complied with all of the conditions of his release and has not had any problems with the law.  PSR at ¶ 81.  The circumstances of this case were tragic, but they were also unique, and Mr. Zazi is unlikely to be faced with similar choices again.  His family remains his primary concern, and he is fully aware that any additional criminal conduct may jeopardize his relationship with them as well as their ability to remain in this country.

A 2004 study by the United States Sentencing Commission found that "recidivism rates decline consistently as age increases [and] generally, the younger the offender, the more likely the offender recidivates."  USSC, Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines at 13 (May 2004).  The study shows that "among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent."  *Id.* at Exhibit 9.

Based on these markedly reduced recidivism rates, courts in the Second Circuit have repeatedly imposed non-Guideline sentences for defendants over forty.  *See, e.g., United States v. Collins,* No. 05 Cr. 1193-02, 2007 WL 1723718, at *6 (S.D.N.Y. June 7, 2007) (acknowledging defendant's advanced age for 54 year old defendant); *United States v. Ruiz,* No. 04 Cr. 1146, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (declining to impose a

Guideline sentence based on age); *Simon v. United States,* 361 F.Supp.2d 35, 49 (E.D.N.Y.

March 17, 2005) (imposing a non-Guidelines sentence based in part on the defendant's age);

*United States v. Carmona-Rodriguez,* No. 04 Cr. 667, 2005 WL 840464, at *4 (S.D.N.Y. April

11, 2005) (imposing a non-Guidelines sentence on 55-year-old defendant). Indeed, the

Guidelines themselves now recognize that a defendant's age may be relevant "if considerations

based on age, individually or in combination with other offender characteristics, are present to an

unusual degree and distinguish the case from the typical cases covered by the guidelines."

U.S.S.G. § 5H1.1.

Given Mr. Zazi's age and his history of hard work and commitment to family, his chance

of recidivism is low. Thus, even if the terrorism enhancement is applied to increase his offense

level, he belongs in Criminal History Category I.

## VI.

## THE COURT SHOULD IMPOSE A SENTENCE OF PROBATION

Section 3553(a) of title 18 provides that "[t]he court shall in every case impose a sentence

sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of

this subsection." 18 U.S.C. § 3553(a). This duty, known as the "parsimony clause," applies at

every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the

offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence

imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct;

[and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

As Your Honor is well aware, this Court has full authority to consider *any* evidence in deciding whether the Guidelines "properly [ ] reflect § 3553(a) considerations." *Rita v. United States,* 551 U.S. 338, 351 (2007).  Sentencing courts "may not [simply] presume that the Guidelines range is reasonable." *Gall v. United States,* 128 S.Ct. 586, 596-97 (2007).  Rather, they are directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 597.

Although Mr. Zazi was offered a plea agreement that probably would have resulted in a non-incarceratory sentence, he wanted a trial, and now he accepts the jury's verdict.  He understands the seriousness of his crimes and acknowledges that some punishment is warranted.  There are several reasons, however, why we believe he merits a sentence of probation.  First, Mr. Zazi's personal history and characteristics are exceptional.  His lengthy track record of generosity and kindness to others is well-documented, *see supra* Section II, and falls "outside the heartland" by any measure, whether in comparison to other criminal defendants or to American citizens as a whole.  Mr. Zazi has repeatedly sacrificed his own happiness and comfort for that of his family and has asked for little in return.

Second, since his chance of recidivism is low, *see supra* Section V, a severe sentence is not necessary either to rehabilitate or incapacitate Mr. Zazi.  In fact, the goal of rehabilitation would be better served by assigning Mr. Zazi a probation officer who can assist him in finding employment and returning to the work force.

Third, a probationary sentence is adequate punishment for Mr. Zazi's offense.  The collateral consequences of this case have been severe and have already had a punitive effect, both on Mr. Zazi and his family.  The Zazis have been vilified in the press for more than two years.  They were forced out of their apartment in September 2009, after being harassed by

journalists and receiving death threats from their neighbors.  *See* Ex. D (letter of Afzal Zazi).

When no one was willing to rent to them, they had to beg their relatives for shelter.  *See id.*  Mr.

Zazi's younger children, ███████████ were "terrified, confused, crying, and asking

questions such as what had they done wrong to deserve all this."  *Id.*  They were incessantly

teased in school.  PSR at ¶ 75.  Because the Zazi name has been tarnished, until several months

ago, no one in the family was able to find work.  Mr. Zazi is still unemployed, and he remains

dependent upon public assistance and the generosity of his brothers to pay his bills.  Moreover,

his family has been torn apart.  Several family members severed communication with Mr. Zazi

following his arrest, and two relatives, Amanullah and Naqib, testified against him at trial.  Per

the terms of his bond, Mr. Zazi is not permitted any contact with Najibullah.  He was not told

that Najibullah was cooperating with the government or that he intended to plead guilty until

after the guilty plea had already occurred.

Fourth, should Mr. Zazi serve any significant time in prison, his family will have no

means of support other than Tariq and will probably have to return to Afghanistan.  Mr. Zazi's

wife is a green-card holder and his two younger children, ███████████ are American

citizens.  However, his wife and elder daughter speak little English, they cannot drive, and

neither one has ever worked outside the home.  Mr. Zazi's wife and children are dependent on

him to drive them to school, the doctor and even to the grocery store.  While Mr. Zazi's extended

family members have provided some financial assistance, they cannot continue to do so

indefinitely.

Should Your Honor consider a sentence of probation, other forms of punishment such as

a lengthy term of home detention and community service may be imposed.  Mr. Zazi is a good

candidate for these forms of punishment.  Following his arrest, he served several months on

home detention without incident.  Moreover, he is an active member of his mosque and is eager to participate in the charitable activities of his mosque and in his community once again.

Thank you for your consideration.

/s/
_____
Deborah Colson
Justine Harris
(212) 257-6455

January 20, 2012
New York, N.Y.