

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

DMB:BWB
F.#2010R00172

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 7, 2012

**By Hand Delivery and ECF**

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:  United States v. Mohammed Wali Zazi
             Criminal Docket No. 10-60 (S-1)(JG)
             Criminal Docket No. 11-718 (JG)

Dear Judge Gleeson:

      The government respectfully submits this letter in connection with the defendant's sentencing, scheduled for February 10, 2012.  The defendant was convicted after trial of conspiracy to obstruct justice, in violation of 18 U.S.C § 1512(k), and obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1) ("the obstruction counts").  Following his conviction on the obstruction counts, the defendant also pleaded guilty to visa fraud, in violation of 18 U.S.C. § 1546(a) ("the visa fraud count").  The government submits that a significant term of incarceration is appropriate for the reasons set forth below.  Such a sentence will, among other things, constitute just punishment and reflect the serious nature of the defendant's offenses.

    I.       The Advisory Guidelines Range

      By statute, in sentencing a defendant, the Court "must consider the Guidelines," along with the other factors listed in 18 U.S.C. § 3553(a).  United States v. Crosby, 297 F.3d 103, 113 (2d Cir. 2005).  Generally, such consideration requires a determination of the applicable Guidelines range.  Id.  Even after the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Guidelines continue to play a critical role in sentencing.  "The guidelines cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors

and, with important exceptions, their calculations were based upon the actual sentences of many judges." United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (omitting internal quotations).

The government agrees with the Guidelines calculation set forth in the Presentence Investigation Report ("PSR"). For the two obstruction counts, the defendant's base offense level is 30. (PSR ¶ 44). The application of the 12-level terrorism enhancement pursuant to U.S.S.G. § 3A1.4(a) (the "terrorism enhancement") increases the offense level to 42 and provides a criminal history category of VI. (PSR ¶¶ 46 and 67). The corresponding advisory Guidelines range is a term of imprisonment of 360 months to life. (PSR ¶ 104). For the visa fraud count, the base offense level is 11 (PSR ¶ 50) and, after subtracting 3 levels per Guideline 2L2.2(b)(1), the adjusted offense level is 8. (PSR ¶ 55). A criminal history category of I would provide an advisory Guidelines range of imprisonment of 0-6 months.

The defendant objects to the application of the terrorism enhancement for the obstruction counts on several grounds. The defendant's objections lack merit and should be rejected.

A.  The PSR Correctly Assesses the Terrorism Enhancement

The defendant first argues that the terrorism enhancement should not be applied to him because his crimes did not "involve," nor were they intended to "promote" a federal crime of terrorism." U.S.S.G. § 3A1.4(a); see Def. Br. 10-16. As set forth below, because the defendant was convicted of obstructing an investigation of a federal crime of terrorism, the enhancement should apply.

1.  Legal Standard

Guideline 3A1.4 provides for a 12-level increase in the defendant's offense level (or a minimum offense level of 32) and a criminal history category of VI if the defendant's offense "involved" or was "intended to promote," a "federal crime of terrorism." U.S.S.G. § 3A1.4(a). A "federal crime of terrorism" is defined to include any of several dozen offenses listed in 18 U.S.C. § 2332b(g)(5)(B)(i)-(iv), when the offense "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

2

The Second Circuit has noted that by using the term "intended to promote," the terrorism enhancement casts a "broader net" than the statutory definition alone. United States v. Stewart, 590 F.3d 93, 137 (2d Cir. 2009). In order to satisfy the requirements of the terrorism enhancement, "[t]he criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help bring into being a crime listed in'" the statutory definition. Id. at 137-38 (alterations in original) (quoting United States v. Mandhai, 374 F.3d 1243, 1247 (11th Cir. 2004)). "The 'intended to promote' prong applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." United States v. Awan, 607 F.3d 306, 314 (2d Cir. 2010). Therefore, in order to satisfy that prong, "the defendant's offense need not itself be 'calculated' as described in Section 2332b(g)(5)(A)." Id.

The Second Circuit has clarified that by requiring that the underlying crime "be calculated to influence or affect . . . or to retaliate against government conduct," the statute does not require "proof of a defendant's particular motive." Id. at 317. "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." Id. By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." Id. (emphasis in original). The Circuit has noted, however, that the enhancement's "motivational requirement" cannot be imputed to a defendant on the basis of his co-conspirators' relevant conduct as defined in U.S.S.G. § 1B1.3(a). Stewart, 590 F.3d at 138.

For purposes of the terrorism enhancement, Application Note 2 states that "an offense that involved obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."

2. Application

The terrorism enhancement should apply to the defendant's Guidelines calculation on the obstruction counts. The defendant was convicted of conspiring to obstruct and obstructing the government's investigation into a terrorism plot

3

involving the defendant's son Najibullah Zazi ("Najibullah"), Adis Medunjanin, Zarein Ahmedzay and others ("the plot"). Application Notes 1 and 2 of Section 3A1.4 state that obstruction offenses trigger the terrorism enhancement so long as the obstructed investigation qualifies as an investigation into a "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5).  See United States v. Ashqar, 582 F.3d 819, 826 (7th Cir. 2009) ("so long as the sentencing court finds that the defendant intended to obstruct an investigation into a federal crime of terrorism . . . the court has found the intent required to apply § 3A1.4").  Here, there can be no dispute that the investigation fits the definition of a federal crime of terrorism as the grand jury was investigating violations of, inter alia, 18 U.S.C. §§ 2332a(a)(2) (the use of weapons of mass destruction), 956(a)(1) (conspiracy to murder, kidnap or maim persons abroad) and 2339B (providing material support to terrorist organizations), all of which are enumerated offenses under 18 U.S.C. § 2332b(g)(5).  Nor can there be any serious contention that the defendant misunderstood the nature of the government's investigation or that he did not intend to obstruct it.

Indeed, the evidence presented at trial indicates that even before his obstruction, the defendant had, at a minimum, a strong indication why the FBI might investigate Najibullah.  At trial, Amanullah Zazi ("Amanullah") testified that he told the defendant that he had arranged for Najibullah, Medunjanin and Ahmedzay to travel to Waziristan when they were in Pakistan together in late 2008.  (T. 320).  After learning that Najibullah had gone to Waziristan, a region widely known to be a safe haven for al-Qaeda (T. 509), the defendant directed Amanullah not to tell anyone else about what Najibullah had done.  (T. 320).  The defendant knew that information suggesting that Najibullah, Medunjanin and Ahmedzay had recently spent time in Waziristan was something to be concerned about and he knew the information should not be shared.

Moreover, at the time of the defendant's obstruction, he knew exactly what the FBI was investigating.  Following Najibullah's return to the United States, Zaheer Akbar told the defendant that Najibullah was trying to kill himself (T. 414, 665) and had left "chemicals" in Naqib Jaji's garage.  (T. 650-51).  Beyond what he learned from others, the defendant had personal knowledge about Najibullah's changing attitudes and behaviors.  The defendant and the rest of his family observed Najibullah becoming increasingly devout in his religious practices (T. 638, 644-45) and Najibullah had been openly watching jihadist videos and cooking odd substances in his family's home.  (T. 342-345).  Moreover, after the defendant

4

learned that the FBI had met with Ahmed Wais Afzali and shown him a photograph of Najibullah, the defendant quickly and emphatically told his son to get a lawyer, asking him "What did you all do?" (GX71).

In short, before the defendant or Najibullah ever met with agents from the FBI, the defendant had ample reason to know that the FBI's investigation involved terrorism. His meetings with the FBI and the receipt by his family members of subpoenas to testify before the Grand Jury only clarified the nature of the FBI's investigation and the heightened importance of candor.

The defendant argues that application of the terrorism enhancement requires "actual" as opposed to "attempted" obstruction of an investigation, see United States v. Biheiri, 356 F. Supp. 2d 589 (E.D. Va. 2005), and asserts that he did not "actually obstruct a terrorism investigation." (Def. Br. 16-17). The evidentiary record establishes otherwise.

The defendant's actual obstruction of the government's investigation was demonstrated repeatedly during trial. First, the defendant instructed his wife and nephew to destroy Najibullah's bomb-making materials, which they did. (T. 322). Moreover, the defendant successfully obstructed the grand jury investigation into the plot by directing his relatives to lie when they testified before the grand jury. (T. 328, 381-87, 681, 683-84). At trial, Amanullah testified that after he received a grand jury subpoena, the defendant instructed him to falsely testify that he had been adopted by the defendant when he was two years old. (T. 328). Naqib Jaji also testified that the defendant told him and other members of the Zazi family to testify that Amanullah had been adopted by the defendant when he was two years old. (T. 683). Jaji and Amanullah traveled to New York and repeated the lies to the grand jury, just as the defendant had instructed. (T. 381-87; 683-84; GX 63 and 65). Far from only "attempting" to obstruct justice, the defendant directed people to destroy evidence, which they did, and counseled family members to commit perjury, which they did. Moreover, the defendant himself lied to the FBI on multiple occasions. That the FBI was ultimately able to bring charges against certain individuals responsible for the underlying plot does not negate the defendant's successful obstruction.

The defendant also mistakenly claims that the terrorism enhancement should not apply to him because his obstruction was not "significant." (Def. Br. 18). Although Section 3A1.4 contains no such requirement, the defendant points to Section 3C1.1, the Guideline applicable to non-terrorism related

5

obstruction. (Def. Br. 17). Section 3C1.1 provides a non-exhaustive list of examples of the types of conduct to which the 2-level obstruction enhancement in 3C1.1 applies. As referenced by the defendant, the list includes "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1, Comment (n.4(G)). Not mentioned by the defendant are two additional categories of conduct on the list, including "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding" and "suborning or attempting to suborn perjury." U.S.S.G. § 3C1.1, Comment (n.4(B and D)).

Applying an "all's well that ends well" mentality to his obstruction, the defendant argues that because the government was ultimately able to disrupt the plot and bring criminal charges against the plotters, the defendant's obstruction was not significant. (Def. Br. 18-19). This "no harm no foul" principle is misplaced. At a minimum, earlier discovery and honest information regarding Najibullah's bomb-making capacity would have provided the FBI with more information, sooner, about the threat posed by the plot. Moreover, the defendant's lies to the FBI about the nature of his relationship with Amanullah and his direction to his family members to repeat those lies to the grand jury forced the FBI to expend significant resources trying to uncover the truth. As Agent Jergenson testified at trial, law enforcement was particularly interested in understanding the relationship between Amanullah and Najibullah because they knew the two had been in Pakistan at the same time. (T. 279-80, 291-92). Indeed, Amanullah actually helped facilitate Najibullah's and his co-conspirators' entry into a terrorist training camp, and the defendant's obstruction delayed Amanullah's arrest, plea, and ultimate cooperation with the investigation. The time and resources the FBI had to invest into unraveling the various lies about Amanullah's background could obviously have been better spent investigating the plot and the international terrorist connections behind it.

The defendant incorrectly asserts that because law enforcement was able to disrupt the plot before any terrorist attack occurred, it is impossible for him to have "intended to encourage, further, or bring about an act of terrorism that had already been aborted." (Def. Br. 15). Application Note 2 to Section 3A1.4 was passed in response to the Patriot Act of 2001 "to clarify that § 3A1.4 may apply in the case of offenses that occurred after the commission of the federal crime of terrorism." U.S. Sentencing Guidelines Manual app. C, amdt. 637 (2007).

6

In the light of the foregoing, there can be no serious question that the defendant "intended to promote," a federal crime of terrorism, as set forth in Section 3A1.4(a). The government has clearly established by a preponderance of the evidence that the plot by Najibullah, Medunjanin and Ahmedzay was intended to influence by means of intimidation and retaliate against the government of the United States of America. 18 U.S.C. § 2332b(g)(5)(A). The defendant's obstruction of law enforcement's investigation into this plot earns him the 12-level terrorism enhancement.

>    B.  Application of the Terrorism Enhancement Does Not
>        Result in Impermissible Double Counting

The defendant next argues that because his base offense level derives from Section 2M6.1,[1] the application of the terrorism enhancement constitutes impermissible double counting. (Def. Br. 19-22). The defendant is incorrect.

The law permits use of multiple guidelines adjustments based on the same underlying conduct, so long as the adjustments at issue "do not serve identical purposes, but rather address separate sentencing considerations." United States v. Volpe, 224 F.3d 72, 76 (2d Cir. 2000); see also United States v. Watkins, -- F.3d --, 2010WL232968 at *6 (2d Cir., January 26, 2012) ("when the challenged part of the Guidelines aim[s] at different harms emanating from the same conduct, there is no impermissible double counting."). The Second Circuit has held that the terrorism enhancement, which covers "acts of terrorism," addresses separate sentencing considerations from both the hate crime enhancement

---

[1] The Guideline applicable to the obstruction counts is Section 2X3.1 (accessory after the fact). See PSR ¶ 44. Sections 2X3.1(a)(1) and (3) provide that the defendant's base offense level should be "6 levels lower than the offense level for the underlying offense," but may not be higher than level 30. Because the defendant obstructed the investigation of a plot to detonate explosives within the New York City subway system, the offense level for the underlying offense is governed by Section 2M6.1 ("Unlawful Activity Involving . . . Weapons of Mass Destruction"). Section 2M6.1(a)(1) provides an offense level of 42 because the subway plot was committed with the intent "to injure the United States" or "to aid a foreign nation or foreign terrorist organization." Because the offense level pursuant to Section 2X3.1 can be no higher than 30, however, the defendant's effective base offense level is 30.

7

(U.S.S.G. § 3A1.1), which "covers the selection of victims based on their national origin" or religion, and the government victim enhancement (U.S.S.G. § 3A1.2(b)), which "deals with the selection of victims based on their status as government employees. In re Terrorist Bombings of U.S. Embassies in E. Aft., 152 F.3d 93, 153 (2d Cir. 2008) (finding that application of all three enhancements did not result in "'double counting,' much less impermissible double counting"). This was so because the enhancements did not cover the same ground - for example, as the Court reasoned, a terrorist act "need not necessarily target government victims or select its victims on the basis of national origin; nor do all offenses that target [such] victims . . . constitute acts of terrorism." Id. Directly on point is the district court's opinion in United States v. Cromitie, 2011 WL 2693293, *5 (S.D.N.Y. June 29, 2011), finding that application of the terrorism enhancement is not impermissible double counting when the base offense level is calculated using Section 2M6.1(a)(1) as "terrorist acts are not always intended to injure the United States or to aid a foreign terrorist organization, and plots to injure the United States or aid a foreign terrorist organization do not always involve acts of terror." As a result there, as here, there is no impermissible double counting.

Acknowledging that the terrorism enhancement is "technically applicable," the defendant nevertheless asserts that the "link to terrorism is already reflected in the use of Guideline 2M6.1," and that the terrorism enhancement should therefore not apply. (Def. Br. 19, 21). As Probation explains in its Addendum to the PSR, the base offense level in Section 2M6.1 and the terrorism enhancement apply to two separate facets of the defendant's conduct. (Addendum at 5). Section 2M6.1 applies because, for purposes of the Guidelines, the defendant's base offense level derives from the intent of Najibullah, Medunjanin and Ahmedzay to injure the United States and aid a foreign terrorist organization. Application Note 2 to Section 3A1.4 directs that, for purposes of the terrorism enhancement, the defendant is considered to have intended to influence the conduct of the United States or retaliate against government conduct. While the conduct underlying both enhancements may be the same, the intent underlying each is distinct. As such, both are properly applied to the defendant.

C. The PSR Properly Assigns Mr. Zazi a Criminal History Category of VI

The defendant argues that the terrorism enhancement's placement of him in Criminal History Category VI over-represents his criminal history and requests a horizontal departure to

8

Criminal History Category I. (Def. Br. 24). The government submits that such a departure is unnecessary. First, as the defendant concedes, even within the Guidelines scheme itself, the Court is not bound by the criminal history category imposed by the terrorism enhancement, but retains the authority to downwardly depart. See U.S.S.G. § 4A1.3 (authorizing departures based on inadequacy of criminal history). Moreover, as set forth above, the Guidelines constitute but a single factor in the Section 3553 analysis. After applying the Guidelines, the Court then must apply all of the other Section 3553(a) factors to determine the appropriate sentence for the defendant.

Moreover, based on the facts of this case, the defendant's complaint regarding the effects of the terrorism enhancement on his criminal history category is irrelevant. Even if Criminal History Category I were applied, the advisory Guidelines range would still be 360 months to life in prison given his offense level of 42.

D. The PSR Correctly Assesses the Sentencing Range under the Guidelines

Because the defendant's objections lack merit, the Court should adopt the Guidelines calculation set forth in the PSR. The Guidelines range "should serve as 'a benchmark or a point of reference or departure'" in determining the sentence. United States v. Fernandez, 443 F.3d 19, 28 (2d Cir. 2006) (quoting United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005)).

II. Application of Factors under 18 U.S.C. § 3553

The defendant seeks a dramatic departure from his applicable Guidelines range and requests a sentence of probation.[2] While the government is not seeking a sentence within the applicable Guidelines range, for the reasons set forth below, a significant term of incarceration will constitute just punishment for the defendant's serious criminal conduct.

---

[2] In his sentencing submissions, the defendant asserts that the government made him a plea offer that would likely have resulted in a non-incarceratory sentence. Those assertions are incorrect.

A. <u>The Nature and Circumstances of the Offense Weigh in Favor of a Significant Period of Incarceration</u>

As the evidence demonstrated at trial, in September 2009, FBI agents across the country were frantically trying to stop a terrorist attack aimed at New York City. They did not know the intended target of the attack and they had not yet identified all of the people involved. Members of the Joint Terrorism Task Force worked tirelessly to investigate every lead and identify every possible suspect. In the context of this investigation, the defendant repeatedly lied to agents and conspired to destroy critical evidence. The significance of the defendant's actions must not be minimized. It is hard to imagine a situation in which law enforcement expects more from our citizens than when they are investigating and trying to stop a terrorist attack. Despite his claim of being a "proud American" who "fervently believed in the American dream" and taught his children to be "the best that they can be" (Def. Br. 3, 7), the defendant nevertheless made the calculated choice to obstruct justice by lying and directing others to do the same.

Indeed the defendant had been deceiving the government since 1997, when he first filed an immigration petition on behalf of Amanullah Zazi, falsely claiming that Amanullah was his biological son instead of his nephew. Over the next decade, the defendant repeated this lie in numerous contexts. The defendant went so far as to submit a false affidavit in which a friend claimed to have actually been present at Amanullah's birth in order to confirm that the defendant was his biological father. All of this was known by the defendant to be untrue.

In sum, based on the extraordinarily serious nature of the defendant's obstruction and the defendant's pattern of lying to law enforcement, a significant term of incarceration is appropriate.

B. <u>History and Characteristics of the Defendant</u>

In support of his request for a sentencing departure, the defendant points to his generosity, selflessness and commitment to his family. (Def. Br. 3-8). The defendant offers numerous letters of support which confirm the same, and the government has no evidence to the contrary. Many of the factors he cites, such as his family relationships, friendships and employment history, are common to many defendants and "inherently suspect" as grounds for a lower sentence. <u>See</u> <u>United States v. Rattoballi</u>, 452 F.3d 127, 133 (2d Cir. 2006) ("[A] non-Guidelines sentence that rests primarily upon factors that are not unique or

10

personal to a particular defendant, but instead reflects attributes common to all defendants should therefore be viewed as inherently suspect.").

Moreover, most of the collateral consequences of conviction which the defendant predicts befall many defendants convicted of serious federal felonies. Indeed, defendants frequently suffer the loss of their livelihood and face financial hardship. While the government does not minimize the significance of the defendant's concerns about his future and that of his family, such concerns do not justify the overly lenient sentence the defendant seeks.

Similarly, the Court should be skeptical of the defendant's contention that his record of steady employment and his family and community ties suggest a diminished risk of recidivism. These same factors did not prevent him from committing visa fraud and they did not prevent him from obstructing a terrorism investigation. There is no reason to believe that they would prevent him from committing further offenses absent the deterrent effect of an appropriate sentence. Even assuming the defendant's risk of recidivism to be low, however, the import of this factor should be weighed against the similarly low odds that he will be in a position to obstruct justice in the future.

In sum, the defendant's history and characteristics favor a significant term of incarceration.

C. <u>A Significant Term of Incarceration will Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment</u>

There are few more serious crimes than the terrorist plot Najibullah, Medunjanin and Ahmedzay were planning. Law enforcement's investigation into and disruption of this plot was essential. The defendant's brazen lies and deception obstructed this critical investigation at a particularly sensitive time. Any sentence other than a substantial sentence of incarceration risks undermining respect for the law by suggesting that a defendant can evade serious punishment for obstructing a federal terrorism investigation and committing visa fraud for over a decade. Only a significant sentence of incarceration can reflect the seriousness of the offense.

The evidence at trial demonstrated beyond a reasonable doubt the defendant's guilt. Yet, in his sentencing submission, the defendant still refuses to accept responsibility for his

actions. In discussing his lies to the FBI, the defendant weakly asserts that "most of [his] responses to the agents' questions were truthful" (Def. Br. 9), an empty argument given the innocuous nature of the topics on which he chose to answer questions truthfully. The defendant further claims that his motive for the obstruction was to "shield Najibullah and the Imam [Ahmad Wais Afzali] from criminal accusations he believed were unwarranted." (Def. Br. 15). This noble description of his motive prompts the question of why it was necessary to lie, destroy evidence and encourage others to lie in order to vindicate those he believed had been wrongly accused. Finally, the defendant continues to shift blame for the offenses, noting that it was Zaheer Akbar's idea to destroy the materials. (Def. Br. 8). Just as the jury rejected the defendant's excuses at trial, the Court should reject them at sentencing. A significant period of incarceration would constitute the only just punishment for the defendant's offenses.

    D.    <u>The Deterrence Factor Weighs in Favor of a Significant Period of Incarceration</u>

Finally, a significant term of incarceration is necessary to adequately deter future violations. As the Supreme Court has recognized, "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms." <u>Gall v. United States</u>, 552 U.S. 38, 48 (2007). Anything less than a significant term of incarceration would not adequately deter the defendant or other similarly situated individuals from committing similar crimes in the future. As a result, the deterrence factor also supports a significant term of incarceration.

In the final analysis, what the defendant fails to recognize and acknowledge is the seriousness of his criminal conduct and the severity of the potential consequences of his and his co-conspirator's scheme. While the government does not disagree that the circumstances of this case were "tragic" (Def. Br. 23), the fact remains that at all times, the defendant had a choice not to speak to law enforcement and not to assist them in their investigation. Voluntary cooperation is not what the law requires even for a purportedly "proud American" citizen. But the defendant chose not just to speak, but to lie. He must now accept the consequences of his actions.

III.     Conclusion

        For the reasons stated herein, the government respectfully submits that the Court should adopt the Probation Department's calculation of the applicable Guidelines range. The Court should also conclude that the section 3553(a) factors warrant imposing a significant incarceratory sentence.

        Respectfully submitted,

        LORETTA E. LYNCH
        United States Attorney

By:     /s/
        Berit W. Berger
        Melissa B. Marrus
        Assistant U.S. Attorneys
        (718) 254-6134/6790

        Courtney A. Sullivan
        Trial Attorney
        Counterterrorism Section
        U.S. Department of Justice
        (202) 353-3121

cc:     Clerk of the Court (JG) (via ECF)
        Defense counsel (via ECF and email)
        Probation Officer Michael Dorra (by hand)